UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **OLLEN G. COLBERT** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.  1:00-CV-00909-SJD-TSH** |
| | ) | |
| **CINCINNATI GAS & ELECTRIC and** | ) | **JUDGE:  J. Dlott** |
| **INTERNATIONAL BROTHERHOOD** | ) | **Magistrate Judge Hogan** |
| **OF ELECTRICAL WORKERS,** | ) | |
| **LOCAL 1347** | ) | **DEFENDANT'S BRIEF IN SUPPORT OF** |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| **Defendants.** | ) | |

## I.     INTRODUCTION

Plaintiff, Ollen G. Colbert, formerly employed by The Cincinnati Gas & Electric

Company ("CG&E"), filed an action on October 30, 2000 against CG&E and the International

Brotherhood of Electrical Workers, Local 1347 ("Local 1347") alleging race discrimination,

racial harassment, and retaliation in violation of federal and state law.  On May 2, 2003, plaintiff

amended his complaint to add a § 301 claim (29 U.S.C. § 185) against the union but failed to

allege anything as against CG&E.

Colbert's claims against CG&E fail because 1) claims based on disciplinary actions

and/or a demotion  predating 1999 are barred by his failure to file suit within 90 days of receipt

of right to sue notices; 2) Colbert has no direct evidence of disparate treatment and cannot make

a prima facie showing of race discrimination; 3) there is no evidence of racial harassment;  4)

Colbert cannot make a prima facie showing of retaliation and 5) he failed to allege any violation

of the CBA by CG&E, is collaterally estopped from arguing that his discipline or his termination

violated the CBA, and there is no evidence of such a violation in any event.

## II.      STATEMENT OF UNDISPUTED MATERIAL FACTS

### III. Prior Lawsuit, Order and Testimony.

Colbert sued CG&E in 1995, claiming that discipline he received from 1990 to 1995 violated § 301 of the NLRA. He lost that suit when this Court entered an order granting summary judgment to both CG&E and the union on all claims on February 9, 1999. (Deposition of Ollen Colbert, November 11, 2004, Dep. Ex. 2).

In his earlier suit, Colbert provided deposition testimony that is background to this suit and which Colbert testified here, accurately reflects the state of affairs up through the time of that deposition, October 30, 1997. (Colbert, 11-11-04, p. 43) Colbert agreed to incorporate that testimony by reference in this suit, (Colbert, 11-11-04, p. 43, Dep. Ex. 5).

Colbert's prior testimony is that he began working for CG&E as a groundman on April 2, 1990. (Colbert 11-11-04, Ex. 5 [at Colbert, 10-14-97, p. 10]). From inception to conclusion of his employment, Colbert was a member of Local 1347. (Colbert 11-11-04, Ex. 5 [at Colbert 10-14-97, p.10]). Eventually, Colbert was assigned to the Lineman Improvement Program to receive training to become a lineman. (Colbert 11-11-04, Ex. 5 [at Colbert 10-14-97, p. 25]). Any employee who failed to satisfactorily complete the program was subject to discharge. (Colbert 11-11-04, Ex. 5 [at Colbert 10-14-97]). While in the program, Colbert was informed that his performance was inadequate, but he was not terminated and instead, permitted to resign from the program and demoted to construction helper. (Colbert 11-11-04, Ex. 5 [at Colbert 10-14-97, pp. 42, 104, and 107]). Later, in August 1993, Colbert was promoted to Groundperson Driver A. In March 1995, he was involved in an accident that caused damage to a transformer. (Colbert 11-11-04, Ex. 5 [at Colbert 10-14-97, pp. 120-21, 191, 194-95]). This, coupled with the thirteen incidents of discipline, caused Colbert to be demoted back to construction helper. (Colbert 11-11-04, Ex. 5 [at Colbert 10-14-97, Exhibits 12 and 16]). The union grieved this

demotion but withdrew the grievance when CG&E agreed to consider Colbert for future promotion *if* his performance improved. (Colbert 11-11-04, Ex. 5 [at Colbert 10-14-97, Ex. 12 B, C and D]).  After March 1995, Colbert received additional discipline (Colbert 11-11-04, Ex. 5 [at Colbert 10-30-97, p. 294, Ex. 56; p. 309 Ex. 58; p. 322, Ex. 65; pp. 335-336, Ex. 73 and 74]) for such things as failing to do his job, leaving the work site without permission and bringing firearms to work.  In his 1997 deposition, Colbert was asked whether he knew of any other employees who had either more disciplines or more accidents than he; he answered no. (Colbert 11-11-04, Ex. 5 [at Colbert, 10-30-97 p. 354.])

