THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO  (CINCINNATI)
WESTERN DIVISION

| | |
|---|---|
| **OLLEN G. COLBERT. Jr.,** | Case No.: 1:00-CV-909 |
| Plaintiff, | Judge Susan J. Dlott |
| | Magistrate Judge Timothy J. Hogan |
| vs. | |
| **CINERGY,** **THE  CINCINNATI GAS AND ELECTRIC COMPANY,** | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS. LOCAL 1347'S MOTION FOR SUMMARY JUDGMENT** |
| **AND** | |
| **INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,** **LOCAL 1347,** | |
| Defendants. | |

Comes now, Plaintiff, Ollen G. Colbert, Jr., (hereinafter "Colbert"), by and through

Counsel, to oppose the Motion for Summary Judgment, filed on January 14, 2005, By "Union",

or"Local 1347"),  based on genuine issues of material facts discussed below.

**STATEMENT OF PERTINENT UNCONTROVERTED FACTS**

1. Colbert was employed by Cincinnati Gas & Electric Company on or about April 2,

1990 as a Groundsman, at $6.50 per hour, (Colbert, Depo., 11-11-04, Exhibit 5[Colbert, Depo.,

10-30-97, Exhibit 2].

2. Colbert was a dues paying member of the International Brotherhood of Electrical

Workers, Local 1347,  contemporaneously with his employment with Cincinnati Gas and

Electric Company.

3. At all times pertinent to this suit, namely from March 2, 1995 through March 15, 2000, while Colbert was an employee with CG&E and a member of the Union, the Company had a progressive and constructive discipline policy which it described in four steps as follows:

Step One – Oral Warnings
Step Two – Written Warnings
Step Three – One, Two, Three Day Suspensions
Step Fourth – Discharge.

(Bricking, Depo., 12-10-2004, Exhibit 1, CG&E Corrective Discipline Policy, [ Appendix A, Brief of Defendant Cinergy Corp, Court of Appeals, First Appellate District of Ohio, Hamilton County, Ohio, Appeal No. C010410; Trial No. A0005948, January 25, 2002])/

4. Effective October 1, 1990, Colbert was promoted to Groundsman, at $6.60 per hour. (Colbert, Depo., 11-11-04, Exhibit 5 [Colbert, Depo., 10-30-97, Exhibit 4].

5. Effective November 20, 1990, Colbert was promoted to Lineman "C" at $13.06 per hour. His rate of pay was increased to $!3.83 per hour, effective May, 20, 1991. (Colbert, Depo., 11-11-04, Exhibit 5 [Colbert, Depo., 10-30-97, Exhibits 5, 8].

6. On July 8, 1992, Colbert resigned as a Lineman and was transferred to the Brecon Heavy Equipment and Repairs District where he assumed the position of Construction Helper at the rate of $12.86. (Colbert, Depo., 11-11-04, Exhibit 5 [Colbert, Depo., 10-30-97, Exhibits 18, 19, and 23].

7. On August 4, 1993, Colbert was promoted to Groundsperson Driver "A" at $14.72 per hour. (Colbert, Depo., 11-11-04, Exhibit [Colbert, Depo., 10-30-97, Exhibit 26].

8. On March 20, 1995, Colbert was demoted from Groundsperson Driver "A" to Construction Helper at $13.331 per hour form $15.36 as Groundsperson Driver "A". (Colbert, Depo., 11-11-04, Exhibit 5[Colbert, Depo., 10-30-97, Exhibit 45].

9. Colbert's demotion was made effective March 20, 1995 following an accident that occurred while he was operating a truck boom to move a transformer, as well as other

disciplinary actions that reflected poor work performance for which he had been disciplines. (Colbert, Depo., 11-11-04, Exhibit 5[Colbert, Depo., 10-30-97, Exhibit 45].

10. The Union requested in a letter dated May 8, 1996, a Third Step hearing on the matter of Colbert's demotion, Grievance No.11-103-04-96 (Colbert, Depo., 11-11-04, Exhibit 5 [Colbert, Depo., 10-30-97, Exhibit 63].

11. The Third Step Meeting took place on July 17, 1996. The Union requested to know from the Company, in case their response was negative regarding returning Colbert to his former position as Groundsperson Driver 'A", what Colbert has to do to improve his performance with the Company. (Colbert, Depo., 11-11-04, Exhibit 5 [Colbert, Depo., 10-30-97, Exhibit 68].

12. The Company responded in a letter of August 22, 1995, signed by Ronald R. Monson, that the Company denied the grievance and stated as follows:

> In response to the Union's question regarding when Mr. Colbert would be allowed to promote to a higher position, Mr. Colbert would need to reverse his trend of poor performance, accidents, etc. for a significant period of time of at least a year or more in order to be considered for promotion to a higher position.

(Colbert, Depo., 11-11-04, Exhibit 5 [Colbert, Depo., 10-30-97, Exhibit 69].

