THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO  (CINCINNATI)
WESTERN DIVISION

| | |
|---|---|
| **OLLEN G. COLBERT. Jr.,**<br><br>                   Plaintiff,<br><br>          vs.<br><br>**CINERGY,**<br>**THE  CINCINNATI GAS AND ELECTRIC**<br>**COMPANY,**<br><br>**AND**<br><br>**INTERNATIONAL BROTHERHOOD OF**<br>**ELECTRICAL WORKERS,**<br>**LOCAL 1347,**<br><br>                   Defendants. | Case No.: 1:00-CV-909<br><br>Judge Susan J. Dlott<br>Magistrate Judge Timothy J. Hogan<br><br><br>**PLAINTIFF'S MEMORANDUM IN**<br>**OPPOSITION TO CINERGY/ THE**<br>**CINCINNATI GAS AND ELECTRIC**<br>**COMPANY'S MOTION FOR SUMMARY**<br>**JUDGMENT** |

Comes now, Plaintiff, Ollen G. Colbert, Jr., (hereinafter "Colbert"), by and through

Counsel, to oppose the Motion for Summary Judgment, filed on January 13, 2005, by Defendant

Cinergy/The Cincinnati Gas and Electric Company (hereinafter "CG&E").  For the reasons given

below, Plaintiff requests that this Court deny CG&E's Motion for Summary Judgment.

**STATEMENT OF UNDISPUTED AND UNCONTROVERTED MATERIAL FACTS**

Plaintiff incorporates the entire statement of facts in Plaintiff 's Affidavit in Support of

this Memorandum in Opposition to the Motion for Summary Judgment by Defendant CG&E.

**ARGUMENT**[1]

---

[1] Contemporaneously with the filing  of this Memorandum, Plaintiff is filing the following:
    1. Plaintiff's Affidavit, pursuant to R. 56(e) of the Federal Rules of Civil Procedure, in Support of
Plaintiff's Memorandum In Opposition To Cinergy/ The Cincinnati Gas And Electric Company's Motion For
Summary Judgment.
    2. Quarles, Dudley, Affidavit,  pursuant to R. 56(e) of the Federal Rules of Civil Procedure, in Support of
Plaintiff's Memorandum In Opposition To Cinergy/ The Cincinnati Gas And Electric Company's Motion For
Summary Judgment.

## A. <u>COLBERT'S IS NOT COLLATERALLY ESTOPPED FROM MAKING A §301 ARGUMENT IN THIS CASE</u>

Defendant CG&E argues that Plaintiff is estopped from advancing a certain §301 Argument on the basis of claims preclusion, citing *Colbert v. Cincinnati Gas and Electric Company and International Brotherhood of Electrical Workers, Local 1347*, Case No. C-1-97-685, U.S. District Court, decided February 8, 1999, granting motions of summary judgment to each of the defendants. Claim preclusion fails in this case for the following reasons:

(1) In contrast to CG&E's argument, the precise issue raised in this case was not raised in the prior proceeding. The case *sub judice* claims that CG&E wrongfully terminated Colbert on March 8, 2000, prior to allowing him full and fair opportunity to pursue the grieving process with regard to the progressive disciplinary process that had been applied to him from June 18, 1999 through March 2, 2000. In the prior case, Colbert claimed he was wrongfully demoted, not terminated. Here Colbert complains that CG&E breached the condition set out in its March 31, 1999 letter and the Union did not resume his representation on CG&E's failure to upgrade him to his former classification.. In addition, this case includes a Title VII discrimination charge against the employer for disparate treatment of Colbert and hostile working environment as well as lack of fair representation. . Therefore, where the issues differ they cannot be precluded.

---

3. Waters, Leon, Affidavit, pursuant to R. 56(e) of the Federal Rules of Civil Procedure, in Support of Plaintiff's Memorandum In Opposition To Cinergy/ The Cincinnati Gas And Electric Company's Motion For Summary Judgment.

4. Plaintiff's Memorandum in Opposition to International Brotherhood of Electrical Workers, Local 1347 Motion for Summary Judgment, incorporated fully as if wholly rewritten in support of Plaintiff's hybrid claim.

5. Plaintiff's Affidavit, pursuant to R. 56(e) of the Federal Rules of Civil Procedure, in Support of Plaintiff's Memorandum In Opposition To International Brotherhood of Electrical Workers, Local 1347's Motion For Summary Judgment, incorporated fully as if wholly rewritten in support of Plaintiff's hybrid claim.

(2)  CG&E argues that the determination of these were necessary to the prior proceeding, therefore are precluded from consideration here. This argument simply does not apply in this present fact pattern where the issues differ from those in the previous case.

(3)  CG&E's third argument for preclusion, namely that the  prior proceeding resulted in a final judgment on the merits of the issues is inapplicable as well  because the issues herein distinguished as unique to the present case and were not decided in Case No. C-1-97-685.

(4), Lastly, CG&E argues that the party against whom estoppel is sought [had] a full and fair opportunity to litigate the issue in the prior proceeding. Whether Colbert, pro se, had a full and fair opportunity to litigate his issues in the previous case is moot since the issues in the present case on different from the ones decided in the prior case.  Therefore,  claim preclusion cannot be invoked. See *Detroit Police Officers Ass'n v Young,* 824 F. 2d 512, 515 (6th Cir. 1987)*; Smith v Securities and Exchange Commission,* 129 F. 3d 356, 362 (6th Cir. 1997)*; National Satellite Sports, Inc. v Eliadis  Inc.,* 253 F. 3d 900, 907 (6th Cir. 2001).

**B. <u>TITLE VII-CLAIMS-BASED-ACTIONS BEFORE JUNE 18, 1999 ARE NOT BARRED</u>**

Colbert can introduce his VII-claims based-actions before June 18, 1999 because they are not barred under two counts. First, they can be introduced as evidence.  This is evident from case law. For example,  in *Black Law Enforcement Officers Associ. V. City of Akron,* 824 F.2d 475, 483 (6th Cir. 1987), the Court held  that the statute of limitations did not bar a plaintiff from offering proof of a pattern and practice of discrimination.

