THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO  (CINCINNATI)
WESTERN DIVISION

| | |
|---|---|
| **OLLEN G. COLBERT. Jr.,** | Case No.: 1:00-CV-909 |
| Plaintiff, | Judge Susan J. Dlott<br>Magistrate Judge Timothy J. Hogan |
| vs. | |
| **CINERGY,<br>THE  CINCINNATI GAS AND ELECTRIC COMPANY,** | **PLAINTIFF'S AFFIDAVIT IN SUPPORT OF MEMORANDUM IN OPPOSITION TO CINERGY'S/THE CINCINNATI GAS AND ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT** |
| **AND** | |
| **INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,<br>LOCAL 1347,** | |
| Defendants. | |

| | |
|---|---|
| STATE OF OHIO | ) |
| | )SS: |
| COUNTY OF HAMILTON | ) |

I, Ollen G. Colbert, Jr.,  undersigned Affiant, having been duly warned and cautioned, do hereby depose and state:

    1. I am the Plaintiff in the above captioned case.

    2. I was employed by Cincinnati Gas and Electric Company on or about April 2, 1990 as a Groundsman at $6.50 per hour.

    3. I have been a dues paying member of the  International Brotherhood of Electrical Workers, Local 1347, contemporaneously with my employment with Cincinnati Gas and Electric Company.

    4. After March 31, 2000, when, contrary to my timely request, the Union did not continue to grieve my termination of employment, I discontinued my membership.

5. Effective October 1, 1990, I was given an increase in salary to $6.60 per hour.

6. Effective November 20, 1990, I was promoted to Lineman "C" at $13.06 per hour. My rate of pay was increased to $13.83 per hour, effective May, 20, 1991.

7. On July 8, 1992, I resigned as a Lineman and was transferred to the Brecon Heavy Equipment and Repairs District where I assumed the position of Construction Helper at the rate of $12.86.

8. On August 4, 1993, I was promoted to Groundsperson Driver "A" at $14.72 per hour.

9. On March 20, 1995, I was demoted from Groundsperson Driver "A" to Construction Helper at $13.31 per hour from $15.36 as Groundsperson Driver "A".

10. My demotion was caused by an accident that occurred while I was operating a truck boom to move a transformer in Hamilton, Ohio, as well as other disciplinary actions that reflected poor work performance for which I had been disciplined. I grieved this demotion: First Step, May 31, 1995; Second Step, June 15, 1995.

11. The Union was able to persuade CG&E to amend its demotion letter of April 7, 1995, with a letter dated August 21, 1995.

12. Francis B. Kelly requested a Third Step Grievance Hearing in a letter dated October 10, 1995 on the matter of objectionable documents in Colbert's personal file.

13. The result of the Third Step Grievance Hearing was that the Union's letter was revised again by the Company on February 20, 1996, which agreed to removing two contested signed warning documents (9-29-93) and (7-14-95) from my personal file as a response to the Union's grievance, June 19, 1995. See Grievance No. 11-100-06-95.

14. The Union requested by a letter dated May 8, 1996, a Third Step Grievance Hearing on the matter of my demotion. See Grievance No.11-103-04-96.

15. The Third Step Grievance Hearing took place on July 17, 1996. The Union requested to know from the Company, in case their response was negative, what I had to do for the Company to allow me to return to my former position as Groundsperson Driver "A".

16. The Company responded in a letter dated August 22, 1995, signed by Ronald R. Monson, that the Company denied my grievance, but compromised as follows regarding my getting back the position of Groundsperson Driver "A", as follows:

> In response to the Union's question regarding when Mr. Colbert would be allowed to promote to a higher position, Mr. Colbert would need to reverse his trend of poor performance, accidents, etc. for a significant period of time of at least a year or more in order to be considered for promotion to a higher position.

(Colbert, Depo., 11-11-04, Exhibit 5 [Colbert, Depo., 10-30-97, Exhibit 69]).

17. On October 31, 1996, the Union requested a Fourth Step grievance procedure on Grievance No. 11-103-04-96. This Fourth Step Meeting was scheduled for January 27, 1997, then rescheduled for February 27, 1997.

18. As a result of the Fourth Step Grievance Meeting, the Union was notified that the grievance concerning my demotion was denied by the Company in a letter signed by H. Joseph Kraus, dated March 31, 1997. (Colbert, Depo., 11-11-04, Exhibit [Colbert, Depo., 10-30-97, Exhibit 76] ).