In its Order granting summary judgment, this Court held that under the CBA in effect from 1994 to 1997, CG&E retained the right to discipline, demote and promote its employees (Colbert 11-11-04, Dep. Ex. 2, p. 2-3) and it could consider prior disciplinary records in making disciplinary decisions. (*Id.* at 6).  This Court held that there was no evidence that CG&E violated the CBA either in disciplining or demoting Colbert (*Id*. at p. 7) and judgment was entered against Colbert on his § 301 claim.

## B.    Colbert's EEO Charges.

During his employment with CG&E, Colbert filed five separate EEO charges but, with the exception of the last charge, did not file suit on any of them.  On August 9, 1996, Colbert filed a charge claiming that discipline he received through May 30, 1996, was discriminatory. (Colbert 11-11-04, Dep. Ex. 6).  He received a Right to Sue Notice on May 29, 1997 (Colbert 11-11-04, Dep. Ex. 7) but never filed suit. (Colbert 11-11-04, p. 50).  On May 20, 1997, Colbert filed a second charge contesting discipline he received in 1997 and claiming retaliation. (Colbert 11-11-04, Dep. Ex. 8). He received a Right to Sue Notice on that charge on January 29, 1998 (Colbert 11-11-04, Dep. Ex. 9) and again, did not sue. (Colbert 11-11-04 p. 51).  On January 6, 1998, Colbert filed yet another charge, based on additional disciplines he received, alleging both

discrimination and retaliation. (Colbert 11-11-04, Dep. Ex. 10).  He received a Right to Sue

Notice on that charge on February 5, 1999 (Colbert 11-11-04, Dep. Ex. 11) and declined to sue.

(Colbert 11-11-04, p. 53).  Colbert's fourth charge, filed on July 23, 1999, claimed he was

unfairly denied an upgrade to driver. (Colbert 11-11-04, Dep. Ex. 12).  Colbert did not sue on

this charge in spite that he received a Right to Sue Notice on November 2, 1999. (Colbert 11-11-

04, Dep. Ex. 13, p. 54).  Colbert's last charge was filed on or about March 31, 2000 and

concerned itself with his discharge on March 8, 2000 and discipline he received from about June

18, 1999 to March 8, 2000. (Colbert 11-11-04, Dep. Ex. 14). It is this charge, and only this

charge, that can form the basis of any Title VII claim.

### III.    Colbert's Concessions.

In the depositions taken in this case, Colbert conceded that between this Court's entry of

summary judgment in February 1999, and his deposition on November 11, 2004, there have been

no changes to the CBA. (Colbert 11-11-04, p. 36).  More specifically, Colbert conceded that the

CBA in place between 1996 and 2001 incorporated the same management rights clause

contained in the prior CBA (Colbert 11-11-04, Dep. Ex. 3, p. 38) and that CG&E can consider

prior disciplinary history in making disciplinary decisions. (Colbert 11-11-04, p. 76).

Colbert also admitted  that he had earlier testified that CG&E could discipline him for

being tardy and that this remained true throughout his employment with CG&E. (Colbert 11-11-

04, p. 45).  Colbert testified that when he received discipline up through 1997, he was told that

further discipline could lead to discharge and that this remained true through the time of his

discharge. (Colbert 11-11-04, pp. 46 and 47)  Likewise, Colbert admitted that his failure to

adhere to safety requirements could lead to discipline, something that remained true throughout

his employment with CG&E. (Colbert 11-11-04, p. 47).  Just as he did in 1997, Colbert admitted

that he was unaware of other individuals' disciplinary or performance records (Colbert 11-11-04,

p. 48) and that he knew of no one with a disciplinary record or work history like his. (Colbert 11-11-04, p.79).

### III.    Colbert's Work History from June 1999 to March 8, 2000.

In the deposition taken in this case, Colbert testified that he first begin reporting to Donald Bricking in 1999 and continued to report to him until his termination. (Colbert 11-11-04, p. 64). Bricking confirms that he became the supervisor at the Brecon Heavy Equipment yard, where Colbert worked, in January 1999.[1] (Deposition of Donald Bricking, 12-10-04, p. 9, 10-11) Colbert testified that his four prior EEO charges had nothing to do with Bricking (Colbert 11-11-04, p. 64) and that he did not discuss them with Bricking. (Colbert 11-11-04 pp. 126-127).

Colbert reported directly to Bricking although, at times, Colbert was asked to work through a lead union person who, more usually than not, was African American. (Colbert 11-11-04, pp. 66, 72; Bricking p. 11). Bricking reported to Kenny Miller, Caucasian, against whom neither Colbert nor his co-workers made any complaints. (Colbert 11-11-04, pp. 67, 70).