13. On October 31, 1996, the Union requested a fourth step grievance procedure on Grievance No. 11-103-04-96. This Fourth Step Meeting was scheduled for January 27, 1997, then rescheduled for February 27, 1997 (Colbert, Depo., 11-11-04, Exhibit 5 [Colbert, Depo., 10-30-97, Exhibits 70, 72].

14. As a result of the Fourth Step Grievance Meeting the Union was notified that the grievance was denied by the Company in a letter signed by H. Joseph Kraus, dated March 31, 1997. (Colbert, Depo., 11-11-04, Exhibit [Colbert, Depo., 10-30-97, Exhibit 76].

54. On May 1, 1997, the Union, withdrew Colbert's demotion grievance conditionally and responded in writing to the CG&E as follows:

> As a result of the fourth step grievance letter dated March 31, 1997, we have decided to withdraw this grievance under that letter's conditions, "if and when Mr. Colbert maintains a satisfactory work record for a significant period of time, the Company will consider him for future job openings in the Groundsperson Drive "A" job classification"

(Colbert, Depo., 11-11-04, Exhibit 5 [Colbert, Depo., 10-30-97, Exhibit 77].

16. Colbert did not agree with the Union's conditional withdrawal from his Grievance and requested that the Union take his case to Arbitration. The Union's decision not to arbitrate the case was shaped in Francis B. Kelly's affidavit dated January 13, 2005. " I decided not to pursue arbitration because, based on all the facts and circumstances, I concluded that the grievance was not meritorious and that CG&E would prevail in arbitration as there was no breach of the collective bargaining agreement (Kelly, Francis B., Affidavit, January 13, 2005, Item 3).

17, Colbert filed a Complaint on July 23, 1997, captioned *Colbert v Cincinnati Gas & Electric and International Brotherhood of Electrical Workers*, U.S. District Court, Southern District of Ohio, Case No. C-1-97-685, ,in which he alleged a hybrid Section 301 action, charging his employer, CG&E and the Union, IBEW with breach of the collective bargaining agreement and the Union, IBEW, with breach of the Union's duty of fair representation.

18. Both Defendants, CG&E and IBEW were granted summary judgment on February 8, 1999 because Colbert failed to produce evidence to support his Complaint. (Doc. 24 and Doc. 25, Judgment in a Civil Case, and Opinion, Case NO. C-1-97-685).

19. Regarding the Union, the Court found in its Opinion as follows:

> [T]he Union processed Plaintiff's grievance through the grievance procedure up to the point of arbitration. Although the Union determined that Plaintiff's claim lacked merit, it, nonetheless, took steps to protect Plaintiff's interest. To this end the Union agreed to withdraw its grievance only upon CG&E's agreement to consider Plaintiff for future promotions.

(Beckwith, Sandra S. Judge, Doc. 25, Judgment in a Civil Case, and Doc. 24,  Opinion, Case NO. C-1-97-685).

20. IBEW failed to grieve Colbert's denial of an upgrade application made on May 18, 1999, after 21 months without a disciplinary action recorded. (Colbert, Affidavit  in Oppo IBEW's SJ, ¶35).

21. Based on the conditional withdraw of Colbert's grievance, the Union ignored its duty of fair representation when the Company, by its agent Bricking, breached its Agreement to consider Colbert's upgrade based "on a letter in his file:" on or about May 17, 2000,  (Bricking, Depo., 12-10-04, p.54)

22. Colbert testified that he grieved a counseling over blowing decals off his truck, but the grieve got "caught up" on the Third Step. (Colbert, Depo., 11-11-04, pp. 74-75 and Exhibit, 19, dated 11-5-98)..

23. In the matter at hand, the discipline history of  Ollen G; Colbert, Jr., between June 18, 1999 and March 8, 2000 was  the following:

| DATE | INFRACTON | DISCIPINARY ACTION |
|---|---|---|
| 4/7/1995 | Overall poor work performance | Demotion |
| 7/7/1995 | Inattentiveness to duties | Oral Warning |
| 12/1/1995 | Poor work performance | Oral Warning |
| 1/26/1996 | Purported weapon on company property | Oral Warning |
| 5/30/1996 | Confrontation with a co-worker & equipment damage | Written Warning |
| 2/27/1997 | Poor work performance | Oral Warning |
| 7/23/1997 | Absenteeism | Oral Warning |
| 7/31/1997 | Absenteeism | Written Warning |
| 8/26/1997 | Insubordination | One-day Suspension |
| 6/18/1999 | Poor work performance | Oral Warning |
| 7/1/1999 | Insubordination | Oral Warning |
| 8/20/1999 | Inattentiveness to duties | Written Warning |
| 8/27/1999 | Leaving without permission | One-day Suspension |
| 10/25/1999 | Abusive Conduct | Three-day Suspension |
| 12/14/1999 | Overall poor work performance | Five-day Suspension |
| 3/15/2000 | Insubordination | Discharge |

(Bricking, Depo., 12-10-2004 Exhibit 2 [Source: Appendix A Summary of Disciplinary Action  - Ollen  G. Colbert, Jr.,, Appendix 5, Brief of Defendant-Appellee, Director, Ohio Department of Job and Family Services, Court of Appeals, First Appellate District, Hamilton County, Ohio, Appeal No. C010410; Trial No. A0005948, selected dates  for the years contested in Colbert's Amended Complaint, April 7, 1995 and March 8, 2000]).