> It is clear that the district court erred in using the statute of limitations to bar the admission of evidence. The function  [*483]  of a statute of limitations is to bar stale claims. *American Pipe & Constr. v. Utah*, 414 U.S. 538, 554, 38 L. Ed. 2d 713, 94 S. Ct. 756 (1974). "The statute of limitations is a defense . . ., not a rule of evidence. Therefore, . . . [it] has no bearing on the admissibility of evidence." *United States v. Ashdown*, 509 F.2d 793, 798 (5th Cir.), *cert. denied*, 423 U.S.

829, 96 S. Ct. 48, 46 L. Ed. 2d 47 (1975). The decision whether to admit evidence is based on its relevancy and probativeness, *see* Fed. R. Evid. 401 and 403, not on whether the evidence is derived from events that occurred prior to a certain time period.

Plaintiffs accurately point out that if their presentation of evidence were limited to discriminatory actions that occurred one year prior to the filing of the action, it would be impossible to prove the pattern and practice of discrimination that is essential to their case. **Plaintiffs' complaints relate to what they perceive to be a long history of discrimination on the part of defendants in promotional decisions involving black officers. In [\*\*25] order to prove this, plaintiffs will certainly have to present evidence of events that occurred more than one year prior to the commencement of their suit.** *See United States v. Garvin,* 565 F.2d 519, 523 (8th Cir. 1977) *(evidence of events extending beyond the statute of limitations admissible to show motive, intent, or continuing scheme).*

Accordingly, the district court's order limiting relevant evidence to a period coextensive with the applicable statute of limitations is REVERSED.

*(Black Law Enforcement Officers Assoi. v. City of Akron,* 824 F.2d 475, 483 (6th Cir. 1987,

emphasis added).

Based on the above case law, Colbert's EEOC charges of discrimination  form evidence

admissible under Fed R. Evid 401 and 403 and will be treated as such by Plaintiff herein.

Further, Colbert's EEOC charges filed prior to June 18, 1999, form a continuing

violation. *National Railroad Passenger Corp (AMTRAK) v. Morgan*, 536 U.S. 101, 122 S.Ct.

2061, 2071 (2002) states:

(c) Hostile work environment claims are different in kind from discrete acts. Because their very nature involves repeated conduct, the "unlawful employment practice," § 2000e-5(e)(1), cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. See *Harris* v. *Forklift Systems, Inc.,* 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367. Determining whether an actionable hostile environment claim exists requires an examination of all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.,* at 23. The question whether a court may, for purposes of determining liability, review all such conduct, including those acts that occur outside the filing period, turns on the statutory requirement that a charge be filed within a certain number of days "after the alleged unlawful employment practice occurred." Because such a claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice," it does not matter that some of the component acts fall outside the statutory time period.

*National Railroad Passenger Corp (AMTRAK) v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 2071 (2002), Syllabus Paragraph c).

In this case, as in Morgan, the EEOC Complains are all considered by Plaintiff to justify the hostile environment that impacted his ability negative and caused him to be disciplined.

## C. COLBERT HAS EVIDENCE OF DISPARATE TREATMENT

CG&E's assertion that Colbert offers no evidence of statements or actions that lead to the conclusion that racial discrimination was a motivating factor in any employment decision made by CG&E is not true. Colbert, has submitted a witness list to Defendants which contains names co-workers that will state that he was treated differently. Affidavits from Quarles and Waters are filed contemporaneously with this Memorandum to verify this statement.

### 1. COLBERT HAS DIRECT EVIDENCE OF RACE DISCRIMINATION

Colbert was constantly subjected to disparate treatment at the hands of Bricking. One example was the discipline Colbert received regarding was the care of company property in contrast to how others were treated.. On August 17, 1999, Bricking blamed Colbert for damage to a company vehicle when he learned of a "ding" in the door of the truck that Colbert drove on August 17, 1999. Colbert denies putting "ding" in the door, but said he saw the "ding" and, following company policy, he took the vehicle to the garage and made out the accident report. Colbert's lead man, Willie Wilson reported to Bricking that Colbert did the "ding" in the truck. Colbert said it came from heavy equipment d being dropped on it. Bricking chose to believe Wilson. Because Wilson was black, CG&E attempts to prove that CG&E was not hostile to blacks. This simply is not true. Bricking was the decision maker here and he chose to hold Colbert responsible based on third party inquisition. (Colbert, Depo. 11-11-04, pp. 101-106). In contrast, white employees were treated differently. Bricking "would look the other way" when

damage occurred to company property. Colbert alleges that Ralph Kroger, a white employee had an incident with a company truck and got a DUI. Colbert states that the vehicle was taken to the garage for repair, However, no paper work was completed on the accident and so there was no evidence within CG&E that Kroger should have been discipline for committing a critical violation of company policy by driving under the influence of alcohol. (Colbert, Affidavit in Oppo CG&E, SJ, ¶70).

There were several incidents that show the micro-management of Colbert in contrast to other white employees. Colbert's application for an upgrade to Groundsperson Driver "A" was ignored by Bricking when his work record showed significant improvement by reason of lack of disciplines from August 26, 1997 through June 18, 1999 and when he had seniority in the pole yard. In contrast, a white employee, Ralph Kroger was promoted equipment operator.

## 2. COLBERT'S PRIMA FACIE CASE OF RACIAL DISCRIMINATION

Colbert can prove a prima facie case of racial discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973) states that, for a *prima facie* showing of disparate treatment, Colbert must establish that he: 1) is a member of a protected group; 2) that he is qualified in his employment, 3) that he suffered an adverse employment action, and 4) that he was treated less favorably than a "similarly-situated " person outside of the protected group. See also *Texas Dept. of Community Affairs v. Burdine*, 450 U.S 248,. at 255; 56. (1981); *Clayton v. Jeijer, Inc.* 281 F. 3d 605, 610 (6th Cir. 2002)

1) Colbert is a minority, an African American, and therefore a member of a protected group. He also had engaged in "protected activity because he filed five EEOC complaints of discrimination against CG&E between May 30, 1996 and March 31, 2000. Pursuant to 42 U.S.C. 2000(e) he is not to be discriminated against by the CG&E for filing such complaints against the Company. (42 U.S.C. 2000(e)-5).