19. On May 1, 1997, the Union, withdrew this grievance conditionally and responded in writing to the CG&E as follows:

> As a result of the fourth step grievance letter dated March 31, 1997, we have decided to withdraw this grievance under that letter's conditions, "if

> and when Mr. Colbert maintains a satisfactory work record for a
> significant period of time, the Company will consider him for future job
> openings in the Groundsperson Driver "A" job classification"

(Colbert, Depo., 11-11-04, Exhibit 5 [Colbert, Depo., 10-30-97, Exhibit 77] ).

20. I did not agree with the Union's conditional withdrawal from my Grievance and requested that the Union take my case to Arbitration. The Union's decision not to arbitrate the case was stated later in Francis B. Kelly's Affidavit dated January 13, 2005. "I decided not to pursue arbitration because, based on all the facts and circumstances, I concluded that the grievance was not meritorious and that CG&E would prevail in arbitration as there was no breach of the collective bargaining agreement". (Kelly, Francis B., Affidavit, January 13, 2005, Item 3).

21. I filed a Complaint on July 23, 1997, captioned *Colbert v Cincinanti Gas & Electric and International Brotherhood of Electrical Workers*, U.S. District Court, Southern District of Ohio, Case No. C-1-97-685, in which I alleged a hybrid Section 301 action, charging my employer, CG&E, with breach of the collective bargaining agreement and the Union, IBEW, with breach of the Union's duty of fair representation.

22. Both Defendants, CG&E and IBEW were granted summary judgments on February 8, 1999 because the Judge said I failed to produce evidence to support my Complaint. (Doc. 24 and Doc. 25, Judgment in a Civil Case, and Opinion, Case No. C-1-97-685).

23. Regarding the Union, the Court found, in its Opinion, as follows:

> [T]he Union processed Plaintiff's grievance through the grievance
> procedure up to the point of arbitration. Although the Union
> determined that Plaintiff's claim lacked merit, it, nonetheless, took
> steps to protect Plaintiff's interest. To this end the Union agreed to
> withdraw its grievance only upon CG&E's agreement to consider
> Plaintiff for future promotions.

(Beckwith, Sandra S. Judge, Doc. 25, Judgment in a Civil Case, and Doc. 24, Opinion, Case NO. C-1-97-685).

24. There were no disciplinary charges lodged against me by the CG&E from August 26, 1997 through June 18, 1999, a total of 21 months according to the Company's records, in so far as the Company had notified either the Union or me.

25. I applied for an upgrade of my job to an open job at Brecon for a Groundsperson Driver "A" on or about May 17, 1999.

26. I believe that I qualified for this job because of my seniority at Brecon and because of the Company's condition stated on August 22, 1996, that "Mr. Colbert would need to reverse his trend of poor performance, accidents, etc. for a significant period of time of at least a year or more in order to be considered for promotion to a higher position".

27. Further, I was qualified to apply for this open position because the Company stated in a letter of March 31, 1997 that it would consider my application as follows:

> [W]hen Mr. Colbert maintains a satisfactory work record for a significant period of time, the Company will consider him for future job openings in the Groundsperson Driver "A" job classification.

28. Bricking, my CG&E supervisor, refused to reply to my question as to why I did not get the job.

29. Lately, after I filed the case, Bricking at his Deposition on 12-10-04 said he could not consider my application for that job "because of a letter in my file".

30. Other than what the Company offered to the Union on March 31, 1997 as a condition of allowing me to apply for a return to my Groundsperson Driver "A" position,

and the Union's acceptance of that condition on May 1, 1997, I know of no other letter in my file.

31. I believe that the Company has discriminated against me by offering a bogus reason for rejecting my application, refusing on or about May 17, 1999 to reply to me as to its refusal, and awarding that position to a white applicant.

32. I also believe that the Company breached its agreement with the Union which settled my grievance as to my Demotion at the Fourth Step Grievance Hearing, and thereby breached the collective bargaining agreement, Article 1, 9(e) with the Union by Bricking's refusal to consider my May 17, 1999 application and failing to notify the Union that they were not going to consider me for rehiring, since Article I, Section 9(e) requires that the Company " will discuss in advance with the representatives of the Union . . . rehiring of employee in all classifications governed by this Agreement . . .".

33. I asked the Union to grieve my rejected application of May 17, 1999 for Groundsperson Driver "A", made after 20 months of no disciplines entered by the Company in light of its conditional acceptance of the Company's offer in the Union's reply letter of May 1, 1997.