In early 1999, Bricking counseled Colbert for blowing stickers off his truck with a power washer. (Colbert 11-11-04, p. 73). Colbert has no information that this counseling was based on race (Colbert 11-11-04, p. 74) or that if Bricking saw anyone else do the same thing, he failed to counsel them. (Colbert 11-11-04, p.73, Dep. Ex. 19). Colbert was next counseled for taking company property off-premises without permission, an offense that Colbert concedes not only can lead to discipline (Colbert 11-11-04, p. 76) but, was not be based on race. (*Id.*) Instead, Colbert complains that he received an oral warning because he was under the microscope and subject to closer scrutiny.[2] Colbert knows of no one who took company property off premises

---

[1] Bricking worked with Colbert in the early 1990's as part of the lineman training program. Colbert stated that he had no complaints about Bricking nor was he aware of anyone else having such complaints. (Colbert 11-11-04, pp. 65, 70).

[2] Even if true, there is no evidence that such scrutiny was based on anything other than Colbert's prior work performance.

and was not counseled. (Colbert 11-11-04, p. 78). Moreover, as he must, Colbert concedes that the incident was reported by Willie Wilson, an African-American and that if Bricking relied on Wilson's report, Bricking would not be basing his reliance on race. (Colbert 11-11-04, p. 83).

Likewise, when Colbert was formally disciplined for failing to stay with a pole truck in June 1999, the discipline was based on a report from the pole truck drive, Vince Rutledge, also African-American. Rutledge reported that Colbert failed to stay with him, one of *several* complaints Bricking received about Colbert, all from African-American drivers. (Bricking pp. 58-59, 83, 86, 149-150; Colbert 11-11-04, Dep. Ex. 21). Colbert claimed that the pole truck driver ran a red light and he was justified in leaving the truck (Colbert 11-11-04, p. 86-87) but concedes that Bricking's decision to rely on Rutledge's version of events rather than Colbert's denial, would not have been based on race. (Colbert 11-11-04, p. 85, 87). Moreover, he does not contest Bricking's testimony that the warning was based on more than one complaint from several drivers.

As he had in the past, Colbert refused or failed to do his job in several ways. On June 28, 1999, Colbert was warned when he not only failed to put his truck keys away and left them in his truck, but then came in the next day, sat in his truck, and refused to go in to get his keys to begin his work assignment. (Colbert 11-11-04, Dep. Ex. 28, p. 93,[3] Bricking pp. 64-65, 150-151). Again, the key was collected and reported as having been left in the truck by Willie Wilson, an African-American. (Colbert 11-11-04, p. 89) Colbert also testified that he knows of no white employees who left their key in the truck who did not receive counseling, a fact confirmed by Bricking. (Colbert 11-11-04, p. 92; Bricking p. 151) Nor could Colbert point to any employee who sat in their truck and waited for someone to bring them the key. (Colbert 11-11-04, p. 95).

---

[3]  Colbert's testimony on this incident is a classic example of his dissembling. Initially, Colbert denied that he sat in his truck waiting for someone to bring him the key until he was handed a document that he wrote in which he stated that he had done just that. (Colbert 11-11-04, p. 93-94, Dep. Ex. 23).

Next, Colbert and another African-American co-worker, Jeff Gregg, got into a tussle when Colbert refused to do his assignment. (Colbert 11-11-04, p. 97). Colbert claimed that Gregg threatened him with a metal bar but concedes that if Bricking took Gregg's word over his, that decision would not be based on race. (*Id.*; Bricking p. 81) Likewise, Leon Waters, another African-American, complained that Colbert literally laid down in the yard and refused to work. (Bricking p.160) which Colbert concedes would not be a complaint based on race. (Colbert 11-11-04, p. 98).

In July 1999, Bricking went looking for Colbert in the yard to find out what he was doing and found him in a storeroom, ostensibly "cooling off". Colbert was not on break, had just come back from lunch, and had not finished his task. (Bricking pp. 152-153). Colbert testified that the storeroom did not have air conditioning although his assigned truck did (Colbert 11-11-04, p. 99, Dep. Ex. 24; Bricking p. 69, 76) and he knows of no white employee, caught in similar circumstances, who was not disciplined. (Colbert 11-11-04, p. 100). For this incident, Colbert received another warning. (Colbert 11-11-04, Dep. Ex. 24).

In August 1999, Willie Wilson took Colbert to his assigned location and parked his truck for him because Colbert was having trouble parking in close quarters. Wilson told Colbert to call him if he needed help pulling the truck out. Wilson subsequently found Colbert in the yard garage, asking to have a dent repaired that had not been there that morning. Colbert denies the event, but concedes that if Bricking took Wilson's story into account along with the matching dent on the door in the area in which Colbert was working, his decision to discipline Colbert for failing to report the accident would not be based on race. (Colbert 11-11-04, p. 105)

On August 24, 1999, Colbert and three other African-Americans were permitted to go to the United Way tour. (Bricking pp. 87-88). The tour ended early, at approximately 10:30 in the morning and the others returned to work, something they simply knew to do since they were

being paid. (Bricking pp. 90, 155-56). Colbert did not return to work. (Colbert 11-11-04, pp. 107-108, 111).  He received a one-day suspension which he concedes cannot possibly be based on race given that the others returned to work, knew to do so, and were African-American. (Colbert 11-11-04, p.108, Dep. Ex. 26).