24. Colbert grieved the incident which involved following the pole truck, June 18, 1999, but that he did not know the outcome because "when I was dismissed, I had about three or four grievances pending. (Deposition of Ollen Colbert, November 11, 2004, (Hereinafter Colbert, Depo.,11-11-04,  pp. 87,- 88).

25. Colbert grieved the Oral Warning received on 7/1/99 that referred to an incident of not taking his keys from the truck and hanging them in the office at Brecon overnight. There was evidence among Ollen G. Colbert's notes that a grievance meeting was held on July 27, 1999, but no evidence of the next step in the grievance procedure which Colbert asked for since Colbert was not satisfied with the outcome.  (Colbert, Depo, pp. 95-96. and Depo. Exhibit. 23).

26. Colbert's Affidavit states that he grieved the one-day suspension that he incurred as a result of not returning to work in the afternoon of August 25, 1999 following his participation  in a United Way Tour. In Item 47 of his Affidavit, Colbert stated he grieved the Company's  action based on the Company's past practice of allowing employees who participate in a United Way Tour in the morning to take off the remainder of the day. . As with the other grievances, the Union did not pursue this grievance beyond Step One, ignoring Colbert's requests. (Colbert, Affidavit in Oppo, to IBEW. SJ.,  ¶ 47)

27. Colbert grieved  the three-day suspension meted out to him for using abusive and profane language toward Tom Sams, an administrator of CG&E at Brecon on October 15,  1999, combined with four days of tardiness. Colbert's grievance of this incident was left pending at the second step of the grievance procedure, due to Colbert's indefinite suspension on March 2, 2000 and dismissal on March 8, 2000. (Colbert, Depo., p. 114-19; See also, Exhibits. 27-29)

28. Colbert grieved his five-day suspension for absence as documented by a letter, dated December 14, 1999. Said letter refers to October 29, 1999, and three days of unpaid absence, November 3, November 15, and December 9, 1999. Colbert stated that the Union held an initial meeting on this matter, postponed the second meeting twice, and thus this matter was pending, unresolved, at the time of his termination on March 8, 2000.  [Colbert, Depo. 11-11-04, pp,119-120, Exhibits. 30].

29. Colbert was indefinitely suspended because he wanted to leave Brecon Heavy Equipment and Repair District at 11:00 a.m. to meet with his Union Representative before the Grievance Hearing scheduled for 1:30 in downtown Cincinnati. The Grievance Hearing was on the matter of  his three-day suspension for using abusive language toward Tom Sams on October 15, 1999..Bricking,  called Kenny Miller, management, for consultation on this matter, and was advise to give a directive to Colbert to work until 11:00 a.m.,  or be suspended. Colbert asked for a vacation day and was refused and indefinitely suspended for insubordination.  (Colbert, Depo., 11-11-2005, pp. 121-124).

30. On March 8, 2000, Colbert was wrongfully dismissed, with several grievances pending, and therefore without due process applied to him according to CG&E'S progressive discipline policy.  He  immediately  grieved his dismissal from Cinergy/The Cincinnati Gas and Electric Co. The initial grievance hearing was March 8, 2004. Subsequent meetings were held up to the time of the Third Step meeting after which he learned  that the Union would not continue to represent him based on CG&E's letter recounting the evidence against him.  (Colbert, Depo., 120, Exhibit 31 and pp. 125-128)

31. Colbert asked the Union to take the matter to arbitration, pursuant to Article II, section 1(e) and Article II, section 2 of the Agreement.  The Union declined. (Colbert, Depo., 11-11-04, pp. 140-142, Exhibit 39).

32.  Colbert field his EEOC Complaint, March 31, 2000. (Colbert, Depo., Exhibits 15, 16,). He received a Determination Letter with a right to sue letter on August 16, 2000 (Colbert Depo.11-11-04,  Exhibit 17)

33. Colbert timely filed his Complaint against Defendants on October 30, 2000.

## ARGUMENT[1]

## I.    STANDARD OF REVIEW

### A.    <u>SUMMARY JUDGMENT</u>

When the moving party establishes by pleadings, depositions,  answers to the interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law", then R. 56(c),  of the Federal Rules of Civil Procedure,  permits the Courts to render summary judgment forthwith.  *DIC v. Alexander,* 78 F.3d 1103, 1106 (CA6, 1996). To avoid

---

[1] Contemporaneously with the filing of this Memorandum, Plaintiff is filing is following:

1. Plaintiff's Affidavit , pursuant to R. 56(e) of the Federal Rules of Civil Procedure, in Support of Plaintiff's Memorandum in Opposition to International Brotherhood of Electrical Workers, Local 1347.