6

2) Colbert was qualified for his employment. He was hired by CG&E based on his employment application. His employee status as a Groundsperson became effective on April 1, 1900. The Company found him qualified at that time. He was traiined and promoted to Groundsperson Driver "A" and held that position until July 13, 1992 (Colbert, Depo., 10-19-97, Exhibit 1,2.3,5,) While in training for the promotion of Lineman "C", he transferred from that to Construction Helper, effective July 13, 1992 because he was not able to perform the duties of Lineman "C". (Colbert, Depo., 10-19-97, Exhibit 19). He took the training for driving a CG&E vehicle and qualified as a Groundsperson Driver "A" on August 4, 1993. (Colbert, Depo., 10-19-97, Exhibits 25, 26). His duties are outlined by the Company in Exhibit 28 (Colbert, Depo., 10-19-97, Exhibit 28). Due to an accident to a transformer, Colbert was demoted to Construction Helper in March, 1995. He began, again to perform duties of the Construction Helper as outlined by the Company and continued in that position until his termination on March 8, 2000. (Colbert, Depo., 10-19-97, Exhibit 27).

3) Colbert suffered an adverse employment action. Colbert applied for an upgrade to his position from Construction Helper to Groundsperson Driver "A", on May 17, 1999. He was denied the upgrade and alleges that his supervisor, Donald Bricking, would not tell him why he did not get the position. In his Deposition, Bricking stated that there was a letter in Colbert's file that stated that he did not qualify for an upgrade. (Bricking, Depo. 12-10-04, pp. 54, 140). Bricking misstated the settlement of Colbert's Demotion grievance. This treatment was adverse for the following reasons:

a. There was an agreement between the Company, CG&E and the Union that Colbert could reapply for an upgraded to Groundsperson Driver "A", if his work record show improvement. (Colbert, 11-11-04, Exhibit 5 [Colbert, Depo., 10-19-97, Exhibits 76 and 77]).

b. Ronald Monson, a representative of the CG&E, defined "significant" as one (1) year or more. (Colbert, Depo., 10-20-97, Exhibit 69).

7

c. A Summary of Disciples  that CG&E compiled against Colbert pursuant to its progressive policy indicates that Colbert had not had any disciplines issued against him from August 26, 1997 to June 18, 1999., almost twenty-two (22) months. (Bricking, Depo., 12-10-04, Exhibit 2).  There is no question here that Colbert was applying for a job for which he was qualified for and one that he had performed for the Company from August 4, 1993 through March 29,  1995. (Colbert, 10-19-97, Exhibits 24,25, 45; Colbert, 11-11-04, Exhibit 5).

4) White employees were treated better than black employees who were similarly situated. In 1999, there were 23 non supervisor employees at Brecon. Of these, only 5 were black.  Colbert testified at his Deposition on February 10, 2003  that the distribution of discipline was racially motivated because he, a Black, received more severe treatment than similarly situated whites for the same or similar offences.  Colbert gave an example in comparison with Ralph Kroger.

> Q. Ms. Ezell: What incidents , other than the events leading up to  your termination, do you feel were racially motivated?
> A. Mr. Colbert:  As far as like distribution of discipline.  I mean, we have – and it still goes on to this day, from what I understand, which—we have like people that are actually – just happen to be white or whatever you want to call it right there and stuff, that should have been terminated a long time ago,  they're still employees.  And then they're getting basically away with murder on a lot of things, like from situations of getting DUIs in company vehicles. To damaging company property, including vehicles.
> Q. Ms. Ezell: And do you have names of individuals that have been given this kind of preferential treatment:?
> A. Mr. Colbert:  The one the pops up is a Ralph Kroger.
> Q. Ms. Ezell: And he's a white male?
> A. Mr. Colbert: Yes.
> Q. Ms. Ezell: And what has he done that you think would have resulted in termination for a black male?
> A. Mr. Colbert: The DUI alone, not one, but two.
> Q. Ms. Ezell: And you said one was in a company vehicle?
> A. Mr. Colbert: Both.
> Q. Ms. Ezell: And what is his position?
> A.. Mr. Colbert: I'm not sure what his position is, but he still is an employee and he works out at Brecon Pole Yard.  I'm not sure if he's an equipment operator or a what, I 'm not sure.  Most likely he's an equipment operator right now.

(Colbert, Depo., 2-10-03, pp. 25-6)

Ralph Kroger received preferred by Bricking in contrast to Colbert who was disciplined

by the reports of third parties, such as Willie Wilson. Where such treatment is meted out to

employees of the same work Unit by the same Supervisor, the Colbert can show that  is

practicing discriminatory action against Colbert because he was black.

As a second example, Colbert offers the following:

> Q. Ms. Ezell:  And what type of questionable activity this did Mr. Hatfield do that
> were overlook?
> A. Mr. Colbert: From damaging of company vehicles and company property – and
> don't get my wrong, in out occupation, construction accidents occur, but it seems
> like if an accident  with myself or maybe other blacks or something like that, the
> discipline was much more severe on us blacks as opposed to the whites.
> Q. Ms Ezell: And can  you give me an example of how the punishment of
> discipline would be more severe on blacks than on whites.
> A. Mr. Colbert:  Myself, using myself as an example, the demotion of 1995, right
> here that was – should have been classified as an accident.  That was twisted
> around to make it look as if I was a very irresponsible person,  and that wasn't the
> case.
> Q. Ms. Ezell: And using your 1995 demotion example, who would have twisted it
> around to make it look like you were irresponsible?\
> A.  Mr. Colbert: That came from management, mainly, spearheaded by out section
> head at the time, Kenny Miller.

(Colbert, Depo, 2-10-03, pp. 27-28).