34. IBEW failed to grieve my denial of an upgrade application made on or about May 17, 1999, after 20 months without a disciplinary action recorded.

35. I believe that the Union's failure to grieve my rejected upgrade application, without reason, is a breach of its fiduciary duty to me as a dues-paying member to fairly represent me against the Company's breach of a conditional acceptance of my Demotion.

36. I believe that by such refusal, the Company rescinded its offer of March 31, 1997, and that my grievance was returned to the status it had at the Fourth Step Hearing.

37. The Union knew that I wanted to arbitrate my Demotion from Groundsperson Driver "A" and should have continued with the process immediately after the Company's breach of its conditional offer.

38. I believe that the Company's breach of its March 31, 1997 condition for my rehiring to Groundsperson Driver "A" is new evidence which alters the application of the Court's decision made on February 8, 1999.

39. I believe that the Company became arrogant in its treatment of me after the Court's Decision and that was the real reason why it breached its agreement with the Union on or about May 17, 1999.

40. Based on the conditional withdrawal of my grievance over my demotion from the position of Groundsperson Driver "A", the Union ignored its duty of fair representation when the Company, by its agent, Bricking, refused to consider Colbert's upgrade based "on a letter in his file".

41. I believe that the Company's breach of its March 31, 1997 offer to allow my reapplication for the Groundsperson Driver "A" position provides new evidence as to the Court's consideration of the §301 hybrid action in my Complaint against the Union and the Company, filed October 30, 2000.

42. I grieved a counseling over blowing decals off my truck, but the grieving got "caught up" on the Third Step.

43. In the matter at hand, my discipline history between June 18, 1999 and March 8, 2000 was the following:

| DATE | INFRACTON | DISCIPINARY ACTION |
|------|-----------|--------------------|
| 4/7/1995 | Overall poor work performance | Demotion |
| 7/7/1995 | Inattentiveness to duties | Oral Warning |

| 12/1/1995 | Poor work performance | Oral Warning |
|---|---|---|
| 1/26/1996 | Purported weapon on company property | Oral Warning |
| 5/30/1996 | Confrontation with a co-worker & equipment damage | Written Warning |
| 2/27/1997 | Poor work performance | Oral Warning |
| 7/23/1997 | Absenteeism | Oral Warning |
| 7/31/1997 | Absenteeism | Written Warning |
| 8/26/1997 | Insubordination | One-day Suspension |
| 6/18/1999 | Poor work performance | Oral Warning |
| 7/1/1999 | Insubordination | Oral Warning |
| 8/20/1999 | Inattentiveness to duties | Written Warning |
| 8/27/1999 | Leaving without permission | One-day Suspension |
| 10/25/1999 | Abusive Conduct | Three-day Suspension |
| 12/14/1999 | Overall poor work performance | Five-day Suspension |
| 3/15/2000 | Insubordination | Discharge |

(Bricking, Depo., 12-10-04, Exhibit 2 [Appendix A Summary of Disciplinary Action -
Ollen G. Colbert, Jr., Appendix 5, Brief of Defendant-Appellee, Director, Ohio
Department of Job and Family Services, Court of Appeals, First Appellate District,
Hamilton County, Ohio, Appeal No. C010410; Trial No. A0005948, selected dates for
the years contested in Colbert's Amended Complaint, April 7, 1995 and March 8, 2000]).

        44. I grieved the pole truck incident that occurred on July 18, 1999 because the

lead vehicle ran a red light and I did not believe I was  required by the Company as in the

line of my duty to violated atraffic law in order to keep up with the pole  truck. The lead

person told a conflicting story and Bricking believed him. The Union did not aggressively

represent me on this matter when there was a conflict in the testimony.

        45. I grieved the keys-left-in-the-truck incident of july 1, 1999,  based on past

pattern and practice in the Company, drivers left keys overnight all the time when the

vehicle was left on Company property. The company produced no documentation of an

announcement of a contrary policy. However, The Union made no investigation to the

best of my knowledge.

        46. I grieved the "hot weather" incident because I thought Bricking unfairly

applied the provisions of the collective bargaining agreement which allowed for shelter

for "cold weather".  I believed that by analogy I should be allowed time to "cool off" in

excessively hot weather. The Union should have represented my rights under the intent of the cold weather clause in the collective bargaining agreement.