On or about October 15, 1999, Colbert got into a verbal altercation with Tom Sams, another African-American, in which he cussed at Sams in a loud and hostile manner in front of a witness. (Colbert 11-11-04, pp. 112-113; Bricking pp. 96, 100).  If, based on the report of Sams and another witness, Bricking decided to impose discipline as a result of this incident, Colbert concedes that this is not racial. (Colbert 11-11-04, p.113).  This event, coupled with on-going problems with tardiness as documented by Bricking, resulted in a three-day suspension meted out on October 25, 1999. (Colbert 11-11-04, p.115, Dep. Ex. 27; Bricking pp. 96, 103). Colbert understood his attendance was critical; as he put it, "All job's attendance is critical." (Colbert 11-11-04, p.119).

Colbert therefore, should not have been surprised when, in December 1999, he received a 5-day suspension for continued attendance problems, the first absence coming just 4 days after his October 25, 1999 suspension. (Colbert 11-11-04, p.119; Bricking p. 109). Colbert testified that nothing in that suspension is based on race (Colbert 11-11-04, p.120) and concedes that he was absent on the days in question. (Colbert 11-11-04 p.119).

On March 2, 2000, Colbert was scheduled to be at a grievance hearing at about 1:00 p.m. Because he was required to attend the meeting and would be paid for attending, he was also required to work the 1st half of that day (under the collective bargaining agreement, Colbert could not take a ½ day vacation). (Bricking p.146). Wilson, the lead person, gave him two choices, paint or cut poles. (Bricking pp. 126-127)  Colbert refused, claiming he did not want to get dirty.  He was told that he would be let go early so that he could clean up. He still refused,

and in front of his union representative, stated "suspend me." (Bricking pp. 128-131, 134)  He

was subsequently suspended and fired. (Colbert 11-11-04, pp. 121-124).

Colbert claims his termination was retaliation for his prior EEO charges, but testified that

Bricking did not even know about the first four charges. (Colbert 11-11-04, p.126).[4]  Bricking

testified that he was unaware of Colbert's prior work history other than in the general sense and

actually told him that as far as he was concerned, Colbert had the chance to wipe the slate clean.

(Bricking p. 53).  Colbert had no information that Bricking was out to "get him" because of prior

complaints. His only support for his retaliation claim is his view that management is "tight-

niched" and could seal his fate with one telephone call, which he concedes is also true for white

employees. (Colbert 11-11-04, p.128).

In his deposition, Don Bricking testified that he followed a company practice of moving

through disciplinary steps as needed, from oral to written warnings, to one-, three- and five-day

suspensions to termination. (Bricking p. 30).  Bricking also testified that beyond the oral warning

stage, he sought input from higher management and human resources and in doing so, provided

them with documentation that he made at or near the time of the events. (Bricking pp. 30, 34,

163, Dep. Ex. 41-51).  Nothing Bricking provided to human resources regarding Colbert was

either false or based on race. (Bricking p.164, see Ex. 41-51).

Bricking explained that oral warnings were for inappropriate behavior, followed by

written warnings for more severe infractions or the same behavior again. (Bricking pp. 32-33).

Suspensions could be for more serious infractions or the same infractions that led to prior oral

and written warnings. (Bricking p. 33).  Although one could receive several oral warnings, for

example, before receiving a written warning, the number of prior disciplines could affect what

---

[4]   The fifth and final charge came after Colbert's termination and therefore, could not have been a basis for
      retaliation.

would happen next.  No one working in the Brecon Heavy Equipment yard had the number of infractions as did Colbert. (Bricking p. 49, 148).

How progressive discipline was administered was not based on race. (Bricking p. 166). The level of discipline imposed on Colbert had nothing to do with race. (Bricking pp. 39, 155). Neither Bricking's decision to report Colbert's infractions to his manager or management's response had anything to do with race. (Bricking p. 147).  No one said or did anything that suggested to Bricking that race factored into any disciplinary action involving Colbert. (Bricking p. 147)   Finally, any credibility assessments Bricking might have been forced to make between those complaining about Colbert, who were African-American, and Colbert himself, had nothing to do with race. (Bricking pp. 165-166).