2. Plaintiff's Memorandum in Opposition to Defendant's (The Cincinnati Gas and Electric Company) Affidavit file in Support of Plaintiff's Memorandum in Opposition to Defendant's (The Cincinnati Gas and Electric Company) Motion for Summary Judgment and the Motion for Summary Judgment by International Brotherhood of Electrical Workers, Local 1347. Motion for Summary Judgment, and Brief in Support.

3. Plaintiff's Affidavit, pursuant to R. 56(e) of the Federal Rules of Civil Procedure, in Support of Plaintiff's Memorandum In Opposition To Cinergy/ The Cincinnati Gas and Electric Company's Motion for Summary Judgment.

4. Quarles, Dudley, Affidavit  in Support of Plaintiff's Memorandum in Opposition to Defendant's (The Cincinnati Gas and Electric Company) Motion for Summary Judgment and the Motion for Summary Judgment by International Brotherhood of Electrical Workers, Local 1347.

5. Water's, Leon, Affidavit file in Support of Plaintiff's Memorandum in Opposition to Defendant's (The Cincinnati Gas and Electric Company) Motion for Summary Judgment and the Motion for Summary Judgment by International Brotherhood of Electrical Workers, Local 1347.

summary judgment, the nonmoving party must come forward with "specific facts showing that

there is a genuine issue for trial. *First Nat's Bank v. Cities Serv. Co*., 391 U.S. 253, 270 (1968).

Case law gives provides insights as to constitutes "a genuine issue" and a "material fact":

> In determining what constitutes a genuine issue as to any material fact for purposes of summary judgment, an issue is "material" if the facts alleged are such as to constitute a legal defense or are of such nature as to  affect the result of the action. *Austin v. Wilder*, 26 N.C. App. 229, 215 S.E. 2d 794.

> A fact is" material": and precludes grant of summary judgment, if proof of the fact would have effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle of law to the rights and obligations of the parties. *Johnson v. Soulis*, Wyo., 542 P. 2d  867, 872.

For the reasons given below, Plaintiff requests that this Court deny  IBEW's Motion for

Summary Judgment because the facts in this matter indicate that there are genuine issues of

material fact that can only be settled by trial.

## B.        BREACH OF CONTRACT/DUTY OF FAIR REPRESENTATION.

*Del Colstello v. Int's Bhd. Of Teamsters*, 4621 U.S. 151, 164, 103 S.Ct. 2281 (1983),

describes the  hybrid § 301 action as follows :

> The suit consists of two distinct causes of action, one against the employer a for violation the collective bargaining agreement under §301 of the Labor Management Act, 29 U.S.C. § 185, and one against the Union for breaching its implied duty of fair representation under the National Labor Relations Act. (*DelCostello*, 462 U.S. at 164). Because an employer's violation of the collective bargaining agreement is ordinarily only enforceable by the union, however, the employee can prevail in either suit only be prevailing in both; the employee must show both that the  employer violated the collective bargaining agreement and the union breached its duty of fair representation.  (*Id*. at 164-165)

Colbert can prove that his Employer violated his rights under collective bargaining

agreement and  Union did nor represent him fairly by not arbitrating his demotion and not

grieving and arbitrating his termination.

In this case, Colbert, the employee, is engaged in a hybrid §301 action, which arises out of his suit against his employer, Cinergy/The Cincinnati Gas & Electric Co., for breach of the Agreement on two counts:  unfair demotion, in violation of Article I, Section 9(a) and Article II, Section 1, and wrongful termination, under Article I, Section 9(d).

Regarding unfair demotion, the Company breached its settlement when it failed to consider Colbert's application for promotion to Groundsperson Driver "A", on or about May 17, 1999, based on the Company's claim that there was a letter in his file." (Bricking, Depo., 12-10-04, p 54 and p. 141, ). Colbert asserts that this is a direct violation of Article I, Section 9 (a), where demotions must be made for "proper and legitimate reasons"

Regarding wrongful termination Colbert  in so far as the Employer  terminated Colbert without due process regarding the Company's application of  the progressive discipline policy to Colbert in violation of the Article I, Section 9(d) and Article II, sections(a), that is the employee's right to grieve and unfair management practice,  as well as out of  his suit against the Union for failing in its duty of fair representation.

The Union breached its duty of fair representation, by not representing Colbert in good faith when the Company broke its offer on or about May 17, 1999,  as set forth in the March 31, letter, to allow Colbert to recover from his demotion by bidding for his Groundsperson Driver "A" after an improvement in job performance for a significant period.  (Colbert, Depo., 11-11-04, Exhibit 5 [Colbert, Depo., 10-30-97, Exhibits 76-77]).