Colbert contrasts his treatment as black negatively with the treatment given to a white

employee, David Hatfield, and by a white supervisor, Kenny Miller. In the particular demotion

incident of March 6, 1995, the accident report indicates that Colbert was sent out of his District

and did not follow an instruction properly;  when using a crane he lowered, rather than raised, a

transformer that was being removed. Colbert was demoted immediately from Groundsperson

Driver "A" to Construction Helper. On the other hand, Dave Hatfield, white, has damaged

Company property, but was considered to have had an accident. Again, comparables under the

same supervisor, were disciplined less severely, in situations where the only difference between

them was color of skin.

A third example of a comparable that Colbert cited to explain disparate treatment, was

Mike Ryan. Colbert testified as follows:

> Q.  Ms. Ezell: Any other examples that you can share with us today of cases in
> which whites were treated more favorable in terms of discipline for similar
> actions?
> A. Mr. Colbert: One that occurred which I was working with one of my
> coworkers, a guy named Mike Ryan.
> Q. Ms. Ezell: Mike?
> A.  Mr. Colbert: Ryan, which , by the way, I understand is the steward up there at
> Brecon  PoleYard.  Whereas Mr. Ryan was operating a vehicle and was operating
> it rather unsafely, I mean, to the point where it was putting me in danger, and I
> complained about it and round up getting written up for it.  He even tried to make
> the accident that he had my fault.
> Q. Ms. Ezell: And how did he make the accident that he had appear to be your
> fault?
> A. Mr. Colbert: No, he didn't try to do it, management did .
> Q. Ms. Ezell: Oh, management did, okay.  How did management try to make it
> look like it was your fault that Ryan had an accident?
> A. Mr. Colbert: Saying that because I was giving him direction on how to
>  load a pole trailer, and somehow or another, it was twisted around in saying that I
> had gave him the wrong direction and that wasn't the occurrence, and I had
> witnesses to back up my story right theres, and if it wasn't for those witnesses, I
> think I would have fired up on that one, I thing I would have gotten another entry
> in my white paper on that.
> Q. Ms. Ezell: And were any of these folks who you identified witnesses to that
> event?
> A. Mr. Colbert: I recall, I think, Leon was in the area.
> Q. Ms. Ezell: And I take it Mr. Ryan is a white male:
> A. Mr. Colbert: Yes.
> Q. Ms. Ezell: And was Mr. Ryan disciplined:
> A. Mr. Colbert: I don't know. I didn't  -- I didn't see his file or anything like that
> or  -- I mean, I hadn't heard any scuttlebutt around the yard or anything.
> Q. Ms. Ezell: What time frame are we talking about:
> A. Mr. Colbert: It was in 1999.

(Colbert, Depo, 2-10-97, pp. 29-31).

Again, when a white comparable, Mike Ryan, working under the same supervisor as Colbert, in the same time frame, is able to throw the blame on the black helper who is similarly situated, namely Colbert, it is apparent that CG&E, was discriminating against Colbert.

To support his testimony that blacks received harsher discipline than white at Brecon Heavy Equipment and Repair District, Colbert notes that the number of blacks that transferred out to Brecon to work on building maintenance in the West End Station, namely: Randy Haggard, Andrew Pope, Dudley Quarles, to mention only a few. (Colbert, Depo., 2-10-03, pp. 37 – 39). (Quarles, Affidavit, ¶¶ 13, 14. attached hereto).

## 3. CG&E'S REASONS FOR DISCIPLINE AND TERMINATION ARE PRETEXTUAL

CG&E's reasons for discipline and termination of Colbert are a pretext for discrimination. In *McDonnell Douglas Corp. v. Green,* (1973) 411 U.S. 792; 93 S. Ct. 1817, pretext is described as as follows:

> Petitioner's reason for rejection thus suffices to meet the prima facie case, but the inquiry must not end here. While Title VII does not, without more, compel rehiring of respondent, neither does it permit petitioner to use respondent's conduct as a pretext for the sort of discrimination prohibited by §703 (a)(1). On remand, respondent must, as the Court of Appeals recognized, be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext. . . . . .Especially relevant to such a showing would be evidence that white employees involved in acts against petitioner of comparable seriousness to the "stall-in" were nevertheless retained or rehired. Petitioner may justifiably refuse to rehire one who was engaged in unlawful, disruptive acts against it, *but only if this criterion is applied alike to members of all races.*
>
> *Other evidence that may be relevant to any showing of pretext includes facts as to the petitioner's treatment of respondent during his prior term of employment; petitioner's reaction, if any, to respondent's legitimate civil rights activities; and petitioner's general policy and  [\*805]  practice with respect to minority employment. n18.*

(*McDonnell Douglas Corp. v. Green,* (1973) 411 U.S. 792 as 805; 93 S. Ct. 1817 as 1825, emphasis added

In the case *sub judice,* the Company's stated reason for issuing disciplines culminating in termination on March 15, 2000 was poor job performance. (Colbert, Depo., 11-11-2004, Exhibit 31, Dismissal Letter, ). Regardless of CG&E's stated reasons, the behavior of Bricking indicates that the Company's reasons are pretextual. CG&E, acting through Bricking, did not like Colbert's EEOC Complaints. Further, Court's Opinion in *Colbert v. Cincinnati Gas and Electric Company, et al.*, entered February 8. 1999, (U.S. District Court Case No. C-1-97-68 Doc. 24) gave the Company unbridled approval to count on past disciplines as creating a justifiable reason for a Company discipline.

Although Colbert's EEOC filings are protected actions, Colbert notes that he did not know of any other employee filing with the EEOC. Further, Colbert knew that the Company was unduly and unfairly scrutinizing his activity by seeking information to establish poor job performance from lead workers as third parties. (Waters, Affidavit,_ attached hereto). Bricking's discipline activity relative to Colbert, is in contrast to the whites, such as Ralph Kroger, David Hatfield and Mike Ryan as recounted in the previous section. Bricking's activity is also in contrast to the collective bargaining agreement. He generated enough disciplines so that Colbert had at least two grievances pending when he received his "indefinite suspension" on March 2, 2000. When questioned about Colbert's right to complete a grievance prior counting those disciplines toward termination, Bricking answered "Absolutely Not". Given Article I, Section 9(d), Bricking's answer, bolstered by CG&E's letter of March 15, 2000, constitutes a cover up as to Bricking's intention to eliminate Colbert through the inconsistent unjust and arbitrary use of the Company's discipline policy, applying it strenuously to blacks like Colbert, but not to whites like Kroger, Hatfield and Ryan.