47. I grieved the one-day suspension under pattern and practice for not returning to work the remainder of the day I took the United Way Tour, August 25, 1999, because in the past employees who signed up for the United Way Tour did not work the remainder of the day. The Company's action was contrary to and inconsistent with the Company's past practice of allowing employees who participate in a United Way Tour in the morning to take off the remainder of the day. In fact when I returned to Brecon to get my car, no one was there to check me out as proof of past practice.

48. I grieved the three-day suspension that I received for abusive language to Tom Sams after he used equally abusive language of me on October 25, 1999. I further objected to the Company including absences that were solely based on Bricking's subjective observations, not on a time clock. Any tardiness charge was based subjectively on Bricking's attitude. In general the truck Drivers never stated before 7:20 a.m. They were going over the routes with Bricking. Most of the time, he wrote me up he asked a low-level lead person if I was on time and they reported negatively, with no proof at all.

49. My grievance of this incident was never settled. It was left pending at the Grievance Hearing Meeting of March 2, 2000 due to my indefinite suspension earlier on March 2, 2000 and finally, left unresolved because of my dismissal on March 8, 2000.

50. I grieved my five-day suspension for absence as documented by a letter, dated December 14, 1999. Said letter refers to October 29, 1999, and three days of unpaid absence, November 3, November 15, and December 9, 1999. The Union held an initial

meeting on this matter, postponed the second meeting twice, and thus this matter was pending, unresolved, at the time of my termination on March 8, 2000.

51. I was indefinitely suspended because I wanted to leave Brecon Heavy Equipment and Repair District at 11:00 a.m. to meet with my Union Representative before the Grievance Hearing began, scheduled for 1:30 p.m. in downtown Cincinnati. The Grievance Hearing was on the matter of my three-day suspension for using abusive language toward Tom Sams on October 15, 1999.

52. Bricking called Kenny Miller, management, for consultation on this matter, and was advise to give a directive to me to work until 11:00 a.m., or be suspended. I asked for a vacation day and was refused and Bricking indefinitely suspended me for insubordination.

53. Bricking did not tell his supervisor Kenny Miller, that the reason that I wanted to leave my job early on March 2, 2000 was to be on time to meet with my Union representative prior to the meeting, which necessitated that I have time to shower, change my clothes, and drive from Sharonville to downtown Cincinnati through the construction on I-75 at the time.

54. I asked the Court to take judicial notice that the drive from Brecon Heavy Equipment and Repairs District, in Sharonville alone, to Cincinnati together with parking would take at least one hour on March 2, 2000, due to construction on that segment of construction of I-75.

55. I needed thirty minutes as a minimum of time to shower and change from my work clothes which I wore to work on March 2, 2000, to my good clothes, which I believe the Court will find reasonable.

56. I also believe that I was acting reasonably to have permission to be allowed to quit my job that day my 11:00 a.m.

57. Bricking would not give me a definite answer. After I grieved this matter he states that he said "11:00 or 11:30 a.m.".

58. Bricking was interested only in reporting my insistence on a time to leave to Kenny Miller, in order to get me terminated for insubordination, so that he did not report my real reason for my request which was to meet with my Union representative at 12:30 p.m. before the Grievance Meeting.

59. Bricking's report to Miller inferred that I was insubordinate, refusing to work. If that had been the case, I would not have reported to Brecon for work that day.

60. Bricking's report misrepresented me and my intentions and caused the Company to put me on indefinite suspension for insubordination.

61. I did not refuse to perform any duties on the morning of March 2, 2000; I was simply asking when I could stop performing them at a certain time so that I would be able to meet with my Union representative.

62. Since I had grievances pending regarding a three-day and a five-day suspension that the Company had given me, I believed it was important to meet with my Union representative before the Grievance Hearing on March 2, 2000 set up for 1:30 that day in downtown Cincinnati.

63. I offered to take a vacation day. Bricking refused to grant me one because I had not given 7 days notice. He had the power to grant my request and later falsely stated that I asked for one-half day vacation which he could not give.

64. I believe that Bricking violated my rights as an employee under the Agreement because this was an exceptional circumstance and I was allowed a vacation day under the Agreement, Article IV, Section 1(e) and I had a right to attend a grievance meeting and meet with my Union representative based on Article I, Section 9(d) and Article II, Section 1(c).

65. As a result of Bricking's misrepresentations, on March 8, 2000, I was wrongfully dismissed, with several grievances pending, and therefore without due process applied to me according to CG&E'S progressive discipline policy.