## III.    ARGUMENT

**A.    This Court's Order of February 5, 1999, Collaterally Estops Colbert from Making Certain § 301 Arguments in this Case.**

A prior decision of a federal court in one case is entitled to a preclusive effect on the same issue raised in another suit if "(1) the precise issue raised in the present case [was] raised in the prior proceeding; (2) determination of the issue [was] necessary to the outcome of the prior proceeding; (3) the prior proceeding …resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought [had] a full and fair opportunity to litigate the issue in the prior proceeding." *Detroit Police Officers Ass'n v. Young, 824 F.2d 512,515 (6th Cir. 1987); Smith v. Securities and Exchange commission 129 F.3d 356, 362 (6th Cir. 1997); National Satellite Sports, Inc. v. Eliadis Inc., 253 F.3d 900, 907 (6th Cir. 2001).*

In Colbert's prior suit, the issue was whether CG&E violated the CBA, containing a management rights clause identical to the one here,[5] when it disciplined Colbert and took into consideration his prior work history in doing so. In connection with this issue, the Court also considered whether (1) Colbert had an adequate work performance, (2) that performance warranted discipline, and (3) that discipline violated the CBA.

To the extent Colbert seeks to raise similar issues against CG&E in this lawsuit, his claims are estopped. Not only is there an identity of issues, but the other elements of collateral estoppel are also present: the prior case was fully litigated and Colbert was given the opportunity to present evidence in response to CG&E's motion for summary judgment. The prior case was brought to final judgment when the Court entered its order granting summary judgment on all claims, and of course, the parties are identical.

This Court's findings on the following points may be given preclusive effect: (1) the CBA's management rights clause in Art. 1, Section 9(a), gives CG&E the right to discipline Colbert on the basis of his performance; (2) Art. 1, Section 9(a) permits discipline, suspension and termination; (3) up through 1995, Colbert had thirteen incidents of discipline and received a demotion because of his work performance; (4) a § 301 claim under the LMRA involves two

---

[5]   The management clause in the CBA in effect from 1994 to 1997 stated:

> Except where expressly abridged by a specific provision of the Agreement, the Union recognizes that the management of the Company, the direction of the work forces, the determination of the number of men it will employ or retain in each classification, and the right to hire, suspend, discharge, discipline, promote, demote, or transfer, and to release employees because of lack of work or for other proper and legitimate reasons are vested in and reserved to the Company. (Colbert 11-11-04, Dep. Ex. 2, p. 3, referring to Art. 1, Section 9(a) of the CBA.

The management clause in the CBA in effect from 1996 until Colbert's terminations stated:

> Except where expressly abridged by a specific provision of this Agreement, the Union recognizes that the management of the Company, the direction of the working forces, the determination of the number of men it will employ or retain in each classification, and the right to hire, suspend, discharge, discipline, promote, demote, or transfer, and to release employees because of lack of work or for other proper and legitimate reasons are vested in and reserved to the Company.

(Colbert 11-11-04, Dep. Ex. 3, p. 12, Art. 1, Section 9(a)).

separate parts, and necessarily requires Colbert to show that CG&E's actions in disciplining him breached the CBA; (5) CG&E's disciplinary actions and demotion in 1995 not only did not violate any provision of the CBA, but nothing in the CBA prevents CG&E from considering Colbert's collective work history in meting out discipline;(6) CG&E was not required to remove any prior disciplinary records from Colbert's employment file under the CBA; and (7)  it is not unreasonable for CG&E to be concerned with safety of its employees and the public in evaluating performance and giving discipline.

### F. Any Title VII Claims Based Actions before June 18, 1999 are  Barred Because Colbert Failed to Timely File Suit Following the Issuance of Right to Sue Notices.

To sue CG&E under Title VII, Colbert was first obligated to exhaust his administrative remedies by filing a charge against CG&E within 300 days of an alleged unlawful employment practice.  42 U.S.C. § 2000e-5(e)(1).   Thereafter, where the EEO issued a Right to Sue notice (RTS), Colbert had ninety days from receipt of that Notice to file suit. 42 U.S.C. § 2000e-5(e) and (f).  His failure to timely file suit on all the claims made in his prior four EEO charges bars any claims that he now seeks to make based on those charges. *Page v. Metropolitan Sewer District of Louisville and Jefferson City, 2003 U.S. App. LEXIS 26582 (6th Cir. 2003) citing, Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 94 S. Ct. 1011(1974).*

It is uncontested that Colbert filed five charges and that he did not sue on four of them. Therefore, he is now precluded from presenting evidence or arguing about (1) discipline he received through May 30, 1996; (2) discipline he received in 1997; (3) additional discipline received in 1997; and (4) failure to upgrade him to driver.  Colbert's last and only viable charge was filed on or about March 31, 2000 and is confined to allegations about his discharge on

March 8, 2000 and discipline he received from about June 18, 1999 to March 8, 2000.[6]