The Union further breached its duty of fair representation by not continuing to represent Colbert in good faith at the time of his termination, on or about March 8, 2000, when he had several grievances pending, particularly based on an employee's rights, under Article I, Section 9(d) and Article II, Section 1(a) of the Agreement. Colbert's three (3) day suspension dating

back to the disciple of October 25, 1999, and the five (5) day suspension dating back to

December 14, 1999, were still pending at the time of Colbert's indefinite suspension. (Colbert,

Depo., 11-11-04, pp114-119' 119-120).  In *United States v Gregory,* the Supreme  Court held "

when assessing the reasonableness [of termination and other serious disciplinary actions]  the

Board [ that is, the Decision Makers, arbitators, etc.] may not consider prior disciplinary actions

that are pending in collective bargained grievance proceedings" *Gregory v. United States Postal*

*Service*,  Supreme Court of the United States, 00-758, Decided November 13, 2001. Certiori

granted to the United States Court of Appeals for the Federal Circuit, 212 F.3d 1296, decided

May 15, 2000.

Here, the failure of both the Company and the Union to resolve the pending grievances means

that termination was not the appropriate discipline for Colbert on March 8, 2000, assuming the

Company was serious about applying the progressive discipline policy.

### i.        Colbert's Claim of Improper Demotion.

Defendant IBEW raises the defense of *res judicata* asserting that Colbert is attempting to

relitigate  he very same (identical) claim pled and litigated by Colbert in *Colbert v. CG&E, et al.*,

C-1-07-685. What Colbert is litigating in the case *sub judic*e is (1) the Company's breach of its

settlement offer at proffer in Monson's letter to the Union on March 31, 1997 and the non

responsiveness of the Union to the Company's breach of its March 31, 1997 condition of

settlement of Colbert's demotion . (Colbert, Depo., 11-11-04, Exhibit 5[Colbert, Depo. 10-30-97,

Exhibit 76]. On or about May 17, 1999, when Colbert applied for open Groundsperson Driver

"A", he was denied because of a letter in his file (Bricking, Depo., 12-10-04, pp. 54-55 and 141),

Colbert's application met the Company's specified requirement of improved job performance  or

a significant period of time, at least a year set forth in its letter of March 31, 1997.(Colbert,

Depo,, 11-11-2004, 5 [Colbert, Depo., 10-30-97, Exhibit 76]  Colbert had not received a

discipline on his record for some 20 month.(Bricking, Depo.,12-10-2004, Exhibit 2). Upon

denial of his application by Bricking, Colbert asked for,  and had a right to expect, that the Union

would arbitrate his claim which was meritorious through Step Four of the grievance  process.

### ii.    __Breach of Contract__ [2]

The Company breached the Agreement with the Union in two ways:

1) The Company failed to honor its offer that Colbert could bid for Groundsperson Driver

"A" position when Colbert, after some 20 months of receiving no disciplines, bid that position.

Hence is had no legitimate or  proper reasons for holding to his demotion to Construction Helper

applied to him March 20, 1995. immediately after an accident were another worker was injured

as Colbert was working with the crane used to change a transformer. Thus, by denying Colbert's

application without replying to him, and later staying that the reason he was denied was"a letter

in his file states that he was not eligible for the promotion, the Company was in violation of

Article 1, Section 9(a), since it had no proper and legitimate reason for such denial.

2) The Company's rights to discipline and termination of an employee is limited by an

exception:  the employee's rights to grieve for an "adjustment" (Article I, Section 9(d) and

Article II, Section 1(a).  The Company failed to honor the employee's rights to grievance

hearings in progress at the time of his termination. The CG&E's letter of March 15, 2000, sets

out its reasons for discharge of Ollen Colbert. (Colbert,  Depo., 11-11-2004-, Exhibit 31). This

---

[2] Colbert has filed his Memorandum in Opposition to Cinergy/ The Cincinnati Gas and Electric Company's Motion for Summary Judgment. Therein he has argued that the Cinergy broke the Agreement between The Cincinnati Gas & Electric Company and Local Union 1347 International Brotherhood of Electrical Worker, Affiliated with the AFL-CIO, 1996-2001, in addition to retaliatory discrimination. Colbert incorporates herein all of the arguments set forth in Plaintiff's Memorandum in Opposition to Cinergy/ The Cincinnati Gas and Electric Company's Motion for Summary Judgment regarding the Cinergy/The Cincinnati Gas and Electric Company (hereinafter referred to as the "Company" or "CG&E").

letter very carefully describes, in paragraph 3,  that in administering disciplines, the Company was following its "progressive and constructive disciplinary process", and notes a total of 31 disciplinary actions.  The termination letter then state:

> Most recently, for your continued overall poor work performance, you received a one-day suspension in August of 1999, a three –day suspension in October of 1999 and in December of 1999 you received a five-day suspension.