### D. <u>COLBERT WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT</u>

A review of the five EEOC complaints filed between May 30, 1996 and March 31, 2000, refute CG&E's argument on page 17 of its Motion for Summary Judgment that Ollen G. Colbert, Jr. cannot prove that he was subject to a hostile work environment. CG&E admits: "What is a hostile or abusive workplace environment depends on the totality of the circumstances," citing *Farragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998). The factors that the Court considers are: " the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance". *Harris v. Forklift Systems, Inc.* 510 U.S. 17, 21 (1993).

1. Colbert cites in his May 30, 1996, EEOC Complaint that he was so subjected to undue scrutiny by CG&E management that no one wanted to work with him. He states: "I am singled out from the Causasian employees for undue scrutiny and monitoring on the job. The job restrictions and scrutiny imposed on me elicits resentment from other coworkers and makes me unwelcome on any crew to which I am assigned". (Colbert, Depo., 11-11-04, Exhibit 6). The 'job restrictions" he alludes to have to do with CG&E's refusal to give Colbert overtime hours in contrast to their treatment of white employees, namely Ralph Kroger, Dave Hatfield, and Mike Ryan. (Colbert's Affidavit in Oppo CG&E, ¶ 85 ).

2. On February 27, 1997, Colbert is given a written oral warning because "he was not with his assigned work crew at 7:20 a.m.". Colbert states that he was singled out by his supervisor on this occasion and given a written oral warning because went to his car to get something out. Colbert states that all employees do this from time to time. He believes that he was treated in a hostile manner because Jerry Krause, (white) from Human Resources, alluded to his previous EEOC charge, when discussing an unrelated matter with him. (Colbert, Depo., 11-11-04, Exhibit 8).

3. When he asked for a change from his assignment to work under Mike Ryan (white), based on a formal complaint that he had fired, Management ignored the situation. When, on

August 20, 1997 Colbert left work due to Mr. Ryan's unsafe behavior, Colbert was disciplined with a one day unpaid suspension. Co-workers who walked off the job due to Mr. Ryan's behavior where given "sick" time and not discipline. White employees treated differently in this situation were Mike Ryan, Ralph Kroger, David Hatfield. (Colbert, Depo., 11-11-04, Exhibit 10).

At this point in Colbert's work history, there is medical documentation of the an emotional break down as well as physical illness that he experienced. He took "company approved" time off after being diagnosed by David Lustig, M.D. on May 1, 1998, with hypertension and diabetes, neither of which he had complained of before. The hostile work environment was the direct cause of these conditions. Colbert's Affidavit states that by 1998, he kept reiterating to himself: "I can't do this any more'" (Colbert, Affidavit in Oppo. CG&E SJ., ¶¶ 89 and 98 ) indicating that the tensions in the work place caused him to break down regarding his ability to function at work. Although Colbert recovered sufficiently to return to work, the environment in the work place remained hostile.

4. On or about May 17, 1999, Colbert received a denial on his application for an upgrade from Construction Helper to Groundsperson Driver "A". He asked for a reason from Bricking and received none. Other, white employees received upgrades, to mention one, Ralph Kroger was promoted by Bricking to an equipment operator. Not to have important questions answered by management is humiliating and discouraging. Colbert filed his EEOC complaint against Bricking's treatment on July 23, 1999. (Colbert, Depo., 11-11-04, Exhibit 12).

5. On or about March 31, 2000, Colbert filed a discrimination charge based on wrongful termination for job performance and poor attendance. Colbert grieved the unfairness of the disciplines from June 18, 1999 through March 15, 2000. The hostility was prevalent in Bricking's treatment of Colbert. He simply refused to believe him, thus reducing him to a feeling of worthlessness in the workplace. For example, Bricking refused to believe Colbert's story regarding losing the losing the pole truck and disciplined him on June 18, 1999, with an oral

warning. On July 1, 1999, Bricking gave Colbert another oral warning for leaving his keys in his truck overnight and refusing to pick them up the next morning. Colbert denied this and said he was "prepping" his truck, but Bricking would not listen. Nor would he listen on August 20, 1999 when he gave Colbert a written warning for cooling off on a hot day, although Colbert tried to explain that the airconditioning was not working in his truck. Again, on August 27, 1999, Bricking chose to believe the report of a co-worker that Colbert left early after the United Way Tour on August 25, 1999, rather than consider CG&E's past practiced. Rather, Bricking meted out a one-day suspension to Colbert for leaving without permission. This hostility so stressed out Colbert that he asked, after a one-day suspension, to take off time without pay due to illness.

Colbert picked up his fifth discipline on October 25, 1999, for a single utterance of "Fuck You" to Tom Sams, who had first used the F word against Colbert. When treated with utter disrespect by Tom Sams (black and a supervisor), Colbert was humiliated publicly. Colbert had entered Sams' office to sign up for overtime. To do so, he picked up a pencil from Sams' desk, Sams exploded over the action, and used the "F: word against Colbert publicly embarrassing him. On leaving the office, Colbert said "fuck you" once.

In characteristic fashion, Bricking states that his investigation of this situation does not support Colbert's version of the story "Your claimed that your behavior was provoked by similar language the management employee had directed towards you. Investigation of your allegation in this incident does not support your claim. . .". (Colbert, Depo., 11-11-04, Exhibit 27). Colbert's hand written note, dated January 20, 2000, states that "An investigation was claim[ed] too [sic] have been made by Don Bricking. The results of such investigation as of to date still have not been disclosed too [sic] I.B.E.W. local #1347 nor myself". (Colbert, Depo, 11-11-04 Exhibit 29). Colbert's Affidavit states that Sams picked fights with a number of people, some of them white. Only when the recipient of Mr. Sams' vituperative language is black, as Colbert is, does Bricking mete out discipline in the way of a three-day suspension, October 26th through

28[h], 1999 for continued tardiness on October 15, 20, 22 and 23.  It is interesting to note that the assignment of discipline cites continued tardiness,  (Colbert, Depo., 11-11-04, Exhibit 27).. Colbert, both in his  Affidavit as well as his hand written Exhibit 29, denies the validity of these citations of tardiness.  (Colbert, Affidavit, ¶ 48; Colbert Depo., Exhibit 29).