66. I immediately grieved my dismissal from Cinergy/The Cincinnati Gas and Electric Co. The initial Grievance Hearing was March 8, 2004.

67. Subsequent meetings were held up to the time of the Third Step meeting after which I learned that the Union would not continue to represent me based on CG&E's letter recounting the evidence against me.

68. I asked the Union to take the matter to arbitration, pursuant to Article II, section 1(e) and Article II, section 2 of the Agreement. The Union declined.

69. I believe that CG&E discriminated against me because of my race because I am the only black man to have been terminated by Bricking, when all of the actions for which I was disciplined were also performed from time to time by white employees who were not disciplined at all or were not disciplined as severely.

70. Bricking looked the other way when Ralph Kroger took company property out of the District, had an incident with the Company truck, and got a DUI. In contrast I was disciplined for taking company property out of the District.

71. The history of my Company disciplines, as they apply to my termination of employment in this case, shows that they were not given to me until after the Court issued it decision of Case No. C-1-97-685. In fact no disciplines were given to me from the time I filed my case *Colbert v. Cincinnati Gas and Electric and International Brotherhood of Electrical Worker*, Case No. C-1-97-685, on October 30, 1997 until its Decision in or about February 8, 1999.

72. I believed that Bricking was interviewed by the EEOC investigator regarding by EEO Complaint, filed on July 23, 1999, for Bricking's ignoring my application up Groundsperson Driver "A" on or about May 17, 1999.

73. My basis for believing that he was interviewed by the EEOC, although he denied it in his deposition was because he was named in my Complaint.

74. I also believe that my EEOC Complaint of July 23 , 1999 which reported his violation of my rights caused him to retaliated against me for a protective activity of reporting an unfair rejection of my application against my rights based on race as well as the Company's Agreement to consider my application for an upgrade in my job application for Groundsperson Driver "A" on or about May 17, 1999.

75. The basis of my belief that Bricking retaliated against me was that a comment made to me by a co-worker in early August, 1999, that the Company would fire me because I filed a EEOC complaint on July 23, 1999.

76. I believe that Bricking retaliated against me by accelerated use of the Company's progressive discipline policy against me between June 18, 1999, and March 2, 2000.

77. It appeared that he was always checking with lead personnel, such as Willie Wilson, an Afro American, to find something wrong with my performance.

78. It was a lie for Bricking and Miller and the Company to say that I had shown no improvement in the March 15, 2000 termination letter, since the Company's discipline record showed that since the "settlement" of my demotion at the Fourth Step Grievance Hearing, I had not contracted any recorded Company disciplines from August 26, 1997 through June 18, 1999.

79. Bricking used the progressive and constructive discipline policy of the Company as a pretext for having me discharged.

80. The history of the unswerving application of the progressive and construction discipline policy between June 18, 1999 and March 2, 2000, indicates an intent by the Company to discharge me by creating a "paper trail" in contrast with the perfunctory application of the policy from 1990 to June 18, 1999.

81. I ask the Court to take judicial notice of the fact tht the Company issued no disciplines against me until after the Court's favorable Decision for the Company and the Union on or about February 8, 1999 on the Complaint that I had filed, Case No. C-1-97-685, on October 20, 1997.

82. Bricking's refusal to consider my application of May 17, 1999, for the posted opening of Groundsperson Driver "A" was based solely on a lie regarding a "letter in my file". In reality Bricking's refusal was based on the fact that the U.S. District Court's Opinion of February 8, 1999 held that the Company may consider past disciplines, empowered Bricking with the strength to keep filing disciplines against me until he got rid of me. This makes the progressive discipline policy a pretext for termination.

83. If Bricking was not using the U.S. Court's Decision of February 8, 1999 as a pretext, then the fact that I had no discipline charges from August 26, 1997 through June 18, 1999, entitled me to have my application of May 17, 1999, seriously considered by Bricking.

84. My filing of a series of EEOC Complaints beginning in 1996 created a hostile work environment as evidenced by the generation of disciplines by the Company immediately after an EEOC investigation. (The only exception to this occurred when I filed a U.S. District Court Case , C-1-97-685 on October 30, 1998).

85. I filed my first EEOC Complaint on August 9, 1996 because the Company was discriminating against me in comparison to white workers at Brecon. The Company restricted my overtime hours because they said I had "too many". However, white employees continued to be given overtime hours and they had many more overtime hours that I did, such as Kroger, Hatfield and Ryan.