**C.    Plaintiff Offers No Evidence of Disparate Treatment either in Discipline or his Discharge.**

In disparate treatment cases, a plaintiff must show evidence of discriminatory intent. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Beene v. St. Vincent Mercy Medical Center*, 111 F. Supp 2d 931, 936-937 (N. D. Ohio 2000).  Colbert may do so by offering either direct evidence of discrimination or by establishing a *prima facie* case as set forth under the burden-shifting method in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 538 (6th Cir. 2002).*

**1.    Colbert Has No Direct Evidence Of Race Discrimination.**

Direct evidence is that which "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor." *Bartlik v. United States Dep't of Labor, 73 F.3d 100, 103, n.5 (6th Cir. 1996).*  Colbert offers no evidence of statements or actions that lead to the conclusion that racial discrimination was a motivating factor in any employment decision made by CG&E.  He refers to no comments or documents by Miller, Bricking, or anyone involved in his discipline or his termination that suggests that racial animus was at work. In fact, he testified that no such statements were ever made. (Colbert, 2-10-03, pp. 28-29, 31, 39-40).  Nor does Colbert have any idea what occurred when his termination was discussed or what factored into the decision. (Colbert 11-11-04, pp. 38-39)

---

[6]  Nor do such claims constitute a continuing violation as they are discreet acts which require that the party seeking to recover timely comply with statutory requirements. *Page v. Metropolitan Sewer District of Louisville and Jefferson City, 2003 U.S. App. LEXIS 26853 (6th Cir. 2003) citing, Janikowski v. Bendix Corp. 823, F.2d 945, 948 (6th Cir. 1987)*  A party must meet the statutory time-lines (filing a charge within 180 or 300 days of the act with the EEO and a suit within 90 days of a RTS or lose the ability to recover for that act. *National Railroad Passenger Corp(AMTRAK). v. Morgan, 536 U.S. 101,122 S.Ct. 2061, 2071 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to the acts alleged in the timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging the act." Id. at 2072.); Thomas v. Compuware Corp.; 2004 U.S. Appl LEXIS 15656 (6th Cir. 2004).*

F.     <u>**Colbert Cannot Make A Prima Facie Case Of Race Discrimination.**</u>

To make a prima facie showing of disparate treatment, Colbert must establish that he: (1) is a member of a protected group, (2) is qualified in his employment, (3) suffered an adverse employment action, and (4) was treated less favorably than a "similarly-situated" person outside of the protected group. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Burdine, 450 U.S. at 255-56; Clayton v. Meijer, Inc., 281 F.3d 605, 610 ( 6th Cir. 2002*.

Colbert is unable to show that similarly situated individuals, not in the protected class, were treated more favorably than he, both with respect to discipline and his termination. Thus, he cannot make a *prima facie* showing and CG&E is entitled to summary judgment. To meet his burden, Colbert first must show that there are "comparables" and that those comparables are similarly situated in all respects. *Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992).* Second, Colbert must show that they were treated more favorably.

"[T]o be deemed 'similarly situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id. at 583*; *Warfield v. Lebanon Correctional Inst*., *181 F. 3d 723 (6th Cir. 1999*) (concluding a discrimination plaintiff has the burden to establish that the other employee's acts are comparably serious to his or her own infraction); *Williams v. Cargill, Inc., 159 F. Supp. 2d 984 (S.D. Ohio 2001*) (comparing oneself to others who have not committed similar acts of comparable seriousness fails to demonstrate disparate treatment).

With regard to disciplines he received after June 1999 through the time of his termination, Colbert can offer no evidence that anyone was similarly situated. In fact, he repeatedly testified that he is not aware of anyone who either experienced the same

circumstances or, if they did, that they were not disciplined. He also testified that he knows of no one who had a performance/disciplinary record such as his own, Caucasian or African-American.

Because Colbert cannot meet this aspect of his prima facie case, his disparate discrimination claims fail and CG&E is entitled to summary judgment.

### F.    CG&E's Legitimate, Non-Discriminatory Reasons Justify Its Actions.

Even if Colbert were able to establish a *prima facie* case of discrimination, CG&E has offered legitimate non-discriminatory reasons for the discipline from June 1999 to and including Colbert's termination and, accordingly, has met its burden of production. *Ang v. Procter and Gamble Co., 932 F.2d 540, 548 (6th Cir. 1991)*; *Boyd v. Harding Academy of Memphis, Inc. 88 F.3d 410, 413 (6th Cir. 1996)*. The burden falls back on Colbert to show that CG&E's proffered explanations are a pretext for discrimination and that CG&E intentionally discriminated against him. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994); *Boyd 88 F.3d at 413*.