It is precisely these two  latter two disciplines that were in the process of being grieved when Bricking and management terminated Colbert. The Company's argument, according to Bricking's Deposition, is that the Company had the right to keep administering the disciplines, regardless of an in process grievance procedure pending when the Company terminated him. That the Company was unhappy with Colbert's delay in choosing a company work assignment on reporting to work on the morning of March 2, 2000, is obvious for the reports both from Bricking and Colbert. However, the issue for the jury is whether, without allowing Colbert and the Union full time to grieve his one-day, three-day, and five-day suspension, Colbert, as a Union employee, has no chance of "adjusting" his disciplines which is Article II, Section 1(a) of the Agreement. Colbert believes that Article II, Section 1 limits the management rights to discharge as listed in Article I, Section 9(a).

### iii Breach of Duty of Fair Representation

The Union breached its duty of fair representation on two points.

1)  Local 1347 failed to represent Colbert on a grievance he requested regarding the Company's denial of the upgrade position, in May, 1999. At that time, Colbert made application to the Company for an upgrade from Construction Helper to Groundsperson Driver "A". The union had accepted,  on a conditional basis, the Company's refusal to restore Colbert to his Groundsperson Driver A, on condition that after a significant time improvement in his work performance. During the negotiation process, the Company defined "significant amount of time

as representing one year or more". As IBEW admits, it withdrew from the grievance process in 1997 on the condition that the CG&E, by this Employee Relations Consultant, H. Joseph Krause, offered in its Marc 31, 1997 letter, namely "If and when Mr. Colbert maintains a satisfactory work record for a significant period of time the Company will consider him for future job openings in the Groundperson Driver "A" job classification". However, for the reasons stated above, the demotion in question was proper and legitimate and therefore, this grievance must be denied." (Colbert Depo., 11-11-2004,  Exhibit 5[ Colbert, Depo. 10-30-97, Exhibit 76].  To this Company offer, Francis B. Kelly responded in a letter dated May 1, 1997: "As a result of the fourth step grievance denial letter dated March 31, 1997, we have decided to withdraw this grievance under that letter's conditions, "If and when Mr. Colbert maintains a satisfactory work record for a significant period of time, the Company will consider him for future job openings in the Groundsperon Driver "A" job classification.  (Colbert Depo., 11-11-2004,  Exhibit 5[ Colbert, Depo. 10-30-97, Exhibit 77].

It is simply disingenuous for Local 1347 to assert that Colbert's grievance was not meritorious.  The condition that the Company proffered was that Colbert maintain a "satisfactory work record for a signification period of time". (Colbert Depo., 11-11-2004,  Exhibit 5[ Colbert, Depo. 10-30-97, Exhibit 76].   Both the Union and the Company understood "satisfactory work record" be one that is not encumbered with disciplinary actions. Further,  both the Company and the Union understood "significant period of time" to mean a year or more.  Colbert Depo., 11-11-2004,  Exhibit 5[ Colbert, Depo. 10-30-97, Exhibit 69]. When, on May 18, 1999, Colbert filed an application for a Groundsperson Driver "A" upgrade, and it was denied by Bricking because of a letter in his file, it becomes obvious that CG&E was not keeping its part of the condition it made with the Union.  The Union's should have recognized that its withdrawal from

the grievance procedure by its letter of May 1, 1997, was breached and that grievance should have been carried to the Fourth Step. The Union's lack of action at that time indicates that its attention to Colbert's requests were at best perfunctory. Colbert had not had a discipline action for least 21 months. The Union had found that his cause was meritorious on the demotion or would not have pursued it through the Fourth Step. At his Deposition of November 11, 2004, the Union showed Colbert a copy of the letter of withdrawal of the Fourth Step grievance on Colbert's demotion based on the Company setting forth a condition allowing Colbert to bid back his position of Groundsperson Driver "A" when Colbert maintains a satisfactory work record for a significant period of time. By ignoring the fact that the Company breached its offer to allow Colbert to make an application to upgrade his position, the Union failed in its duty of fair representation by a arbitrary and perfunctory that challenges the reasonableness of the Union's conduct. As noted in the Opinion (Colbert, Depo., 11-11-04, Exhibit 2, *[Opinion* Doc. 24, Beckwith, Sandra S., C-1-97-685, p. 8]), of Judge Beckwith:

> Although the Union determined that Plaintiff's case lacked merit, it, nonetheless, took steps to protect Plaintiff's interests. To this end, the Union agreed to withdraw its grievance only upon CG&E's agreement to consider Plaintiff for future promotions.

Based on the Opinion of Judge Beckwith, it is Plaintiff's contention that this agreement constituted an implied contract to settle the matter of Plaintiff's demoted between the Company and the Union. When the Company's agent, Bricking, stated that he could not consider Colbert's application based on a letter in his file, after Colbert and performed his CG&E's duties without a recorded discipline for 20 months, the Company breached its agreement, the contract is rescinded, all arrangements are returned between the Company and the Union as they existed on May 1, 1997. At this point, that is,, on or about May 17, 1999, the Union had a standing offer from Colbert for payment of the Arbitrator.