Bricking gave Colbert a five day suspension on December 14, 1999 for coming "late" on October 15, November 3, and 15, and December 9, 1999. In his Affidavit  Colbert denies that he was late. Bricking simply decided not to believe Colbert and take another step in the process required to terminate him. (Colbert, Depo., 11-11-04, Exhibit 30 ).

:The hostile environment which existed around Colbert in the work place accelerated the progressive discipline policy to its ultimate order on March 2, 2000 when Colbert was attempting to pin Bricking down as to what time he could leave to meet with his Union representative:

> I got the union steward and gave you a direct order to carry out the assignment and informed you that refusal would result in your indefinite suspension.  You said, 'Suspend me'.  At that point you were indefinitely suspended.

(Colbert, Depo., 11-11-04, Exhibit 31).

It should be noted that Ollen arrived at work the morning of March 2, 2000 in work clothes. (Waters, Affidavit, ¶ 13; Colbert, Affidavit in Oppo to CG&E, SJ, ¶ 53. (Bricking, Depo, , 12-10-04, pp. 167-168, and Exhibit 51).  The issue with Colbert was not his work assignment. He was attempting to pin Miller down regarding the time he could leave to meet with his Union representative before the Grievance Hearing scheduled for 2:00 p.m.  Mr. Bricking's failure to tell Mr. Miller that Colbert had a Union Meeting, in and of itself is of prime importance in this case. Mr. Miller may have allowed Colbert to leave by 11:00 a.m. as Colbert requested, had he known.  If Miller granted that request, the termination would not have taken place. The very hostility of the environment in which Colbert was working kept him from obtaining a fair hearing on the issue of wrongful termination.

### E. **COLBERT CAN ESTABLISH A CLAIM OF RETALIATION**

Colbert's disciplines and termination were retaliatory for his filing of an EEO Complaint against

Bricking's refusal of his upgrade on July 23, 1999. That EEOC  filing was a protected activity.

That Bricking did not know about it is disingenuous when EEO reported that it has made an

investigation of Colbert's complaint and Bricking was the only CG&E management

representative mentioned in the EEO Complaint. (Bricking, Depo., 12-10-04, p. 143, and Exhibit

 12). Colbert testifies that in early August a co-worker told him he ". . .  was as good as fired"

for filing his EEO Complaint and another co-worker urged him to withdraw it to avoid further

disciplines. (Colbert, Affidavit in Oppo to CG&E's SJ, ¶ ).  The frequency of the disciplines that

Colbert received from Bricking without awaiting  the results of the grievance process for the

disciplines outlined indicates that Bricking was operation with an intention to pursue Colbert to

the final steps of indefinite suspension.

    The disciplines dated 6/1/99;  6/18/99; 7/1/99, 8/20/99; 8/27/99; 12/14/99; 3/2/00;

3/15/00 (Bricking, Depo., 12-10-2004, Summary of Disciples,  Exhibit 2), indicate that there was

a steady application of the progressive discipline policy against Colbert which was

discriminatory because it was not equally and evenly applied to whites such as Ralph Kroger,

Dave Hatfield, Mike Ryan as developed above.  Bricking admitted that he had not indefinitely

suspended anyone else but Colbert. Proximity in time not only establishes a nexus between an

event and the result, but it can serve as proof of the retaliatory intent. CASE CITE . Colbert

testifies that over and over again that management was "up in his face", particularly after he

asked for the upgrade, was denied and then filed his fourth EEO complaint citing Bricking as

discriminating against him  That statement suggests that Bricking' disciplines of Colbert were

motivated by retaliation.. In actuality Bricking used the discipline policy as a cover up of his

desire to eliminate an employee who reported him to the EEOC for discriminatory treatment. Although Bricking stated that he only applied the disciplines that came from upper management, he was the one that decided what to report and what not to report to upper management. Bricking admitted that he had neglected to mention that Colbert had a meeting at 12:30 p.m. with the Union Representative prior to his meeting which resulted in upper management's directed to suspend Colbert indefinitely. A review of the employment behaviors of Colbert during this period of 1999 shows no precise violations that were serious enough to terminate Colbert. Attendance is based on Bricking's observation, not on clock time. An employee was only late when deemed so by Bricking. Colbert's disciplines for lateness were discriminatory because the same measure was not applied to white employees. (Colbert, Affidavit in Oppo to CG&E's SJ, ¶48). Discipline for damage to company vehicles was not evenly applied. (Colbert, Affidavit, ¶70). Past practice was not applied evenly: the United Way Tour was an occasion for taking the remainder of the day off in some years; in contrast, it became an occasion to check attendance for the remainder of the day in 1999, without prior warning.

## F. COLBERT CAN PROVE HIS §301 CLAIM AGAINST CG&E

Colbert proves his § 301 Claims against Cinergy/The Cincinnati Gas and Electric Company and against the Union, International Brotherhood of Electric Workers, Local 1347. As pointed out above, CG&E breached its collective bargaining agreement with the Union by its rush to Colbert's termination by the progressive discipline policy without waiting for the grievance procedure to be accomplished before termination. Thus CG&E engaged in an unfair labor practice. There is no dispute as to the management rights clause Article I, Section 9(a) of the Agreement between The Cincinnati Gas and Electric Company and the Local Union 1347, International Brotherhood of Electrical Workers, (Hereinafter "The Agreement"). However,

18

Article I, Secion 9(d) and Article II (a)  of the Agreement provides that the employee who is a
union member has certain rights to have his objections to the disciplines received "adjusted" by
the grievence process. The management rights clause, Article I, Section 9, clearly begins the
limitation "***Except where expressly abridgd by a specific provision of the Agreement,*** the Union
recognizes that the management of the Company, etc. . . . . .  are vested in and reserved to the
Company" (Agreement, Article I, Section 9(a). and  Article II, Section 1(a) are  expressed
limitation on the management's rights.  Article I, Section 9(d) reserves the employees rights to
grieve managememt's decision in Article I, Section 9(a), (b) and (c).