86. The Company placed me under undue scrutiny, and unfairly restricted my duties.. I felt singled out and unduly scrutinized and monitored by management while on the job. For example, on May 30, 1996, I was blamed for damaged to equipment which was not my fault. I was given a written warning based on lies told by my co-worker. This created a hostile environment and caused my performance to be ineffective. Co-workers knew that I was the most closely watched employee and did not want to work with me because they, too, might be seen doing something wrong. I was unwelcome in any work group.

87. On May 20, 1997, I filed my second EEOC discrimination charge complaining of an oral warning that I had been given on February 27, 1997 for going to my car to get

something that I need.  Other employees did this all the time and nothing was said about it. I received a written oral warning by Mike Gilligan, supervisor because he said I left my assigned work crew.. I believe that the Company was motivated by retaliation because Jerry Krause, CG&E.s Human Relations Manager, mentioned my previous EEOC complaint when we were meeting on this grievance, unrelated to the first.

88 . I filed my next – third -- charge with the EEOC on January 6, 1998 for an event that occurred on August 20, 1997. On that day I left my assigned duties under Mike Ryan (white) because of his unsafe driving and other unsafe work place behavior.  The other employees have done the same thing and have not been  disciplined.  In constrast, CG&E failed to respond to my formal complaint about Ryan's unsafe activities and gave me a one-day suspension without pay for leaving my work duties. This Company's undue scrutiny is creating a hostile work environment and causing me to get excessive disciplines. I got an Oral Warning for absenteeism on July 23, 1997 and a written waning for absenteeism on July 31, 1997. No white employee is treated this way for refusing to work under Mike Ryan. Management says they that they are "sick".

89. I became ill  on or about May 1, 1998  and took off "company approved" time. I was diagnosed at that time by David Lustig, M.D. with hypertension and diabetes, neither of which he had complained of before. The hostile work environment was the direct cause of these conditions.  I was so frustrated and depressed I  kept reiterating to myself: "I can't do this any more'" because the tensions in the work place at CG&E were so hostile that they caused me to break down regarding my ability to function at work. Although I eventually grew strong enough to return to work, the environment in the work place remained hostile.

90. On July 23, 1999, I filed my fourth discrimination charge against the Company because it failed to consider my application for an upgrade position from Construction Helper to Groundsperson Driver "A" when I applied on May 17, 1999. I had made significant improvement in their job performance which I can proved by the fact that the Company listed on discipline against me for almost two years, specifically for 21 months. This was a condition set forth by the Company in a letter of March 31, 1997 to settle my grievance over my demotion from Groundsperson Driver "A". The Union accepted this condition for settlement as indicated in a response to the Company issued on May 1, 1997. I did not approve of the Union's settlement.

91. In May 17, 1999, The Company, acting through Don Bricking, its agent, denied Colbert's application for an upgrade to Groundsperson Driver "A". Don Bricking would not answer me as to why he denied my upgrade. I also believe that I has seniority for that appointment. Instead, I believe that Bricking filled the open position with a Caucasian when I was qualified.

92. On March 31, 2000, I filed my fifth discrimination charge concerning my wrongful termination by the company because I received at least seven written reprimands for my job performance after I grieved the Company's refusal to consider my application for appointment to Groundsperson Driver "A" on May 17, 1999.

93. These written disciplines were given to me between June 18, 1999 and March 2, 2000 and at least two of them were pending when the Company terminated me on March 8, 2000. I believe this is in violation of the collective bargaining agreement that states that I have a right as an employee to have my grievances against management's decisions "adjusted" by the four step grievance procedure. If I can be terminated in the

process, then my rights under the collective bargaining agreement, Article I, Section 9(d) are violated.

94. I believe that my termination by CG&E on or about March 8 2000 was an unfair labor practice under its progressive discipline policy because the Company can not bargain to "adjust" grievances as listed in Article II, Section 1 of its *Agreement* with the Union if it terminates the me as an employee before grievances are heard.

95. Bricking's attitude toward me from June 18, 1999 to March 2, 2000 created a hostile working environment because he was always in my face, attempting to micro-manage me through interrogation of the lead persons that I was assigned to, such as Willie Wilson, who reported the "truck key" incident.