Here, Colbert had a long history of prior disciplinary action which his direct supervisor, Donald Bricking was willing to ignore so long as Colbert performed. Despite Bricking's willingness to give Colbert a chance, Colbert repeatedly engaged in behavior from 1999 forward that showed a complete disregard for his job, ranging from failing to report to work at the conclusion of a fore-shortened United Way tour to taking unauthorized breaks, lying down, acting as if he couldn't get the key for his truck, fighting with other employees and acting in a loud and abusive manner toward a supervisor. In a rare set for factual circumstances, all of the discipline Colbert received from June 1999 to his termination, involved either complaints or reports from other African-Americans, meaning that those complaints and the supervisor's determination regarding credibility about those complaints could not have been based on race.

The company was well within its rights, both under Title VII and under the CBA, to take disciplinary action and to step up that action as Colbert's conduct failed to improve.    And, although CG&E could have done so, it did not skip any disciplinary steps with Colbert, giving him every opportunity to turn things around. After oral and written warnings, one-, three-, and five-day suspensions, and Colbert's final refusal to work, he was appropriately terminated.

### F.    Colbert Is Unable To Demonstrate Pretext.

To makes a showing of pretext, Colbert must offer evidence that (1) the reason proffered by CG&E for each disciplinary action and his termination has no basis in fact; (2) the reason did not actually motivate the adverse action; or (3) the reason is insufficient to motivate adverse action. *Reeves v. Sanderson Plumbing Products, Inc.*, *500 U.S. 133 (2000)*; *Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).*  In other words, Colbert must produce sufficient evidence from which the jury could reasonably reject CG&E's explanation and infer intentional discrimination. *Braithwaite v. Timken, Co., 258 F.3d 488 (6th Cir 2001).*

Colbert has not and cannot show that any of the stated reasons for CG&E's actions were untrue.  For example, Colbert cannot show that he did not leave his work assignment, that he actually did return from the United Way tour, that he did not lose the pole truck, or that other employees did not complain about him.  Nor can he show that these events, if true, did not motivate CG&E to warn and suspend him.  The very fact that Colbert took the opportunity to grieve many of these disciplinary actions ensured that CG&E was acting for reasons that were legitimate under the CBA and otherwise.  Finally, Colbert cannot show that someone with his disciplinary history (Bricking Dep. Ex. 2) would not otherwise have been terminated. In fact, both he and Bricking testified, that there is no one with the kind of work history that Colbert had.

Simply asserting that events are discriminatory is not enough. *Vaughn v. Watkins Motor Lines, Inc., 291 F.3d 900 (6th Cir 2002).*  Subjective beliefs and feelings are insufficient to prove

discrimination based on race. *Ngeunjuntr v. Metropolitan Life Insurance Co.*, 146 F.3d 464 (7th *Cir 1998); Chappell v. GT&E Products Corp.*, 803 F.2d 262, 268 (6th *Cir. 1986*) ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination"); *Rin Das v. The Ohio State University,* 2003 U.S. *App. LEXIS 2236 (6*[th] *Cir. 2003*) (copy attached) (employee failed to produce competent objective materials evidence to prove discriminatory animus and disprove defendant's articulated legitimate business reason for her discharge). For all these reasons, CG&E is entitled to summary judgment on plaintiff's disparate treatment claims.

### F.      <u>Colbert Cannot Prove That He Was Subject to a Hostile Work Environment</u>.

To sustain a claim based on hostile work environment, Colbert must show racial conduct that is "sufficiently severe or pervasive to alter the conditions of the [his] employment and create an abusive work environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993); *Meritor Savings Bank FSB v. Vincent*, 477 U.S. 57, 67 (1986). What is a hostile or abusive workplace environment depends on the totality of the circumstances. *Farragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998). Specifically, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, *supra* at 23; *Jackson v. Quanax Corp.*, *191 F.3d 647 (6*[th] *Cir. 1999)*. Finally, the work environment must be both objectively and subjectively offensive.

Colbert makes an unsupported assertion that he was harassed not by any racially discriminatory actions but by discipline. Harassment is comprised of words or actions that suggest racial animus is at work. As discussed above, there is no evidence of any racial animus in any of the actions about which Colbert complains.

**F.    Colbert Cannot Establish A Claim For Retaliation.**

To make a *prima facie* case of retaliation, a plaintiff must prove that he engaged in protected activity; the defendant knew it; the defendant thereafter, took adverse employment action or subjected the plaintiff to severe or pervasive retaliatory harassment by a supervisor; and there was a causal connection between the protected activity and the adverse employment action or harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784 (6th Cir. 2000).