Assuming that the only reason that the Union did not go forward was its limited resources, the Union should have notified the Company within 30 days of May 17, 1999, of its desire for Arbitration, as set forth by the Agreement, Article II, Section 2. As stated in *Driver v. United States Postal Service, Inc.,* 328 F.3d 863 at 896 (6th Cir. 2003):

> The duty does require that a union investigate the complaint and handle the employee's grievance fairly. Although the union is to be given some deference in its handling of such matters, as its action are not to be considered arbitrary unless its actions are 'so far outside a wide range of reasonableness as to be irrational, ' *Air Line Pilots*, 499 U. S. at 67( quotation removed), the union has a duty to conduct an independent investigation of the matter.  A union may not, for example, . . .  give up on an employee's grievance solely because the employer's evidence indicates that the employee was at fault for an incident, see *Schoonver v. Consol. Freightways Corp. of Del*. 147 F. 3d. 492, 495-96 (6th Cir., 1998).

It is clear that the from the documents and testimony by the Company and the Union , (see Colbert's Depo, 11-11-04, Exhibit 5 [ Colbert, Depo., 1-30-97, Exhibits 76 and 77] and [ Colbert, Depo., pp. 343-347]) entered herein that, on the matter of Plaintiff's demotion, the Union acted  in an arbitrary manner, that is, 'so far outside a wide range of reasonableness as to be irrational, ' *Air Line Pilots*, 499 U. S. at 67' by not resuming its representation of Colbert on, or after,  he notified the Union of the  Company's failure to consider his May 17, 1999 application for Groundsman Driver "A". On page 345-346, of his Deposition taken on October 30, 1997, Colbert states that he did not agree that he thought that the compromise referred to in Exhibits 76 and 77 between the Union and the Company regarding his demotion was a good compromise. (Colbert, Depo.,  11-11-04, Exhibit 5 [Colbert, Depo., 10-10-97, pp. 343-347, Exhibit 76,77])

2)  The Union failed to fairly represent Colbert fairly in the wrongful termination action, dated March 8, 2000. Colbert had grieved to the Union the one-day, three-day and five-day suspensions. On March 2, there was a meeting set up for 1:30 pm. on the grievance growing

from his three-day suspension for use of abusive vocabulary to Tom Sams and attendance problems. It was in trying to obtain permission to leave early enough to see his union representative about one hour before the meeting that Colbert was fired from CG&E. By the time that Colbert had reached that Union meeting of March 23, he had been indefinitely suspended. From the documentation of the March 2, 2000, no information was obtained on the outcome of the March 2,2000 grievance hearing regarding the Tom Sams abusive language and poor work performance. In fact, Bricking's testimony was that he could not remember whether he ever revealed the results of his investigation of the October 25, incident to the Union or to Colbert. (Bricking, Depo., 12-10-04, p. 124.-125.)  If Mr. Bricking did not make his investigation known to the Union,  or to Mr. Colbert, the Union had the responsibility for requesting an "adjustment" to the discipline process. The Union produced no evidence that it did any investigation of the October 25, 1999 incident with Tom Sams, and allowed CG&E reject Colbert's story instead of holding it on a par with Tom Sams. Based on Union representation regarding this grievance on verbal abuse of Tom Sams, Colbert's grievance was never adjusted by the time of his wrongful termination.

Not only was the three-day suspension not grieved to resolution, but the five-day grievance request was not grieved at all. Had the Union grieved to resolution the three-day suspension, Colbert would not have been given a five – suspension from work when he was late on  October 29, November 3, November 15 and December 9, 1999. For one thing, Colbert denies being late. The Company used no time clock.  The disciplinary actions were based only on observation by the supervisor, Bricking, when it came to lateness for work. The Union failed to resolve this grievance at the time that Colbert was terminated.

On March 30, 2000 the Union filed its grievance for wrongful discharge. Local 1347 requested as settlement that Colbert be reinstated and made whole for all lost wages and benefits. (Colbert, Depo., 11-11-04, Exhibit 36). The Union also held a third step grievance meeting on May 10, 2000. (Colbert, Depo., 11-11-04, Exhibit 37) In response to that meeting, CG&E produced an 8-page response letter in which it noted on page 7, that "[t]he Union requested that the Company reconsider this discharge because of the conflict in statements made by the supervisor and Mr. Colbert's statement". (Colbert, Depo., 11-11-04, Exhibit 38, p. 7). This conflict in statements as to what happened on the morning of March 2, 2005, is still in existence at the present time. Whether the collective bargaining Agreement allows for the unconditional dismissal of an employee when the CG&E progressive discipline policy was being applied, is a material issue that the Court must decide. Case law, such as United States v. Gregory, quoted above appears not to allow disciplinary actions pending collective bargained proceedings to be considered.