CG&E totally ignored the fact that,  at the accelerated rate that it was awarding
disciplines against Colbert, it was getting ready with every warning to terminate Colbert. On
March 2, 2000, the Company suspended Colbert indefinitely. On March 8, 2000, the Company
terminated him. Colbert had grieved his disciplines, but the process was not complete for several
disciplines.  Had the Company given Colbert a full and fair hearing, the Union might have
prevailed for the employee had any effort been put forth by the Union.  It appears to be a
violation of the property rights of the individual employee to be given a change for employment.
The Company violated Plaintiff's rights by its haste to terminate Colbert. The Company, by
*Agreement,* should not have terminated Colbert until the grievance procedure was accomplished.
That the management had no respect for the *Agreement* is evident in Bricking's reply when
asked in the Deposition:

Q.(Fleming): Why would you five a five day suspension before you know that the three
day suspension was –whether it was going to be approved or not?
A. (Bricking): I did answer that; It would be the next step in the grievance process.
Q. (Fleming): Your don't have to wait to see if—
A. Absolutely Not.

(Bricking, Depo.,12-10-2004, pp. 124-125).

Colbert believes that CG&E did violate the Agreement it had with the Union based on Bricking's behavior of disciplining him without allowing him to complete his grievances and by suspending him indefinitely without granting him his request because of his unusual and extenuating circumstances and the preference promised by the Agreement for granting vacations to Union employees under Article IV, Section 1(e).

The Union's failure of fair representation is fully developed in the Plaintiff's Memorandum in Opposition to the Motion of Summary Judgment of Defendant International Brotherhood of Electrical Workers, Local 1347, which establishes the second prong of Colbert's hybrid §301 count against employer and Union.. Union failed in its duty of fair representative to Colbert by withdrawing from grievances when the CG&E presented letters ostensibly defending its action. Prior to withdrawal from grievances, the Union had a fiduciary obligation to make an independent comprehensive investigation which it did not perform, either in the upgrade application to recover from his demotion on May 17, 1999 or in Colbert's termination in March 15, 2000. The Union's failure to make an independent investigation of the facts does not meet the standards set out by *Driver v. United States Postal Service, Inc.,* 328 F.3d 863 at 896 (6th Cir. 2003):

WHEREFORE, for the foregoing reasons, Colbert requests that GC&E' Motion for Summary Judgment be denied and that Plaintiff be allowed to proceed to trial on the claims contained in his amended complaint.

/s/Rose Ann Fleming
Rose Ann Fleming
BAR  ID. #0041337
ROSE ANN FLEMING, P.C.
3855 Ledgewood Drive
Suite 13
Cincinnati, OH  45207
Phone: 513-924-8389
Fax: 513-924-8389
Email: Fleming@xavier.edu

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on 29th day of March, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:


Ariane Schallwig Johnson, Esq.
Legal Department
Cinergy Services, Inc.
1000 E. Main Street
Plainfield, IN 46168
Telephone: 317-838-1235
Fax: 317-838-1842
Ariane.johnson@cinergy.com

And

Jerry A. Spicer
Snyder, Rakay & Spicer
11 West Monument Building, Suite 307
Dayton, OH 45402
Telepone: 937-228-2696
Fax: 937-228-5248
snyrakspi@aol.com


/s/Rose Ann Fleming
Rose Ann Fleming
BAR  ID. #0041337
ROSE ANN FLEMING, P.C.
3855 Ledgewood Drive
Suite 13
Cincinnati, OH  45207
Phone: 513-924-8389
Fax: 513-924-8389
Email: Fleming@xavier.edu

NOTES:

PRETEXT

show that he was using the Company's  progressive and constructive discipline policy as a tool to achieve for Colbert's termination,  regardless of Colbert's rights to grieve these disciplines as a member of the Union. Colbert's experienced a surge of disciplines levied against him by Bricking immediately after the Court's Opinion was published in *Colbert v. Cincinnati Gas and Electric Company, et al.*,  entered February 8. 1999,  (U.S. District Court Case No. C-1-97-68 Doc. 24). The rate of discipline's further accelerated after he filed his fourth EEOC Complaint on July 23, 1999, against Briking's denial of his application for upgrade of his job classification. This acceleration is obvious from the CG&E's "Summary of Disciplinary Actions – Ollen Colbert". (Bricking, Depo., 12-10-2004, Exhibit 2) . Bricking's aggressive application of disciplines against Colbert was enkindled by his assumption that the Company's management's rights were absolute and all inclusive.  Therefore, Bricking, theorized that Colbert could be given a straight line of disciplines without hesitation, even though the grievance hearings of the earlier disciplines had not yet resolved through the grievance process.

In addition to misuse of the Company's progressive discipline policy, Bricking refused to consider Colbert's application for an upgrade on May 17, 1999, or to give him a reason for this.

Colbert filed his fourth EEOC complaint on July 23, 1999 complaining about Bricking's denial

of his application for his upgrade to a Groundsperson Driver "A" application, based on

discrimination and retaliation for protected activity. To explained this treatment, in his

Deposition, December 10, 2004, Bricking stated: "There's a letter in his file saying he cannot be

upgraded until his performance improves". (Bricking, Depo. 12-10-04, p. 54). On further

questioning regarding the documentation of any response to Colbert's request for consideration

for an upgrade in his job classification, Bricking stated in response to the question :

> Q. (Ms. Fleming;) Do you mean that you put a written response in Ollen's file to
>    Ollen's request that he be upgraded in the early months of 1999, after
>    January 30 when he took over—
> A. (Bricking): I really don't recall, but that again is covered under the collective
>    bargaining agreement.
> Q. (Ms. Fleming): What is covered?
> **A. *Upgrades, things like that. If I did break a union rule there would be more
>    grievance language of what's going on.***

(Bricking, Depo., 12-10-04, pp. 54, 55, emphasis added)**.**

        The denial of Colbert's application for an ungrade on May 17, 1999, and the frequency

of the disciplines that arose after the denial of ungrade, demonstrates, by a preponderance of

evidence, that Colbert's disciplines and termination is pretextual. As shown above on disparate

racial treatment, this denial of an upgrade constituted serious adverse employment action.