96. Bricking was upset that I filed an EEOC grievance against him, as my supervisor, and the agent of CGE, because of his ignoring my application for an upgrade to the position of Groundsperson Driver "A" and his subsequent intent to terminate me through the use of interrogation of the lead person of the work crew as to my job performance and then to use the Company's progressive discipline policy against me.

97. I grieved every discipline because I felt that management was intent upon getting rid of me after my EEOC Complaint of July 23, 1999.

98. I became ill in September, 1999 and took close to a month off without pay because of the stress. I asked to see the Company doctor as I had in May, 1998, but Bricking told me he would not approve of a visit to a Company doctor, but I could take leave without pay.

99. From the time the Company breached its condition with the Union by not considering my application to bid back the Groundsperon Driver "A" position which was

open, on or about May 17, 1999, the Union was perfunctory in investigation of the facts and circumstances of the Company's charges. Therefore, the Union did not provide me fair representation on any of the disciplines with which I was charged from June 18, 1999 through March 2, 2000.

100. I believe that the Union should have arbitrated my demotion because the Union knew that my demotion was not correctly based on previous disciplines, nor on safety factors regarding my use of the boom on the crane truck, but on my lack of Company training at the time.

101. I believe that the Union should have continued to grieve my termination based on the conflicting stories presented as to the cause of the "indefinite suspension", the failure of Bricking to tell Miller why I wanted a time certain to leave and the Company's unfair labor practice of terminating me while grievance were pending.

102. Where the cause is meritorious over a long period of time, the Union cannot suddenly reverse its position that my cause is not meritorious, without further evidence from Company that there was additional evidence either to demonstrate that the accident that occurred to a co-worker in March, 1995 occurred because of extraordinary carelessness on my part.

103. Between March 20, 1995, when I was notified of my demotion and May 1, 1997, I presented the Union with all the information and evidence that I had to show that I was unfairly demoted. The Company provided no new evidence. The Union, in good faith, cannot state that because I failed to produce additional evidence, they would not continue to represent me and my cause, because I wanted the Union to arbitrate my case.

104. Actually, the Company's breach of its offer in its letter of March 31, 1997, did present the Union with new evidence, that is rescission of the Company's offer, had the Union wanted to represent my cause in good faith. Instead, the Union declined to represent me.

105. The Union breached that fiduciary duty to me by deciding not to continue to represent me beyond the Third Grievance Meeting when I was terminated, even though there were conflicting statements given by Bricking and me which the Company first advanced in my behalf.

106. The Union knew that it was representing me on at least two grievances at the time that it was notified by the Company that I had been indefinitely suspended for insubordination. These were the grievances of October 25, 1999 and December 14, 1999.

107. The Union never asserted in my defense that the Company was violating my rights under Article I, Section 9(d) and under Article II, Section 1(a) to terminate me before I had time to grieve the disciplines arising from the incidents of October 25, 1999, December 14, 1999 and March 2, 2000.

108. I filed my EEOC Complaint on my wrongful termination, March 31, 2000. I received a Determination Letter giving me a right to sue in United States District Court on August 16, 2000.

109. I timely filed Complaint in United States District Court against Defendants on October 30, 2000.

110. I amended my U.S. District Court Complaint on May 2, 2003 to clarify that the Complaint constituted a §301 hybrid complaint against both the Company and the Union.

AFFIANT FURTHER SAYETH NAUGHT.

Ollen G. Colbert, Jr. Affiant and Plaintiff

Sworn to and subscribed before me, this _29th_ day of March, 2005.

NOTARY PUBLIC

My Commission expires: _N/A_

ROSE ANN FLEMING
Attorney at Law
Notary Public, State of Ohio
My Commission Has No Expiration
Section 147.03 R.C.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on 29th day of March, 2005, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the following:

Ariane Schallwig Johnson, Esq.
Legal Department
Cinergy Services, Inc.
1000 E. Main Street
Plainfield, IN 46168
Telephone: 317-838-1235
Facsimile: 317-838-1842
Ariane.johnson@cinergy.com

and

Jerry A. Spicer
Snyder, Rakay & Spicer
11 West Monument Building, Suite 307
Dayton, OH 45402
937-228-2696
937-228-5248
snyrakspi@aol.com

/s/Rose Ann Fleming
Rose Ann Fleming
BAR ID. #0041337
ROSE ANN FLEMING, P.C.
3855 Ledgewood Drive
Suite 13
Cincinnati, OH 45207
Phone: 513-924-8389
Fax: 513-924-8389
Email: Fleming@xavier.edu