In this lawsuit, Colbert claims that Bricking retaliated against him by terminating him. First, the evidence is that Colbert refused to do his job a number of times from June 1999 to March 2000, all of which factored into his progressive discipline. Colbert also knew that that he would be required to work on March 2, a day for which he was receiving pay because he was scheduled to attend a grievance hearing. The very fact that Colbert reported to work indicates that he knew that he was expected to do something productive until his grievance hearing. Had he been concerned about getting dirty as he now claims, he either could have brought a change of clothing or chosen the painting task for which, Bricking testified, CG&E provided coveralls. (Bricking p. 132). Instead, Colbert argued about whether he needed to clean up at 11:30 or some earlier time to get downtown and as a result, refused to do any work. Colbert knew his failure to do what he was told could lead to discipline. (Bricking Dep. Ex. 51). Given the many chances that Colbert was given and his repeated failure to improve, termination became inevitable.

Second, a decision to terminate did not come from Bricking but rather, involved higher management and human resources. Bricking repeatedly testified that he took direction from those above him. Hence, Bricking was not in a position to retaliate and there is no suggestion that anyone else retaliated either.

Third, Colbert cannot show that Donald Bricking was aware of any prior EEO complaints. Bricking was not his supervisor until January 1999 and Colbert testified that the prior charges did not involve Bricking. He also testified that he did not discuss his prior charges with Bricking. Bricking testified that he was never asked to participate in any EEO investigation (Bricking p. 143). Also, Bricking testified as far as he was concerned, he and Colbert had a clean slate and there is nothing to suggest that Bricking took action because of those charges.

Fourth, as described above, each disciplinary action was based on substantiated events and progressive discipline which culminated in termination long after the fourth EEO charge was filed.

**F.     Colbert's § 301 Claim Against CG&E is Without Merit.**

In a § 301 action, a plaintiff must prove two interrelated things: first, plaintiff must show that the employer breached a collective bargaining agreement and second, that the union, which represents him, breached its duty of fair representation. *Del Costello v. Int'l Brotherhood of Teamsters, 462 U.S. 151,165 (1983).* Where, as is the case here, plaintiff pleads a hybrid § 301 claim, the claim implicates this interrelationship. *Vencl v. Int'l Union of Operating Engineers, Local 18, 137 F.3d 420, 424 (6th Cir. 1998).* Unless plaintiff can show both parts of the claim, he cannot recover against either the union or the employer. *White v. Anchor Motor Freight, Inc., 899 F.2d 555,561 (6th Cir. 1990).*

Despite the need to prove two things, plaintiff has not alleged that CG&E violated the CBA in any way and for that reason alone summary judgment is appropriate.

Even if Colbert's bare recitation of § 301 is enough to create a viable cause of action against CG&E, Colbert is collaterally estopped from arguing that CG&E violated the CBA by disciplining him for his work performance, including for such safety violations as failing to stay with a pole truck and laying down on the job. Moreover, Colbert admitted that punctuality and

attendance are critical to any job, meaning that any discipline for attendance issues (including in part, the three-day suspension and, in whole, the five-day suspension) did not violate the CBA. Nor was the contract violated when CG&E stepped up the discipline as the management rights clause allows CG&E to discipline, suspend and terminate. Likewise, it is established and not subject to further argument that CG&E was permitted to take into consideration prior disciplinary history in meting out discipline.

Third, Colbert can offer no evidence that discipline after 1995, the time of this Court's first opinion, violated the CBA or could, in any way, violate the CBA or that CG&E was not permitted to terminate him. The CBA contained the same clause as it did in 1995 and there is no evidence that anything changed that would give Colbert a claim. Colbert's § 301 claim against CG&E and, by necessity, against the union, must fail.[7]

## IV.    CONCLUSION

Based on the undisputed evidence, the depositions filed with this motion and the brief in support, defendant CG&E respectfully requests that summary judgment be entered in its favor and against Colbert on all claims in Colbert's complaint against it.


                              Respectfully submitted,

                              CINERGY CORP.


                              By:    s/Ariane Schallwig Johnson
                                     Ariane Schallwig Johnson, #0077236
                                     One of the Attorneys for Cincinnati Gas &
                                     Electric

---

[7] The union may wish to present additional arguments on this point, which CG&E incorporates by reference to the extent those arguments preclude this § 301 claim against it.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on **January 13, 2005**, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Rose Ann Fleming
Rose Ann Fleming Professional Legal Corp.
3855 Ledgewood Drive, Suite 13
Cincinnati, OH 45207
fleming@xavier.edu

Jerry A. Spicer
Snyder, Rakay & Spicer
11 West Monument Building, Suite 307
Dayton, OH 45402
snyrakspi@aol.com

s/Ariane Schallwig Johnson
Ariane Johnson

Ariane Schallwig Johnson
LEGAL DEPARTMENT
CINERGY SERVICES, INC.
1000 E. Main Street
Plainfield, IN 46168
Telephone: 317/838-1285
Facsimile: 317/838-1842
ariane.johnson@cinergy.com