There are numerous violations of the *Agreement* in this dismissal which should have been responded to by the Union. For example, had the Union investigated the incident of March 2, 2000 it would have learned that Bricking did not represent to Miller that Colbert's insistence on getting away from Brecon early on March 2, 2000, had to do with meeting with his Union representative. That omission in itself may have changed Miller's mind about 'indefinite suspension" and then termination. Because the Union a comprehensive investigation, Colbert did not have fair and effective representation.

Had the Union performed its own investigation, it would have determined that Colbert had asked for a vacation day. Bricking's note does not indicate a half day. Colbert's request to "burn one" should have been granted to Colbert because Bricking had granted it to

others.(Bricking. Depo., 12-10-2004, Exhibit 41, Bricking's own handwritten notes)  Further, the

Company stated that the half day " vacations are not granted to this work group. However, the

Union Steward should have asked for evidenced since there is no exception stated for  the

Brecon Pole yard employees regarding Article  IV, Section 1(e)  of the Agreement. This section

provides as follows. According to Article IV, Section 1(a) (3):

> Employees with seven (7) or more years of service with the Company shall be
> entitled to a vacation of three (3) weeks.

Colbert had been with the Company, just three weeks short of  ten (10 ) years when he

was unjustly terminated. Based on the Agreement, he had three weeks of vacation in a calendar

year.

> Article IV section 6 (e)  states that  "[A]n employee entitled to two or more weeks of
> vacation in a calendar year may arrange to take five days of that vacation in one day
> increments. Requests must be made at least seven calendar days prior to the date
> requested and must be approved by the supervisor.  However, because of extenuating
> circumstances, a day of with less than a seven calendar day notation may be approved by
> an employee's supervisor.

It is simply incredulous that the Union failed to investigate the conflict between Bricking

and Colbert on March 2, 2000. Had the Union done so, the outcome of the March 8, 2000

Grievance Hearing on Colbert's indefinite suspension would have been different. There is clear

that the Union's behavior was arbitrary based on the facts the discovery materials have revealed.

This matter must be tried. The Agreement guarantees to the employees that he may have his

grievances heard ;  that guarantee was violated here.  Without a grievance hearing, the employee

has no opportunity for an "adjustment" in the matter of his discipline record.  Whether the Union

could have effected an adjustment here is uncertain because the procedure was ignored. Without

the operation of such procedures there is virtually no way a progressive and constructive

discipline policy can be administered. Based on  the conduct of the Company, Colbert is

charging wrongful discharge.  Based on the conduct of the Union, Colbert is charging lack of fair

and just representation due to arbitrary and capricious handling of his demotion grievance and

Colbert's wrongful discharge. In the grievance process, the three-day and the five-day

suspension were pending, and Colbert had requested that he be represented by the Union. The

"indefinite suspension" of March 2, 2005, was the third for which Colbert asked for Union

representation.   Without time to grieve these three disciplines, Colbert was deprived of due

process in pursing his rights as set forth in Article II, Section 1 and Article 1, Section 10. In

*Litton v. United Parcel Service,* 15 F.3d 1365, 70 (CA6, 1994), quoting *Poole v. Budd*, 706 F.2d

181,183 (CA6, 1983)., " a union acts arbitrarily only if 'it handles a grievance in a "perfunctory"

manner, with caprice or without rational explanation.' "   Colbert charges that the Union did not

fairly represent him regarding his demotion and regarding his wrongful termination by handling

his grievance in a perfunctory manner.

WHEREFORE, for the foregoing reasons, Colbert requests that  Defendant International

Brotherhood of Electrical Workers, Local 1347's Motion for Summary Judgment be denied and

that Plaintiff be allowed to proceed to trial on the claims contained in his amended complaint.

Respectfully submitted,

/s/Rose Ann Fleming
Rose Ann Fleming
BAR  ID. #0041337
ROSE ANN FLEMING, P.C.
3855 Ledgewood Drive
Suite 13
Cincinnati, OH  45207
Phone: 513-924-8389
Fax: 513-924-8389
Email: Fleming@xavier.edu

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on 29<u>th</u> day of March, 2005, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

to the following:


Ariane Schallwig Johnson, Esq.
Legal Department
Cinergy Services, Inc.
1000 E. Main Street
Plainfield, IN 46168
Telephone: 317-838-1285
Facsimile: 317/838-1842
Ariane.joynson@cinergy.com

And

Jerry A. Spicer
Snyder, Rakay & Spicer
11 Wesst Monumnet Building, Suite 307
Dayton, OH 45402
937-228-2696
937-228-5248
snyrakspi@aol.com


/s/Rose Ann Fleming
Rose Ann Fleming
BAR ID. #0041337
ROSE ANN FLEMING, P.C.
3855 Ledgewood Drive
Suite 13
Cincinnati, OH  45207
Phone: 513-924-8389
Fax: 513-924-8389
Email: Fleming@xavier.edu