This treatment is in sharp contrast to that applied to Ralph Kroger's acquisition of two DUIs

when driving a company vehicle, referenced above, and Mike Ryan's damage in a company

vehicle, to mention only two reference above in this Memorandum. IThis treatment is also in

sharp contrast to CG&E's *Agreement* with the Union: CG&E ran rough-shod over Colbert's

rights as a Union employee to "adjust" his disciplines by the grievance process as stated in

Article I, section 9(d). Colbert should not have been terminated until his grievances on the three-

day and five-day and indefinite suspensions were resolved under Article II, Section I. The use of

the management rights clause of the  collective bargaining agreement is a pretext for the

elimination of blacks like Colbert  by Bricking.


HOSTILE ATTITUDE

Further, Leon Waters' Affidavit states that Colbert was subjected to undue scrutiny to cause he

was black and had filed EEOC charges of discrimination. Waters believes that Colbert was

treated in a hostile manner because he would complain about the unfair treatment that he was

receiving, where as a lot of other black employees would not say anything about management

because they needed there jobs. Waters Affidavit Item _____ ). Waters says that Kenny Miller,

Supervisor, pulled him into the office and, after saying, "You are a fried of Ollen G. Colbert,

aren't you?, he asked if Waters knew whether Colbert had  brought a gun to work since Miller

saw Waters "talking with Colbert near Colbert's car that morning". (Waters' Affidavit _____

Quarles' Affidavit states that Colbert was "micro-managed"  by CG&E management. He

contrasted the treatment that Bricking meted out to Mike Dieckman, white employee at Brecon

in the same work group as Colbert and the treatment consistently received by Colbert.



The 301 claim against the union.

        The Union's  egregious failure to investigate  Colbert's grievances is very clear from the

record here. First, the Union withdrew its grievance of Colbert's Demotion at the Fourth Step

accepting as a condition of Colbert's ability to bid back its position the Company's offer as

stated in the CG&E letter of March 31, 1997, (Colbert, Depo., 11-11-2004,  Exhibit 5 [ Colbert,

Depo, 10-30-1997, Exhibit     ]).   Had the Union not done so, it would have taken notice on or

about May 17, 1999,  that  CG&E's breached of its own condition on Colbert demotion set forth

in the CG&E letter dated March 31, 1997, thereby rescinding the agreement of May1, 1997. At this point the Union should have asked the Company for arbitration, but instead, it ignored Colbert's request to grieve his denial of upgrade and did nothing. Second, at the time of termination, when the Union received the letter dated March 15, 2000, it withdrew at the Third Step Grievance Hearing without making its own independent investigation, contrary to the Affidavit of Francis B. Kelly attached to the Memorandum. Had the Union investigated, it would have taken note of the pending grievances of the three- day and five-day suspensions which were not resolved. Unresolved grievances are not evidence that termination is the next step in progressive and constructive discipline policy. Colbert's termination was wrongful and occurred because of lack of Union investigation. Further, an independent investigation would have provided the Union with the information that Bricking had failed to notified Kenny Miller (CG&E management), that the real reason that Colbert wanted to pin down his time to leave *work for which he had reported,* was to meet with his Union supervisor. Colbert had a right to this Meeting and the Union had a fiduciary obligation to defend him against wrongful termination.

HOSTILE ENVIRONMENT

Colbert's termination at CG&E was simply the last step of management's rush to eliminate Colbert. The charge of insubordinate is a pretext for finding a serious enough cause to bring CG&E;s progressive disciplinary policy to an end. The facts demonstrated in the letter dated March 15, 2000, indicate that there was no insubordination. Exhibit 31 of Colbert's deposition of November 11, 2004, is a copy of the March 15, 2000 termination letter to Colbert signed by Bricking. Colbert did not refuse to do the assigned work. He refused to accept Bricking's arrangements that he could leave at 11:00 or 11:30. to take a shower and change clothes to attend that grievance meeting. *To that statement you replied "no".* (Colbert, Depo., 11-11-04, Exhibit

31). Bricking denies knowing that Colbert had been told by the Union representative to come to a preliminary meeting an hour ahead of time to discuss the details of his termination of March 2, 2000 with his Union representative.  Given the fact that it is the responsibility of the Union to notify the company of the designated step in the grievance process, it is doubtful that Bricking did not know that  Colbert had a meeting ahead of time with the Union. Neither the Company nor the Union has ever denied that the Grievance Meeting of Colbert's Affidavit gives the details of his side of the story.

**Vacation days**

Further, CG&E breached the contract by denying Colbert's request for a vacation day.  Colbert was denied that relief ostensibly because the Company had to pay him in the afternoon.  But, because Colbert wanted to take a whole day vacation day, the Company would not have to pay him since it would not have been a work day for Colbert. As any rate, Article IV, Section 1(e) states:"[B]ecause of extenuating circumstances, a day off with less than seven calendar day notification, may be approved by an employee's supervisor". (Agreement, Art. IV, §1(e)). The Agreement further states: in Article IV, Section 1(e) promises: "Preference for vacations hall be granted within a classification at a headquarters on a system service basis within the bargaining unit". (Agreement, Id). There was no one else with more merit than Ollen Colbert requesting a vacation day on March 2, 2000. Preference should have been granted to Colbert's request for a vacation day. Instead, Colbert testified that Bricking told him that it was short notice and he could not spare him (Colbert, Depo. 11-11-04, p. 124). Bricking flatly stated that he denied Colbert his request for a vacation day on March 2, 2000 "Because we don't give partial vacation days" (Bricking, Depo. 2-10-2004, p. 130). However, Colbert did not ask for a partial day. According to his testimony, he asked for a vacation day, not a half day.  Bricking's statement is simply a pretext for a breach of the Agreement.