

1            UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF OHIO

3                 WESTERN DIVISION

4             CASE NUMBER: 00-CV-909

5

6  OLLEN G. COLBERT, JR.                    PLAINTIFF

7       vs.

8  CINCINNATI GAS & ELECTRIC                DEFENDANT

9

10                * * * * * * * *

11 DEPONENT:          OLLEN G. COLBERT, JR.

12 DATE:              MARCH 10, 2003

13                * * * * * * * *

14

15 JANA B. COLTER,

16 REGISTERED MERIT REPORTER

17

18

19

20

21

22        *BARLOW REPORTING & VIDEO SERVICES*
              *333 Madison Avenue*
23         *Covington, Kentucky  41011*
              *(859) 261-8440*
24

25

50

1                          I N D E X

2                                                Page

3    Cross-Examination By Ms. Ezell:              52

4                          EXHIBITS

5                                                Page

6    Defendant's Exhibit A                        119

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

51

1        The continued deposition of OLLEN G. COLBERT,

2   JR., taken for the purpose of discovery and/or use

3   as evidence in the within action, pursuant to

4   notice, heretofore taken at the office of Cinergy,

5   Suite 2500, Atrium II, 221 East Fourth Street,

6   Cincinnati, Ohio, on March 10, 2003, at 1:40 p.m.,

7   upon oral examination, and to be used in accordance

8   with the Federal Rules of Civil Procedure.

9

10                      * * * * * * * *

11                       APPEARANCES

12  REPRESENTING THE PLAINTIFF:

13  ROSE ANN FLEMING, ESQ.

14  REPRESENTING THE DEFENDANT:

15  JULIE EZELL, ESQ.

16                      * * * * * * * *

17

18

19

20

21

22

23       OLLEN G. COLBERT, JR., called on behalf of the

24  Defendant, after having been first duly sworn, was

25  examined and deposed as follows:

52

1                    CROSS-EXAMINATION

2   BY MS. EZELL:

3       Q.   We'll go back on the record.  Mr. Colbert,

4   do you realize that you're still under oath from

5   your last deposition?

6       A.   Yes, ma'am.

7       Q.   And, again, the same rules apply that we

8   went through last time.  And if you have any

9   questions about what I'm asking you, please speak up

10  and let me know that you have some questions, and

11  I'll be happy to restate my question.  And if you

12  need to take a break, let me know, and we'll be

13  happy to go off the record.

14           I had asked your attorney to request that

15  you bring some documents that we discussed at your

16  first deposition, and I know you have some materials

17  with you today.  What I'd like to do, Mr. Colbert,

18  before we get into the questions, is just have you

19  identify on the record what you brought pursuant to

20  my request, and then your attorney is going to have

21  those copied and sent to me.

22      A.   Okay.  Well, first off the top, last tax

23  year, this is for 2000, and some -- earnings for

24  2000.  Taxes from -- this is '97 -- '97, '96, '95, I

25  even got '94.

53

1       Q.    You don't have '94?

2       A.    I said I even have '94.

3       Q.    Thank you.

4       A.    The original complaint from in front of

5    the EEOC.

6       Q.    What's the date of the charge number on

7    that?

8       A.    The date is 31 March 2000.  The charge is

9    Case Number 221A00384.

10      Q.    Okay.

11      A.    Cinergy employee handbook.  These are jobs

12   that I tried to apply for.

13      Q.    Since your termination?

14      A.    Yes, ma'am.

15      Q.    Okay.

16      A.    Those are -- this is some of the evidence

17   supporting my claim for some of the things that were

18   going on.  Numbers of witnesses.  Those are taxes

19   also.

20      Q.    And in the envelope marked H&R Block, what

21   year?

22      A.    That's just taxes, that's for --

23            MS. FLEMING:  It notes that '96 is an

24      amended form, amended copy for '94.

25      A.    And these are original disciplinary

54

1    entries, which I was working off, and that's what I

2    have on me as of this date.

3        Q.    I'm sorry?

4        A.    That's what I have on me at this time.

5        Q.    Okay.  And then this was --

6            MS. FLEMING:  The Ohio and the federal

7            amended 1994, filed 1/15/96.

8        Q.    And then your lawyer also has some other

9    documents that she was going to give me.  Can you

10   identify what those are, please?

11       A.    That's the constitution for the IBEW.

12   That's the contract agreement between IBEW Local

13   1347 and Cincinnati Gas & Electric Company.  That's

14   from '94 through '97.  And I have a little black

15   book with notes of -- originally opened, it was

16   first opened on 3/14/95.

17       Q.    And, to your knowledge, that's all the

18   information that you've retained?

19       A.    That's all the information I have at this

20   time right there, because -- I have quite a bit of

21   information, it's just a matter of sorting out

22   everything, and, I mean, that has been a real, real

23   hectic weekend for me.

24       Q.    So you may still have other material,

25   you've just not found it yet?

55

1        A.    Yes, ma'am.

2        Q.    And to the extent that you find other

3   materials which would be responsive to my request,

4   you'll agree to provide that to your attorney at a

5   later date?

6        A.    Yes, ma'am, and that should be real soon.

7        Q.    Okay.  I appreciate that.  Why don't we

8   start here with what you've identified as your black

9   book that was opened on March 14, 1995.  There are a

10  couple of loose pages.

11       A.    Yes, those are pages that at the time when

12  things occur, I'll jot them down real quick or

13  something like that, and then later I'll put them

14  back -- jot them in the book so I won't miss it.

15  Because there's times when I'm at the workplace and

16  I actually have to be attentive of something, and I

17  just can't just open up my book and just -- at the

18  job you have to stop.  I'd just jot it down as quick

19  as I could and that's it.

20       Q.    And the notes that are actually in the

21  notebook, were they written in there

22  contemporaneous, at the time of the event, or did

23  you --

24       A.    Yes, ma'am.

25       Q.    And the loose pages were the things that

1    you jotted down to then include in your book?

2        A.   I didn't include at the time, but I jotted

3    them down, but they were still in the book to be

4    included in it.

5        Q.   And I believe I asked you this at the

6    first deposition.  I apologize if I'm repeating

7    myself.  What was your purpose in beginning in March

8    of 1995 to keep this black book?

9        A.   My purpose was just for self-preservation

10   and to protect myself, because at the time, I

11   noticed a pattern of being written -- being written

12   up for any and everything, and, basically, people

13   just, you know, telling their little version of what

14   happened.

15       Q.   Telling their little version of what

16   happened?

17       A.   Yes.  I mean, it was -- our versions

18   didn't -- didn't -- they didn't match up, meaning

19   some people can just come out and say certain things

20   like, well, this happened, and it never did happen,

21   but it was just basically for my records, just

22   protecting myself.

23       Q.   Let's look at the first page.  Down at the

24   bottom of the entry you have in parentheses H.D.,

25   and then OGC.  What does that symbolize?

1      A.    Well, the H.D. stands for hand digs.  It
2   was a period of time where for like a nine-month
3   period straight time I did nothing more than hand
4   digs.  I mean, I was in the district basically just
5   doing all the manual work.  I mean, stuff nobody
6   didn't really want to do, they gave to me.  And the
7   OGC, that's my initials.

8      Q.    And I apologize for my ignorance, but in
9   terms of hand digs, what is encompassed in that
10  description?

11     A.    Well, what it is, is we still have to set
12  poles for the lines and everything and stuff, and
13  sometimes if they call OSHA or something like that,
14  and it might be a utility within a three-foot radius
15  of where we might put that hole in, we would have to
16  hand dig it, because if we were to put an auger in
17  there or something, we might damage the utility line
18  or whatever.

19     Q.    In your second entry for March 24, 1995,
20  and then on the entry for March 29, 1995, you used
21  the term that the supervisor, it looks like
22  Mr. Morgan, was giving you static?  Want to take a
23  look at those two entries?  The first one is on the
24  preceding page.

25     A.    I recall.  That was a period of time where

58

1    Mr. Morgan at the time and stuff was basically just

2    constantly around supervising, and usually when a

3    supervisor is in the area, it's very hard to get

4    work done when somebody is constantly looking over

5    your back and asking you questions on this and that,

6    it's hard to get things done.  And Mr. Morgan, on

7    the average, it wasn't nothing for me to see him

8    maybe three or four times a day on the job, whereas

9    other people would say they never see him.  And I

10   asked him why he was giving me so much attention and

11   he just -- just went off the deep end, and that's my

12   job, and that's it.

13        Q.    And you used the term that he was giving

14   you static.  What do you mean by that term?

15        A.    He was nitpicking on any -- any little

16   thing, any little given thing.  I mean, you can tell

17   when somebody's just going out of their way to look

18   for something, and he was just nitpicking on any

19   little thing.

20        Q.    And did you have any suspicion as to why

21   Mr. Morgan was on your job site three or four times

22   a day?

23        A.    Yes, ma'am, I did.

24        Q.    And what was that?

25        A.    As I had said earlier in the record, that

1    I was up under a microscope, and that was my

2    suspicion.  Later on, I found out that my suspicions

3    were true, that -- by certain employees -- you know,

4    coworkers had basically said that, you know, I was

5    up under the microscope and they didn't want to work

6    with me simply because they was looking to get me.

7        Q.    And we talked about those individuals at

8    our first session of the deposition; is that

9    correct?

10       A.    Yes, ma'am.

11       Q.    Did you observe back in this 1995 time

12   period if Mr. Morgan was giving other employees

13   static or if he was supervising other employees at

14   the same level you were receiving supervision?

15       A.    Yes, I did.

16       Q.    And what other employees did you observe?

17       A.    I observed pretty much -- I mean, our unit

18   is maybe -- there is no more than 30 people i our

19   units, and everybody at the end of the day, we sit

20   back and we talk about the day here and there and

21   stuff and swap stories and this and that, and the

22   stories were, you know, hey, I haven't seen him all

23   day.  It just seemed like he was going out of his

24   way to pay special attention to me.

25       Q.    On that unit, did you work with any other

60

1    African-Americans?

2        A.    Yes.

3        Q.    Did the other African-Americans indicate

4    whether they thought they, too, were under the

5    microscope?

6        A.    Some did, but not as much as me.  And a

7    lot of them used to thank me, used to thank me, say,

8    well, I'm glad you're here, because if he wasn't

9    messing with -- messing with you, he'd be messing

10   with me.

11       Q.    And what employees made those statements

12   to you?

13       A.    Let's see.  Leon Waters, Randy -- excuse

14   me.  Randy Hisles, Reggie lackey, Dave Austin, Tony

15   Thomas.  I can go on and on.

16       Q.    Okay.  I'm sorry.  Who else?  Dave Austin?

17       A.    Dave Austin, Tony Thompson.  I can go on

18   and on.

19       Q.    Okay.  Who are the other individuals?

20       A.    Those are fellow cowokers, those were

21   fellow cowokers.

22       Q.    But you said you could go on and on.  I

23   would like for you to go on and on.

24       A.    Dudley Quales, Raymond Pope, Mike Howe.

25   That's it.

61

1        Q.   And all of these individuals were

2    coworkers?

3        A.   Yes, ma'am.

4        Q.   And they're all African-American?

5        A.   Yes, ma'am.

6        Q.   There's reference in April of '95 to your

7    filing a grievance and trying to figure out the

8    status of your future with CG&E.  Do you remember

9    what grievance you had filed back in April of '95?

10       A.   Let me see.  There's been so many

11   grievances.  I don't recall right off the top what

12   it was, but...

13       Q.   And I don't want you to speculate.  Since

14   it was the first one in your book, I thought you

15   might know, that's all.  If you don't know, we can

16   just move on.

17       A.   That's fine.

18       Q.   So you don't recall?

19       A.   I don't recall off the top.

20       Q.   There's also reference in April of '95 to

21   your having some type of injury and that you were on

22   light duty.

23       A.   Yes, ma'am.  What it basically was was

24   just strained muscles in the back from just doing so

25   many hand digs.  Because for a nine-month period

62

1    straight, as I was saying, every day, nothing but

2    hand digs, and, you know, I had other people lower

3    on the totem pole than me, but it seemed like I got

4    all the hand digs, all the manual work.  And I

5    didn't complain, I looked at it as nothing more than

6    exercise, but sometimes your body just breaks down,

7    and that's all it was.

8        Q.    Do you recall roughly what the time frame

9    was in which you received the demotion, would that

10   also have been in the spring of '95?

11       A.    That was in '95, yes, ma'am.  It was

12   towards the summer months of '95, if I recall.

13       Q.    And what was the basis of the demotion,

14   what was the reason for it?

15       A.    Well, the reason -- we never really got

16   any reason for it right there, but they was saying

17   that they didn't feel that I was being attentive to

18   my duties and I was unsafe, operating in an unsafe

19   manner.  And I grieved it back and forth and back

20   and forth, and it was basically one of those things

21   where it was never -- we never got any closure on

22   the matter.

23       Q.    Was there any resolution of the grievance

24   at all?

25       A.    It came up for solution that if I present

1    myself for a period of time without any occurrences

2    or accidents right there, I could be considered to

3    be repromoted, be back -- promoted back to a Driver

4    A position.

5        Q.   What accidents had you been involved in up

6    until the time of your demotion in 1995?

7        A.   Let's see.  I had a backing accident.

8    That's it.

9        Q.   And was there any property damage caused

10   as a result of the accident?

11       A.   Yes, there was.

12       Q.   Were there any personal injuries?

13       A.   No, ma'am.

14       Q.   Do you know what the cost of repair for

15   the property damage was?

16       A.   Property damage was $1,500, and that's

17   coming from people that went out and actually did

18   the work.

19       Q.   And in terms of the lack of attention that

20   was also given to you as a basis for the demotion,

21   had you been written up for not being attentive on

22   the job?

23       A.   No, ma'am.

24       Q.   Did you have a theory on why you were --

25   I'm sorry?

64

1          A.    I'm sorry.  I just recalled one more

2    accident that was a bucket truck incident right

3    there where there was damage to the swivel of the

4    bucket truck.  The actual damage on that right

5    there, the amount, I don't know.

6          Q.    And how did the bucket truck incident

7    occur?

8          A.    It happened while I was on the training

9    crew, when we were going in an area with heavy

10   vegetation, trees were hanging over in the roadway

11   and one of the limbs got caught on the bucket.

12         Q.    And I don't think I asked you, how did the

13   backing accident occur?

14         A.    The backing accident occurred, while I was

15   backing, both of my crew members, they jumped in the

16   truck, and I was looking out my mirrors, and I just

17   misjudged the ditch, and I backed up into the side

18   of a house and chipped some brick and messed up some

19   vinyl.

20         Q.    In terms of the resolution of the

21   grievance, did your performance improve to allow you

22   to be considered for the promotion?

23         A.    As far as performance working, yes.  Of

24   the little write-ups and everything, no.

25         Q.    Did you have any more property damage

65

1    accidents?

2        A.    No, ma'am.

3        Q.    So your work performance improved, but the

4    write-ups continued to accumulate in your file?

5        A.    Yes, ma'am.

6        Q.    And why do you say your work performance

7    improved?

8        A.    Any time you can go out here and complete

9    jobs and come home with all your fingers and toes

10   intact and no injuries, then that's a good day.

11   That hadn't occurred for quite some time with me.

12       Q.    You said it hadn't occurred for you in

13   quite some time?

14       A.    Yes, ma'am.  I'm referring to the

15   accidents and everything.

16       Q.    Other than the strained muscles in your

17   back that you just described, did you have any other

18   accidents or injuries related to your work at CG&E?

19       A.    No accidents.  As far as like '97, I went

20   down with -- it was mainly just stress right there.

21       Q.    So you had no accidents or injuries in

22   1996?

23       A.    No, ma'am.

24       Q.    And then what happened in 1997?

25       A.    Well, a combination of stress and not

66

1    eating properly and everything and stuff.  I was

2    diagnosed as being a type B diabetic.  And to this

3    day, I don't ever want to get sick like that again.

4         Q.    And was the stress related to situations

5    at home or your work or something else?

6         A.    Mainly at work.  I was working at a very

7    stressful environment.  A combination of being up

8    under the microscope and being written up for every

9    little thing and pressure from coworkers, it just

10   started building up on me.

11        Q.    Now, have you been treated at any time for

12   problems related to stress?

13        A.    I was given medication and advised to not

14   allow things to get to me as -- as they were at the

15   time.  I was one of those people that used to try to

16   be on top of everything.

17        Q.    And what kind of medication were you

18   given?

19        A.    It was mainly like blood thinner.

20        Q.    And what time frame was this when you were

21   given medication and told not to let things get to

22   you?

23        A.    That was like the early part of '97.

24        Q.    Since 1997, have you been treated for

25   stress?

1       A.   No, ma'am.  I don't allow things to get to

2    me no more.

3       Q.   After the period of time when you had the

4    strained muscles in your back, did you do any more

5    hand digging?

6       A.   Yes, I did.  The hand digs continued.

7    Basically, they gave me -- send you down here to the

8    company doctor and he basically prescribed some

9    ibuprofen or something, and, you know, maybe take it

10   light for a couple of days, and after that, get back

11   to work.

12      Q.   And did you write in your book here every

13   time you did the hand digging or other manual labor?

14      A.   For the most part, yes, ma'am.

15      Q.   Would your time sheets or any of the other

16   records that you were required to fill out while you

17   were working at CG&E, did it document the kind of

18   work you did on a particular day?

19      A.   Yes, ma'am.

20      Q.   And what types of things would be

21   documented on your timecards?

22      A.   How many hours you spent on certain jobs.

23   Each job had a number and we had to charge so many

24   hours to the job.

25      Q.   And then how would your work that would be

1    charged to a particular job, how would that work be

2    described?  Let me give you an example, because I

3    can tell this question is not making sense to you.

4    Did you put two hours on January 15th, 4th and

5    Sycamore, five hours at Hall Street?  I mean, did --

6         A.    And then you've got to put in your time

7    for travel and et cetera.

8         Q.    And in terms of what you did during the

9    two hours at 4th and Sycamore, would it describe

10   anything that you did, repair gas main, or would it

11   say anything at all?

12        A.    Yes, ma'am, it would, basically we had

13   goals which described what particular work you were

14   doing on that job.

15        Q.    I'm sorry, I didn't ask those questions

16   very well.  I didn't mean to get you confused.

17             In terms of the black book that I'm still

18   kind of paging through here, did you ever show this

19   to anyone other than a lawyer?

20        A.    No, but a lot of people knew that I had

21   it.

22        Q.    And how would they know that you had the

23   black book?

24        A.    Just by observation.

25        Q.    You would pull it out and start writing

1   things in it?

2       A.    When I had the opportunity or whenever I

3   started writing things down in it, they would say

4   he's putting things in his black book, they'd say.

5       Q.    Did you make entries in front of mangers

6   in your black book?

7       A.    I tried not to, but there was a few times

8   and stuff, so that I wouldn't miss what all was said

9   or done at the time, yes, I pulled it out then.

10      Q.    Did anyone from management ever ask you

11  what you were doing with this black book?

12      A.    No, because in their words, it didn't

13  matter.

14      Q.    And whose words were those?

15      A.    Robert Morgan's.

16      Q.    And what was the context in which he told

17  you that your writing in the black book wouldn't

18  matter?

19      A.    Me and him used to have some conversations

20  at times and stuff, and well, like, do you want me

21  to quote on you that right there, well, you can

22  quote whatever you want, it don't matter.

23      Q.    And what types of things would you want to

24  quote him on?

25      A.    Certain things that he had presented to me

1   regarding why he was, you know, saying -- why it is

2   he would say he was picking on me.

3       Q.   And what did you understand Morgan to mean

4   when he said you can write what you want, but it

5   won't mean anything?

6       A.   Exactly just that.  Basically, hey, we're

7   going to put whatever we want to put in there, at

8   any time and stuff, and you just deal with it.

9       Q.   And did you write that down in your book?

10      A.   I don't recall writing that down right

11  there.  I remember that conversation right there,

12  because that was one of those episodes right there

13  and stuff that I had to bite a hole in my lip on

14  that one right there, because I really wanted to

15  tell him something.

16      Q.   But you don't recall if you wrote that

17  down in your book?

18      A.   I don't recall honestly if I did or not.

19      Q.   Were you ever put back in the Driver A

20  position?

21      A.   No, ma'am.  I wouldn't even receive an

22  upgrade.

23      Q.   Was there any process while you were

24  working at CG&E for automatic consideration for

25  promotion after you had been in a position for a

71

1   length of time?

2        A.   No, ma'am, not that I've heard of.  It was

3   basically up to management's discretion.

4        Q.   And based on performance as opposed to

5   seniority in a position?

6        A.   That's what they say.

7        Q.   Did you see other people who were promoted

8   on the basis of seniority rather than performance?

9        A.   Yes, ma'am.

10       Q.   And who did you observe being promoted on

11  the basis of seniority rather than performance?

12       A.   I wouldn't say -- correction, not so much

13  seniority, because everybody has to still place a

14  bid for it.

15       Q.   I'm sorry?

16       A.   I mean, if a job listing comes open, they

17  would still have to place a bid for the job.

18       Q.   A bid for the job, okay.

19       A.   And whether or not they were accepted was

20  up to management.

21       Q.   Did you see anybody in your unit being

22  promoted that you thought had performance issues

23  greater than yours?

24       A.   Yes, ma'am.

25       Q.   And who was promoted that you thought

72

1    didn't have the qualifications that you have?

2        A.    Let's see.  Ralph Kroger, Tracy Proms.

3    Let's see.  Them are the top, them just come off the

4    top of my head, yeah.

5        Q.    If you think of anybody else during the

6    deposition, please let me know.

7        A.    Charlie Young.

8        Q.    What's his last name?

9        A.    Young.

10       Q.    Young.  And were any of these individuals

11   African-American?

12       A.    All three that I named right there were

13   white.

14       Q.    Why do you say their performance wasn't as

15   good as your performance?

16       A.    Kroger, me and him, we have a history,

17   he's a regular hothead.  I mean, him and Bricking

18   are real tight.  His performance -- I mean, he's

19   just a little loose cannon, I mean, always putting

20   his work off on somebody else, and that's that.

21            Tracy, she's more so a whiner.  She

22   basically is constantly kissing butt, just to try to

23   get some things accomplished.  In a period of time

24   where she was doing the hand digs with me, and more

25   so, I did more hand digs than she did, and I had to

1    finish her work and then -- I used to mess with her,

2    saying I had to take one step and then drag her,

3    take another step and then drag her.

4        Q.    And Charlie Young?

5        A.    Charlie, his biggest thing was -- me and

6    Charlie, we came up through the LIPS program

7    together.

8        Q.    The what program?

9        A.    LIPS, the Lineman Improvement Program.

10   And at times, it just seemed like he didn't feel

11   like he belonged, that's all.

12       Q.    He didn't feel like he belonged, what do

13   you mean?

14       A.    Belonged in that section.  And some of the

15   work, he just, you know, personal problems or

16   whatever at home or whatever and stuff, he just

17   wasn't -- you know, I'm just here.

18       Q.    So he wasn't very involved in the job, is

19   that what you're saying?

20       A.    Very much so, yes.

21       Q.    And were these three individuals all

22   promoted into the Driver A position?

23       A.    Yes, ma'am.  Charlie, not to -- he wasn't

24   Driver A, he decided to go to -- he went over with

25   building maintenance, he took a bid over there and

74

1    went over to building maintenance.  As far as driver

2    or equipment operator, which follows after that, he

3    didn't want to have no part of it, which I was

4    advised by certain people to do, which I should

5    have.

6        Q.    You were advised to also try to get a

7    position in building maintenance?

8        A.    Yes, ma'am.

9        Q.    And who advised you to do that?

10       A.    Some of the people in building

11   maintenance, Jim McLaren, Ray Pope, a little bit of

12   everybody say, hey, you'll work out great over here

13   for us.  I wouldn't have to go through the bull that

14   you have to go through in the equipment operation

15   section.

16       Q.    In the equipment operation?

17       A.    Section.

18       Q.    Section.  I'm sorry.

19            And were the individuals that told you to

20   try to get a job over in building maintenance, were

21   they white or African-American?

22       A.    McLaren's white, Ray Pope is black.

23       Q.    And what is the bull in the operation

24   section?

25       A.    Certain people basically just get their

1    little pick of this, their jobs, this and that and

2    stuff, and they don't catch a hard time.  I mean,

3    certain people within the clique or whatever and

4    stuff, they don't have to go through the little

5    hardships or whatever and stuff that people do like

6    myself.

7        Q.    Now, do the cliques seem to be based on

8    race or whining and butt kissing like you described

9    with Tracy or could you figure out a pattern on

10   that?

11       A.    Partially race.  You had a few -- you had

12   a few blacks in the clique, yes.  Those were the

13   ones that basically, you know, I'll give you him so

14   you don't mess with me.

15       Q.    Okay.  You lost me on that.

16       A.    Somebody basically that wants to protect

17   themselves, or call it self-preservation or

18   whatever, I serve you up him so you won't be looking

19   at me.

20       Q.    So they would rat you out?

21       A.    On certain things, yes.

22       Q.    So these blacks who were in the clique

23   within the section would rat you out and other

24   blacks to protect themselves?

25       A.    If it was something real, real major, yes.

76

1      Q.    Can you give me an example of someone who
2  did that and what they did?

3      A.    I can think of an incident with a Jeff
4  Bragg, whereas -- okay, I thought I was --

5      Q.    Jeff?

6      A.    A guy named Jeff Bragg.  He's black.

7      Q.    Bragg, Okay.  I'm sorry.

8      A.    I thought I was really, really stressed,
9  but they were really, really, really coming down on
10 him.  The accident occurred loading up a pole --
11 loading up the pole truck, and right off the bat and
12 stuff, I mean, he claimed -- he was operating a
13 vehicle and I was giving him directions on how to
14 load up the pole truck, and he basically -- well, he
15 was -- I remember what it was.

16          At the time, he was working two jobs, he
17 was working with the Post Office at the time and not
18 getting very much sleep.  And the accident occurred,
19 and right off the bat, he -- he tried to blame me
20 for it and everything and stuff, and I tried to tell
21 him that he wasn't listening to what I was saying.
22 And, I mean, a little heated argument occurred, and
23 he pulled a pole out on me and was ready to swing it
24 at me and stuff.

25     Q.    Was he disciplined for any of this?

77

1       A.    No, ma'am, it was just gaffed off, it was

2   forgotten.

3       Q.    Were you disciplined?

4       A.    No, but I had some people ride me on that

5   from management, mainly Bob Morgan.

6       Q.    When you say Bob Morgan was riding you on

7   it, what did he do?

8       A.    Well, you're supposed to listen to what

9   Jeff says and do what he says and if anything

10  occurs, then -- happens -- then that's his butt in

11  the sling.  That it was more so just that it wasn't

12  him, oh, okay, we know -- it basically came down to

13  we know the reason this occurred is because Ollen

14  was there, and that was that.

15      Q.    And I thought you said that Bob Morgan

16  rode you because of this incident.  Was there any

17  other treatment that Morgan dealt to you that you

18  thought was somehow related to this incident with

19  Bragg?

20      A.    Every time I looked around the corner, I

21  look over my shoulder and stuff, there is Mr. Morgan

22  trying to hide and catch me doing something or

23  whatever, and that's what was occurring right there.

24  He was really, really gunning for me.  And when I

25  started really bringing it to management's

78

1    attention, and even filed a grievance on it right

2    there, he sort of backed off.

3        Q.    And when did you file the grievance about

4    Mr. Morgan?

5        A.    That was sometime in '97.

6        Q.    And did you try to capture all of the

7    incidents with Mr. Morgan in your black book?

8        A.    I tried to.  I tried to.  I mean, but -- I

9    mean, as far as like being in a habit of constantly

10   writing things in the book and all that and

11   everything and stuff, I mean, I honestly was too

12   busy to actually just zip, zip, zip, zip.  I

13   wouldn't have got nothing done if I -- if I wrote

14   down every little incident.

15       Q.    Can you give me an estimate of how many of

16   the events with Mr. Morgan you were able to capture

17   and write down in your book here?

18       A.    I couldn't tell you.  Honestly, I couldn't

19   tell you, because I have had quite a few episodes

20   with Mr. Morgan.

21       Q.    Can you give me an estimate of how many

22   episodes you had with Morgan, not what you wrote

23   down?

24       A.    Hundreds, hundreds.

25       Q.    Hundreds?

79

1        A.   Hundreds.

2        Q.   I want you to take a look at the entry

3   that you put in there on January 22nd, 1996.

4        A.   Yes, ma'am.

5        Q.   Do you recall that meeting with

6   Mr. Hoppenjohns?

7        A.   Yes, ma'am.

8        Q.   What happened when you met with

9   Mr. Hoppenjohns?

10       A.   Well, basically, I was telling him some of

11  the problems, trials and tribulations out at the

12  pole yard and some of the treatment, the one-sided

13  treatment experienced by Robert Morgan and Mike

14  Gilligan, and just in general how things were going

15  for me at the pole yard.

16       Q.   And what was Mr. Hoppenjohns' position at

17  that time?

18       A.   He was in charge of human relations.

19       Q.   And why did you go to Mr. Hoppenjohns?

20       A.   I wasn't getting any results with the

21  union, the grievance proceedings, basically just to

22  get -- get this guy off my back.

23       Q.   And that would be Mr. Morgan?

24       A.   Yes.

25       Q.   You said you hadn't gotten any results

1    with the union and the grievance proceedings.  As of

2    January 1996, how many grievances had you filed with

3    the union?

4        A.    Probably would -- I know it would have

5    been way over 20, I know that.

6        Q.    And as of January 1996, had any of the

7    grievances been resolved to your satisfaction in

8    that you got what you asked for?

9        A.    No, ma'am.

10       Q.    And did you have any explanation as to why

11   you had gotten no relief through the grievance

12   process?

13       A.    No explanation was given.  Most the time

14   it was usually sugarcoated, and words were, well, if

15   he can change his act, you know, we might consider,

16   you know, maybe removing this or whatever.

17       Q.    And when you say removing this, are you

18   talking about --

19       A.    I'm talking about entries, outdated

20   entries, and numerous disciplinary entries, mainly

21   warnings, oral warnings and stuff.

22       Q.    What did Mr. Hoppenjohns tell you in the

23   January 22nd, '96, meeting?

24       A.    He said he would investigate and look into

25   it.

81

1      Q.   And did you ever get any more information

2   from Mr. Hoppenjohns?

3      A.   No, ma'am.

4      Q.   Did he ever call you back?

5      A.   No, ma'am.

6      Q.   Did anyone else working with him get in

7   touch with you about Mr. Hoppenjohns' inquiry?

8      A.   No, ma'am.

9      Q.   Did you ever try to talk to him again?

10     A.   Yes, ma'am, but he's a busy person and

11  never did return calls or anything.

12     Q.   Did you schedule any meetings with anyone

13  else in the company to talk about the treatment you

14  were receiving from Morgan and others?

15     A.   No, ma'am.  No, ma'am.  What use?  I was

16  actually just getting to the point where it was no

17  use in doing it, it's just blowing hot air.

18     Q.   You have a couple of paper clips,

19  actually, three paper clips in your black book.  Are

20  they in here for any particular reason?

21     A.   Those were entries right there at the time

22  when I was jotting them right there, just a little

23  mental note to finish your thoughts, get back in

24  there and everything.

25     Q.   And were you able to go back in and

82

1    complete your thoughts on the pages you've marked

2    with paper clips?

3        A.   No.   There was something else coming up

4    after that.

5        Q.   And it looks like to me that your last

6    entry in your black book is dated May 2nd, 1996.

7        A.   Yes, ma'am.  At that point right there,

8    the reason I had to stop doing that is I started

9    getting copies of the trip tickets, and any

10   discrepancies or anything like that, I'd just jot it

11   on that right there, collect it in a nice little --

12   I've got a nice little file at the house.  It just

13   seemed like it was more quick and more efficient

14   just to do it that-a-way, and then I could actually

15   have a record of what I was doing that day.

16       Q.   This was one of the loose sheets that you

17   had in your book.  Can you tell me what that note is

18   about?

19       A.   This was written while we were filing a

20   grievance regarding the demotion, and it was written

21   by Jan Stanley at the time.  He's retired from the

22   company.  And we were basically just -- he was the

23   union steward at the time, just piecing something

24   together so we could actually put it in grievance

25   form.

83

1      Q.    And here's another entry that was on a
2    loose sheet of paper.  And tell me what that one's
3    about and the date.
4      A.    An incident, the date on that is
5    March 5th, 1997.  I was driving an escort truck and
6    it seemed like we went around -- we started out
7    going north around the Lebanon area, just past
8    Lebanon, and we went from Lebanon all the way down
9    to Dry Ridge, Kentucky.  Went from Dry Ridge,
10   Kentucky, all the way out by the border, over there
11   by Indiana, out in Harrison.  Went back downtown and
12   drove back out.  On the way back into the district,
13   I ran out of gas.
14          And Mr. Morgan got on me about that, about
15   running out of gas.  And I had informed him that I
16   left with a full tank that morning and with all that
17   driving, I ran out of gas.  His response was, well,
18   the pole truck didn't run out of gas.  And I was
19   like well, that's a diesel, and the little truck
20   that we had right there's escorting.
21     Q.    And there's some reference about
22   Mr. Gilligan saying that you weren't attentive to
23   your duties and that he doesn't know what is going
24   on in your personal life, but that the company
25   offered help programs and that you should seek

1    outside help.  Do you recall that part of the

2    conversation?

3        A.    Yes, I recall that.

4        Q.    And what was the basis of Mr. Gilligan's

5    statement to you, if you know?

6        A.    I don't know what the basis was.  I mean,

7    but, I -- I would be assuming that that's just his

8    job, that, you know, in management, if somebody's

9    got a problem, you've got to offer that to them.

10        Q.    Had you said anything about problems at

11    home or anything to management?

12        A.    No, ma'am.

13        Q.    And now I'm looking at the package of

14    material, it says disciplinary entries.

15        A.    Yes, ma'am.

16        Q.    Let me ask you to identify this first

17    document that's Summary of Disciplinary Action,

18    Ollen Colbert.  Is that something that you prepared?

19        A.    No, this was prepared by the company.

20        Q.    And when were you given a copy of that?

21        A.    Just before dismissal.

22        Q.    Was that in the last meeting?

23        A.    Yes, ma'am.

24        Q.    And who made the check marks that are on

25    the left side of the page?

1        A.    Well, the check marks would be -- I mean,

2   basically, I went down it one by one.  And the ones

3   that I could recall, pretty much all of them were

4   grieved, but the ones I recall we didn't get any

5   answers on and everything were the ones that were

6   checked.

7        Q.    Okay.  So these were disciplines that you

8   had grieved but didn't get a resolution on; is that

9   correct?

10       A.    Yes, ma'am.

11       Q.    Okay.  And those are the ones that you

12  checked?

13       A.    Yes, ma'am.

14       Q.    Okay.  And then you've also made a note

15  here in the middle of the page.

16       A.    That wasn't me.

17       Q.    That's not you.

18       A.    I mean, as far as writing in-house

19  suspension, that's what that was for, two days

20  suspension, that was in-house.

21       Q.    But you didn't write that?

22       A.    I wrote that in-house, yes, but I didn't

23  scribble this right here (indicating).

24       Q.    Okay.  And then down at the bottom page,

25  for the August 26, 1997, incident, insubordination,

86

1    what is your response on that?

2        A.    At the time, I had complained to

3    management about one of the equipment operators

4    operating in an unsafe manner, Mike Ryan, and he

5    just basically gaffed it off, said, hey, you go out

6    there and you do what you're told to do, and if

7    anything occurs, then we'll deal with it then.

8        And like I told him, hey, I have the right

9    to work in a safe work environment.  If it was

10   someone else complaining, then the issue would be

11   addressed, but basically it was me, get out there, I

12   don't care what happens to you.  Until something

13   happens, don't come back.

14       Q.    Was that actually said to you or was that

15   what you concluded from the meeting?

16       A.    That's what I concluded from the meeting,

17   from Mike Gilligan and Mr. Morgan.

18       Q.    And did you raise your voice to any of the

19   individuals in that meeting?

20       A.    Yes, I think I did.

21       Q.    And did you use any --

22       A.    No profanity.  I raised my voice, yes.

23       Q.    And your note on the summary of

24   disciplinary action for the August 26, '97, incident

25   is, "not insubordination.  I have the right to work

1    in a safe workplace."

2         A.    Yes, ma'am.

3         Q.    Correct?

4               Okay.  Then there's also an entry for

5    July 1st, 1999, also listed as insubordination.  You

6    wrote "not insubordination"?

7         A.    Yes, ma'am.  Can I see this, please?

8         Q.    Please.

9         A.    It was regarding an oral warning written

10   by Mr. Bricking.

11        Q.    Okay.  In the July 1st, 1999, document,

12   the oral warning says that "you must stop your

13   continued insubordination of not performing tasks

14   that you know must be done.  This warning is in

15   reference to the truck key incident that occurred on

16   June 20th, 1999."  What was the truck key incident?

17        A.    What occurred for a period of time out at

18   Brecon Pole Yard, they were actually at the end of

19   the day bringing in the keys to the vehicles,

20   because there was a complaint of a vehicle coming up

21   missing.  And they told everybody in the section to

22   do it, which I conformed to it, like as far as

23   dropping off the key in the morning, I dropped it

24   off in the evening.

25               Now, when I come back in that next morning

1    asking for the key to the vehicle, because I was

2    escorting the pole truck, it was nowhere to be

3    found.  Okay.  I went out and I asked people about

4    it and nobody knew nothing about it, so what I did

5    was I went ahead and went down to the garage, got a

6    ride down to the garage and got the spare, because

7    it seemed like it was let's hide the key or

8    whatever.  Got the spare and started up the truck

9    and everything, did all my little work.

10            Then along come Bricking later on that day

11   saying that I could have -- I was supposed to -- I'm

12   supposed to come into the office to get the key.

13   And he got upset with me for doing -- going down to

14   the garage and getting the key, the spare key, when

15   I went in the office the first time and asked for

16   the key and nobody knew nothing about it, they

17   couldn't find it, so...

18       Q.   Did you and Mr. Bricking have any kind of

19   heated exchange that day?

20       A.   No, I just listened to what he said and I

21   explained to him what went on.  Later on I got an

22   oral warning for it.

23       Q.   Did you ever find the key that was

24   supposed to be in the office?

25       A.   They found it, yes.  At the time, it was

1   with a person by the name of Willy Wilson, and Willy

2   Wilson likes to play games.

3       Q.   And is Willy black or white?

4       A.   He's black.

5       Q.   You also have a typed entry on this page

6   of 12/14/99.  It looks like you've changed the date,

7   and it also says as part of the typewritten

8   document, "overall poor work performance," and

9   you've made a note next to it.  What is that

10  notation?

11      A.   The dates didn't jive as far as like the

12  date that I received it and how it occurred, it just

13  didn't jive.  Let me see.  Yes, that's 12/14.  It

14  was saying that was issued on that date right there,

15  but it wasn't.  I didn't receive nothing until the

16  third day of 2000, which I had questioned, because

17  at the time, I used to go in and ask to look at my

18  file pretty much on a weekly basis.  There wasn't

19  nothing in the file or anything and we ain't got no

20  problems with you, and then all of a sudden I've got

21  a write-up.  So I'm questioning it, where did this

22  come from.

23      Q.   Okay.  And did you ever determine whether

24  this December 14th, 1999, entry on the date line

25  here was a typo or --

1      A.    I asked about it and it was just gaffed

2   off.  I never did receive an answer to it.

3      Q.    But you did have a meeting on January 3rd,

4   2000?

5      A.    Yes, I -- yes, we did.

6      Q.    And what was the criticism or the basis

7   for the discipline explained to you in the

8   January 2000 meeting?

9      A.    Basically overall performance.  We felt

10  you haven't made any improvements, so we're writing

11  you up on this, which was -- was the norm for me.

12     Q.    What was the basis for the three-day

13  suspension for inappropriate behavior and tardiness

14  back in October of '99, October 25, 1999?

15     A.    That was regarding a Tom Sams incident

16  where on October the 15th, I recall we were -- I was

17  assigned to a crew, we had to go out for an auto

18  damage.  It was towards midday, and we knew we

19  wasn't going to get back in time.  We was actually

20  going to be working overtime, there was auto damage.

21  And that was a Friday, and they had an overtime list

22  posted, at the end of the day on Friday, overtime

23  list for Saturday goes in effect.  By the time we

24  got back, management would not have been able to

25  know that I wasn't able to work that overtime.

1        When I went in the office and I know I'm

2   rushing out for auto damage, came in, let me see

3   your pencil, Tom, so I can put up a W, because I

4   won't be able to work this overtime.  He snatched --

5   snatched the pencil from me, and I was like -- he

6   said, you know, wait until you get my fucking

7   permission before you take anything off of my desk.

8        Okay.  I let that go right there and

9   stuff, and just went over to Bricking's desk, got an

10  ink pen, went out there and put my W up on the

11  overtime list.  Came back in, put it -- the ink pen

12  back on Bricking's desk.  And I know I was wrong for

13  this, but I said, fuck you, Tom, and went off, just

14  went off to my work, and that's how it occurred.

15        Q.    And Tom was a supervisor?

16        A.    Tom is a -- he's classified as

17  supervision, but he's the secretary.  He is the

18  secretary, everything, timecards and everything and

19  stuff goes through him.

20        Q.    And you were given a three-day suspension

21  for that incident, correct?

22        A.    Yes, ma'am.

23        Q.    It says you were also given the three-day

24  suspension for tardiness?

25        A.    Yeah, I found out there was a tardiness

92

1    issue also that was presented.  That's the usual

2    right there, okay, we're going to throw this in also

3    to make it seem more severe than what it really is.

4         Q.    Were you late on October 18th,

5    October 20th, October 22nd and October 23rd of 1999?

6         A.    No, ma'am.

7         Q.    And do you have any documentation to

8    dispute whether you were late?

9         A.    No, I don't have any documentation,

10   because we don't use any timecards or anything.

11   It's -- basically he's saying I was late and well, I

12   seen you at this time.  My thing was what I used to

13   do was come in, go directly to the board, see what

14   I've got to do.  Go to my locker, get what equipment

15   I might need or whatever and that's that.  I mean, I

16   didn't go around and socialize with anybody or

17   whatever and stuff.  I was just let me get my work

18   and be done and be gone from there.  A lot of times,

19   I mean, they used to tell me because we didn't see

20   you, you had to be late.

21        Q.    And you weren't keeping any kind of track

22   of time separately to disprove any of these

23   allegations?

24        A.    No, ma'am, I wasn't keeping any time,

25   because I didn't know I had to keep time on it.  I

1   was there to make sure that I was prepared for my

2   day, daily work and everything and stuff, and when

3   they -- it was time for us to leave out, I was ready

4   to leave out.

5        Q.   And the October 25, 1999, letter to you

6   references your one-day suspension that occurred the

7   month before, that being on September 1st, 1999.  Do

8   you recall that one-day suspension?

9        A.   Yes, I was suspended on September the 1st,

10  1999.

11       Q.   And what was that suspension for?

12       A.   At the time, I was -- I had to attend a

13  United Way tour, which in the past and everything,

14  usually, the United Way tours was an all-day thing,

15  and even on the board, it was scheduled for an

16  all-day thing, whereas, okay, they had me come back

17  and I had -- I had to come back to the district,

18  because I had the company vehicle.

19            What I did was they had me scheduled for

20  The United Way.  I went ahead and went to The United

21  Way, and we got out of there quicker than usual, and

22  I came back.  I asked if they had any work for me,

23  you know, they didn't.  I got lost.  It was like

24  hey, you've got me scheduled to be here, I'm getting

25  paid for being here and everything, I left the

1    district.  According to them, it wasn't an all-day

2    thing, but it was.

3        Q.    And did you obtain anyone's permission

4    before you got lost after the tour?

5        A.    Nobody -- nobody was in the district,

6    nobody was in the district, nobody for supervision.

7    As a matter of fact, the office was locked up.

8        Q.    So you received a one-day suspension

9    September 1st, 1999.  Then you had a three-day

10    suspension in October of 1999; is that correct?

11        A.    Yes, ma'am.

12        Q.    Did you grieve those suspensions?

13        A.    Yes, ma'am.

14        Q.    And was there any resolution for those

15    grievances?

16        A.    No, ma'am, they were basically just gaffed

17    off.

18        Q.    You're going to have to define this gaffed

19    off for me.  This is a new one.

20        A.    They were just pushed to the side.

21        Q.    And in this letter dated December 14th,

22    1999, which doesn't make sense with the rest of the

23    letter, you're right, but referencing this

24    January 3rd, 2000, meeting, it indicates that you

25    were absent on an unpaid absence on November 3rd,

95

1    November 15th and December 9th; is that correct?

2        A.   I mean, that's what the letter says, but

3    that's not correct.

4        Q.   Were you off work on November 3rd,

5    November 15th and December 9th, 1999?

6        A.   If I recall, yes, I was.

7        Q.   Were those paid or unpaid absences?

8        A.   Unpaid.

9        Q.   And what was the nature of your absences?

10       A.   At the time -- let's see.  There were two

11   of which was auto -- was car trouble.  I don't

12   recall the third one.

13       Q.   And why would car trouble be treated as an

14   unpaid absence?

15       A.   Well, if I don't have any means of getting

16   to work, because Brecon is not on the bus line, and

17   not being able to get in touch with anybody as far

18   as maybe like can I hitch a ride with you and stuff,

19   didn't leave me no other choice but to call, hey, I

20   can't get to work.

21       Q.   Had you exhausted all of your personal

22   days and vacation time or was it because you called

23   on the day that you were going to miss work that it

24   was treated as a --

25       A.   I had exhausted all my personal time and

96

1   vacation days, yes.  It was towards the end of the

2   year, towards Christmas and everything.

3       Q.   And as a result, according to this letter,

4   of those three unpaid absences, you received a

5   five-day suspension in January of 2000; is that

6   correct?

7       A.   Yes, ma'am.

8       Q.   Did you grieve this discipline?

9       A.   Yes, ma'am, I did.

10      Q.   And was it resolved in any way?

11      A.   No, ma'am.

12      Q.   Going back to this preprinted list of the

13  summary of the disciplinary actions, on this

14  in-house, two-day suspension on July 14th, 1994,

15  what do you mean by it was an in-house suspension?

16      A.   I actually worked at work and got paid for

17  it.  It was jotted in my file as disciplinary that

18  we're giving you this, but yet, you can work it.

19      Q.   You worked and you were paid?

20      A.   Yes, ma'am.

21      Q.   Do you know why that was allowed, since it

22  was supposed to be a disciplinary action?

23      A.   Well, at the time, I explained to

24  Mr. Miller what was going on.  True, I had a

25  delinquent utility account with the company, which

97

1    is looked down upon, but that right there, at the

2    time I was going through a heated divorce, and I had

3    brought it out kind of to support what was going on,

4    plus I had brought documentation saying that I had

5    gotten in touch with the company letting them know

6    as far as, yes, my name is on this bill, but I am no

7    longer in this household.  Please take my name off

8    the bill.  They wouldn't do it.

9           My ex let the bill go six months, let it

10   get behind or whatever and stuff, and they're coming

11   after me, and I can pay the house note and all of

12   this and everything and stuff, but whether or not

13   she paid the utility, no, she didn't.

14          Q.   So this was a discipline that was given to

15   you, but you didn't really have to serve it?

16          A.   Yes, ma'am.

17          Q.   And then there's another one-day

18   suspension on here dated September 3rd, 1994, for

19   inattentiveness to duties.  Did you serve that

20   one-day suspension, September '94?

21          A.   I think so.

22          MS. EZELL:  While you're looking for

23      that, let's go off the record for a sec.

24          (Recess taken.)

25   BY MS. EZELL:

98

1    Q.   I think when we stopped, Mr. Colbert, I

2  was asking you about the one-day suspension back in

3  September of 1994, and whether you had actually

4  served that suspension.

5    A.   I did.

6    Q.   And what was the reason for that

7  suspension?

8    A.   The reason was that at the time, it was

9  working overtime with a Jim Holcomb, and we were

10  working out at Miami Fort, which is a power station.

11  I had never been to Miami Fort, and I didn't know

12  how to get there.  On that day, coming to the

13  district, the old car I had right there broke down

14  and I had to call in saying I was going to be a

15  little late.

16        When I got to the district, I was

17  scheduled to drive the crane truck, which basically,

18  we take all our little timbers out and everything

19  and all the little -- all my little planks and all

20  of that stuff that I used to shore up the crane,

21  setting it up on all of that stuff, I was operating

22  that.

23    Q.   Okay.

24    A.   At the time, the crane was already out

25  there.  Mr. Holcomb took -- by me being late,

1   Mr. Holcomb, he took the pickup truck and drove out

2   to Miami Fort.  When I got to the district, which

3   was about 15 minutes after that right there, because

4   I called and told them that I was going to be late,

5   Mr. Holcomb had left.  I had not ever been to Miami

6   Fort.  I didn't know where it was at.  They tried

7   giving me directions and all that and everything and

8   stuff and I followed them to the best of my ability,

9   but got lost.

10          On the open air channel, I tried to call

11  Mr. Holcomb, when I first got in the district, I

12  tried calling him, no response on the radio.  I

13  tried even calling his personal radio phone, where

14  he was at right there, and no response, calling

15  around and asking for this and that, drove on out

16  there, couldn't find the place, got lost and

17  everything.  After about an hour up and down on 50,

18  I just pulled off on the side and said hey, there

19  ain't no sense in driving this right here.  Let me

20  keep on calling, keep on calling, keep on calling.

21  Nobody answered.

22          Okay.  I went ahead and went by -- I'm off

23  on the side still trying to raise somebody.  Along

24  come Mr. Miller, pulls up alongside of me and bangs

25  on the door, and he said what the hell are you doing

1    and everything.  I said, hey, I'm sitting here

2    trying to raise somebody on the radio and stuff to

3    give me directions to Miami Fort.  I don't know

4    them -- I've done told you I don't know where Miami

5    Fort is.  He chewed my butt and all this and stuff

6    and showed me directly to Miami Fort and that was

7    that.

8        Q.    And the letter that you were given on the

9    discipline indicates that you had your eyes closed

10   and appeared to be sleeping, do you dispute that?

11       A.    Yes, I dispute that.  Considering that I'm

12   pulled off on the side of the road and everything

13   and stuff and basically not moving and got a radio

14   in my hand and everything and stuff, I felt like

15   that was self-explanatory, but Mr. Miller had in his

16   mind that I was sleeping and that was that.  I went

17   ahead and served my suspension and thought that was

18   the end of it, but apparently it wasn't.

19       Q.    And, Mr. Colbert, I've taken a letter that

20   looked like it was from Freking & Betz out of the

21   material that you've provided to me today.  I don't

22   want any information from lawyers or that you sent

23   to lawyers.

24           And then the last letter that we have here

25   is from March 15, 2000, which indicates in the first

1   paragraph, it was referencing a meeting on

2   March 2nd, and on March 8, you talk about

3   insubordinate contact and your overall unacceptable

4   work record.  Could you tell me what happened on

5   March 2nd?

6       A.    What happened on March 2nd was I was

7   scheduled to attend a grievance meeting down at

8   4th and Main, so they had to make arrangements so

9   that I can be out of there, be out of the pole yard

10  and at the meeting on time.  Basically, I was going

11  to be working half the day, and my assignment was to

12  work inside the pole yard cutting up pole pieces and

13  painting.

14          I was told that I would be able to leave

15  the pole yard at 12:30.  I immediately brought that

16  to Mr. Bricking's attention that I had a meeting at

17  1:00, and that was at downtown.  Brecon Pole Yard is

18  located out in Sharonville.  At the time, 2000, we

19  had a lot of construction going on around here, and

20  I was telling Mike it was enough time for me to get

21  cleaned up and to make it from Brecon Pole Yard and

22  find a place to park down here and meet -- make

23  it -- make my meeting at 1:00 for my grievance.

24      Q.    So what did you do?

25      A.    I just brought it to his attention, I

1   didn't feel that was enough time.  So what

2   Mr. Bricking did was he went back into the office

3   and supposedly called Mr. Miller and let him know

4   what was going on, and Mr. Miller said that, okay,

5   we can cut him loose about maybe -- he had a meeting

6   at 1:00, so we can cut him loose at 11:30, and that

7   gives you enough time to get cleaned up and go from

8   there -- get cleaned up, make it down to 4th and

9   Main, find some place to park and make your meeting

10  on time.

11         Considering the traffic back-up, I told

12  them no, I don't think that was enough time.  I

13  still don't think that's enough time.  Well, that's

14  the best you're going to get.  I still don't think

15  it's enough time.  Are you refusing an order?  No,

16  I'm not refusing an order, I'm just telling you I

17  don't think it's enough time.  So what he did was at

18  the time he called Joe Starks over, and as soon as

19  Joe Starks got there, it was like, I'm giving you a

20  direct order to go to work.

21         Q.   And Starks was your union steward?

22         A.   Starks is not a union steward, but he's a

23  coworker.  I used him, yeah.  I said I'm not

24  refusing work, I'm just telling you I don't think

25  that's enough time.  Mr. Bricking said hand me your

103

1    company ID card, you're suspended indefinitely, and

2    that's how that occurred.

3        Q.    Okay.    And then what was the conversation

4    on March 8?

5        A.    March 8th was -- that was telling me that

6    I was fired.

7        Q.    And what was said to you during the

8    termination?

9        A.    Based upon -- I mean, that's when I got to

10    read everything off in the file, and based upon

11    this, we feel that you ain't making any improvements

12    and, you know, it's best to just cut ties.

13        Q.    And did they go over this summary of

14    disciplinary action in that meeting?

15        A.    Yes, ma'am.

16        Q.    And did you have any comments to make

17    during the meeting on March 8, 2000?

18        A.    No, ma'am.    There was no -- no sense in

19    even saying it because he already had his mind made

20    up.

21        Q.    When you were told earlier that week on

22    March 2nd, 2000, that you were suspended

23    indefinitely, did you have any conversation or make

24    any comments at that point?

25        A.    No.    I just -- other than just telling

104

1    them I didn't feel it was enough time to get down

2    here and make -- get cleaned up and make my meeting

3    on time, that was it.

4         Q.    At one point, I thought you told me you

5    were keeping track on time tickets?

6         A.    Yes.

7         Q.    Do you have those?

8         A.    Yes, I have a box of them at the house and

9    stuff as far as like assignments for that day.  I

10   recall I didn't get one for that date, but I know

11   that I was -- it was listed in the discipline that

12   my duties were to cut poles and paint.

13        Q.    And will you provide those to your

14   attorney?

15        A.    Yes, ma'am.

16        Q.    What else do you think you might have at

17   your home?  I know you said you had a busy week this

18   week and weren't able to get to everything.

19        A.    In the nature of?

20        Q.    Anything related to your employment at

21   CG&E, your attempt to find work since you were

22   terminated in March of 2000.

23        A.    What I have as far as like jobs for

24   consideration, I have envelopes full of jobs that I

25   may have been considered for, and just didn't make

105

1   the cut for some apparent reason or whatever.

2       Q.    In addition to what you've given me today?

3       A.    Yes, ma'am.

4       Q.    So those would be more the nature of

5   rejection letters from prospective employers?

6       A.    I wouldn't say so much rejection right

7   there, I mean, you qualify, setting up second, third

8   interviews, but just didn't get the job or whatever.

9       Q.    I'm just trying to figure out how to put

10  this so that I can ask you for it.  So it would be

11  envelopes of correspondence to and from potential

12  employers?

13      A.    Yes, ma'am.

14      Q.    And if I describe a box of timecards, is

15  that an adequate description of this box that you

16  have in which you kept track of your assignments and

17  other information?

18      A.    Not timecards, it would be classified

19  as -- they call it a trip sheet.  And that basically

20  tells what your assignment is due for that day and

21  what you're going to be doing.

22      Q.    Okay.  So you have a box of trip sheets,

23  you have envelopes of correspondence with potential

24  employers?

25      A.    It's funny, because on the trip sheets,

1    when they seen that I began at the end of the day to

2    just take them off the board, Mr. Morgan used to

3    call it -- it was so funny, he'd just take them off

4    and, no, you can't have this, you can't have this.

5    I'm like, what are you going to do with it anyway.

6    I mean, Tom has a copy, what are you going to do

7    with it.  No, you just can't have it.  He was just

8    being a real butt hole on it.

9        Q.    On how many occasions did that happen

10   where they wouldn't let you have the trip sheets?

11       A.    That was probably, say, about a dozen or

12   so.

13       Q.    In what span of time are we talking about

14   in terms of when you were keeping trip sheets?

15       A.    I started grabbing trip sheets back in

16   '97.

17       Q.    And you continued to do that until the

18   time of your termination?

19       A.    Pretty much, yes.

20       Q.    Any other documents that you have at home

21   related to your employment at CG&E or your efforts

22   to find other employment since your termination?

23       A.    No, other than the ones I was telling you

24   about, letters from potential employers.

25       Q.    And you're currently working -- and I

107

1   apologize, I don't remember if this was something

2   your attorney told me or if you told me this in your

3   first deposition.  You're currently working for a

4   parking company?

5       A.   Yes, the City of Cincinnati parking at

6   Fountain Square.  It's a part-time job.

7       Q.   And how many hours a week are you working?

8       A.   I'll be lucky if I get maybe ten a week.

9       Q.   And what's the pay scale?

10      A.   The pay scale, I'm only making 6.50 an

11  hour.

12      Q.   And your other source of income at this

13  point would be from the odd jobs that you described

14  to me in your first deposition?

15      A.   Yes, and the Reserves.

16      Q.   And the Reserves.  And what income are you

17  receiving from the Reserves?

18      A.   The Reserves, monthly income, I'm

19  receiving, after taxes, maybe about 60 bucks.

20      Q.   Are you subject to being called to duty?

21      A.   Yes, ma'am.  With the occurrences in the

22  world right now and stuff, I mean, like everything

23  is up in the air.

24      Q.   But as of now, you've not been notified of

25  any active duty requirement?

108

1      A.    No, ma'am.  No, ma'am.

2      Q.    I'm going to ask you to identify some of

3  these folks.  I know we've talked about a number of

4  potential witnesses that you've identified.  Leon

5  Waters is the first one on this list.  Is this a

6  handwritten document that you prepared?

7      A.    Yes, ma'am.

8      Q.    David Austin?

9      A.    He's not on the original list, no.

10     Q.    Okay.  And what was David Austin's role as

11  a potential witness?

12     A.    He witnessed a lot of occurrences in the

13  pole yard, some of the preferential treatment and

14  all of that and everything.

15     Q.    Was he one of the individuals who said he

16  didn't want to work with you because you were under

17  the microscope?

18     A.    No, that was actually Randy Hisles that

19  said that.

20     Q.    Okay.

21     A.    Randy Hisles and I remember Jeff Bragg

22  saying that to me, too.

23     Q.    And then Randy is the third one on the

24  list.  Reginald Lackey, what role would he play?

25     A.    I have him in there as a potential witness

109

1    to some of the events -- witnessing some of the

2    events that had occurred.

3        Q.    Okay.  And, to your knowledge, is David

4    Austin still employed at CG&E?

5        A.    Last I recall, yes, he is.  I haven't

6    spoken with him in quite some time.

7        Q.    Okay.  And then Randy Hisles, H-I-S-L-E-S,

8    is he still employed at CG&E?

9        A.    Yes, he's employed down here at 4th and

10   Main.

11       Q.    Okay.  Reginald Lackey, is he still

12   employed at CG&E?

13       A.    Yes, ma'am, he's -- yes, ma'am, he's

14   located at West End station.

15       Q.    And Dudley Quales you have listed as a

16   potential witness.  What knowledge would he have

17   regarding --

18       A.    He witnessed most of the events that --

19   some of the events that occurred, too.

20       Q.    Okay.  And did he work at the pole yard?

21       A.    Yes, ma'am.

22       Q.    Is he black or white?

23       A.    He's black.

24       Q.    Raymond Pope, I know you mentioned his

25   name a couple of times.  What would he have

1  knowledge regarding?

2       A.    Mainly some of the treatment that was

3  administered by Bob Morgan and Gilligan.

4       Q.    So he worked at the pole yard?

5       A.    Yes, ma'am.

6       Q.    Is Dudley Quales still employed at CG&E?

7       A.    Yes, he is.  He's located down at West

8  End, so is Ray Pope, Mark Roll, he is white, he's

9  located at West End, also.

10      Q.    And what would Mark Roll, R-O-L-L, have

11 knowledge regarding in terms of your lawsuit?

12      A.    Treatment, some of the treatment done by

13 Morgan and Gilligan.

14      Q.    And there's a Frank Moore listed.

15      A.    Frank Moore, he's still located out at the

16 pole yard.  He is now an equipment operator.

17      Q.    Is he white or black?

18      A.    He's black.

19      Q.    And what information might he have as to

20 your lawsuit?

21      A.    Some of -- same thing with Morgan, some of

22 the treatment, because there's been some occasions

23 where me and him was working side by side and along

24 come Morgan and he's jumping in my stuff, and

25 Frank's like I'm glad he didn't see that with me,

111

1    something may have went wrong with Frank, and, you

2    know, he'd just overlooked it just to get to me,

3    that's all.

4         Q.    Okay.   And Tony Thompson?

5         A.    Yes.

6         Q.    What knowledge would he have regarding

7    your lawsuit?

8         A.    Pretty much the same as the others above.

9         Q.    Okay.   He worked in the pole yard?

10        A.    Yes, ma'am, and he's now at West End.

11        Q.    At West End.   Is he white or black?

12        A.    He's black.

13        Q.    James McLaren, M-C-L-A-R-E-N.

14        A.    Yes, ma'am.

15        Q.    What information would he have about your

16    lawsuit?

17        A.    He's basically a union rep, and he

18    experienced -- I should say he seen and witnessed a

19    lot of -- some of the treatment that Morgan was

20    administering my way.

21        Q.    And was he assigned at the pole yard?

22        A.    Yes, ma'am, he's now at West End station.

23        Q.    Is he white or black?

24        A.    He's white.

25        Q.    Dan --

112

1      A.    Schalk.

2      Q.    Schalk.

3      A.    Yes?

4      Q.    S-C-H-A-L-K?

5      A.    Yes.

6      Q.    And what would he have in terms of

7  information?

8      A.    Same thing with some of the treatment by

9  Morgan and Gilligan.

10      Q.    So he worked at the pole yard?

11      A.    Yes, and he's white.  He's now located at

12  West End.

13      Q.    Richard -- what is this?

14      A.    Akers.

15      Q.    Akers?

16      A.    Yes.

17      Q.    A-K-E-R-S.  And what would Mr. Akers know

18  in terms of your lawsuit?

19      A.    Pretty much the same as the others above,

20  and as far as like -- I think he's retired now.

21      Q.    Is he white or black?

22      A.    He's white.

23      Q.    And he had formerly worked at the pole

24  yard when you were there?

25      A.    Yes.  All of them people right there were

```
 1    building maintenance and they're now stationed out
 2    at West End station.
 3         Q.   Okay.  And Charlie Young, you've talked
 4    about him in today's session.
 5         A.   He's at -- he's at West End station also.
 6    A lot of people -- from here on right here,
 7    basically, they seen that it was -- it was not -- it
 8    was hopeless working at the pole yard, and first
 9    opportunity they took to get away from there, that's
10    what they did.
11         Q.   Okay.  And this would be the people listed
12    1 through 13?
13         A.   Pretty much, yes, ma'am.
14         Q.   Gerald Griffith?
15         A.   Gerald, I mean, me and Gerald, I mean, I
16    like to look at him as more so, me and him were
17    real, real tight, he's more like a mentor to me and
18    everything.  And some of the problems he tried to
19    help me with, you know, but it's like so much that
20    he can do.  I mean, they're gunning for you.  He
21    used to -- I can truly say he was a friend, he tried
22    to forewarn me of some things.  He's black.
23         Q.   He's black?
24         A.   He's black, and he's still working at the
25    pole yard.
```

114

1   Q.   Samuel --

2   A.   Sameeh Muhammed.

3   Q.   Okay.  We've got the spelling on that as

4   S-A-M-E-E-H.

5   A.   That's how he spells it.

6   Q.   Okay.  And then his last name is

7   M-U-H-A-M-M-E-D?

8   A.   Muhammed.

9   Q.   And what does Mr. Muhammed know about your

10  lawsuit?

11  A.   He knows that I was going through

12  problems, and he sort of acted as an mentor with me,

13  also, and tried to help me the best that he could.

14  But as I said, there's only so much that he can do,

15  so -- I mean, they're gunning for you, that's that,

16  you can just try to weather it and go from there.

17  He no longer works at the pole yard, he's located at

18  Dana Avenue.  He seen an opportunity to get away

19  from there and he got away.

20  Q.   And is he Caucasian?

21  A.   No, he's black.

22  Q.   He's black?

23  A.   Yes.

24  Q.   Darryl --

25  A.   Trace.

115

1      Q.    Trace, T-R-A-C-E.    What would Mr. Trace

2    know in terms of your lawsuit?

3      A.    Trace -- Trace used to -- I can truly say

4    Trace, he's white, and I classify him as a friend.

5    I mean, if something came to his attention, he would

6    bring it to my attention.    As far as like certain

7    things he couldn't deal with that were out of his

8    hands, and, you know, he used to just warn me of

9    certain things.

10     Q.    And white or black?

11     A.    He's white.

12     Q.    And he worked at the pole yard?

13     A.    Yes, ma'am.

14     Q.    Do you know where he's currently working?

15     A.    He's still at the pole yard.

16     Q.    Okay.    Mike Howe, H-O-W-E.    What would

17   Mr. Howe know about your lawsuit?

18     A.    Mr. Howe, at the time that he was out at

19   the pole yard, he was experiencing a lot of what

20   I've described.

21     Q.    He's also black?

22     A.    Yes.    And he took the first opportunity he

23   could to get out of there.    He's now working at

24   Queensgate.    He's in the street light department.

25     Q.    Mike Knighten?

116

1     A.   Steve Knighten.

2     Q.   I'm sorry, Steve Knighten,

3   K-N-I-G-H-T-E-N.

4     A.   I think Steve is retired, I'm not sure.

5     Q.   Okay.  But he did work at the pole yard?

6     A.   Yes, ma'am.  He was part of -- he's black,

7   and he's part of building maintenance.

8     Q.   And what would Mr. Knighten know about

9   your allegations?

10    A.   Steve used to have a big problem with work

11  and how he used to talk to people and all of this,

12  and on numerous occasions, I mean, basically I had

13  used him as a witness for some of the grievance

14  proceedings.

15    Q.   Okay.  Joe Starks, what information would

16  he have regarding your allegations?

17    A.   Joe Starks, I used him in some instances

18  as a steward in the grievance proceedings, plus,

19  also, me and him used to talk regarding some of the

20  treatment Mr. Morgan used to -- Mr. Morgan and

21  Mr. Gilligan used to experience, and Starks used

22  to -- he was just somebody -- a friend I could talk

23  to, that's all.

24    Q.   Okay.  Michael -- I can't read your

25  handwriting.

117

1      A.    Dieckmann.

2      Q.    Could you spell that for Jana?

3      A.    It's spelled D-I-E-C-K-M-A-N-N.

4      Q.    And what would Mr. Dieckmann know about

5   your lawsuit?

6      A.    Mr. Dieckmann, he witnessed a lot of the

7   treatment that Mr. Morgan and Mr. Gilligan were

8   addressing towards me, and Dieckmann, I could

9   classify as a true friend.  He's white, and me and

10  him get along pretty good.

11     Q.    And do you know where he's currently

12  working?

13     A.    Last I know, he's still out at Brecon Pole

14  Yard.

15     Q.    And then the last person you have

16  identified is Tony Sinclair.

17     A.    Yes, Tony Sinclair, he's white, and, I

18  mean, me and him, we talked.  I mean, some of the

19  things that occurred to me and everything, he used

20  to warn me about his buddy, Morgan, because him and

21  Morgan were real cool.  But he actually used to tell

22  me some things, you know, just for my knowledge, you

23  know, to keep me abreast of everything and stuff,

24  but Tony I would classify as a friend, yes.

25     Q.    And Sinclair is white?

118

1      A.   Yes, ma'am.

2      Q.   And is he still working at the pole yard?

3      A.   Last I heard, yes, he is.

4      Q.   Okay.  You identified Mr. Knighten on your

5  list as someone who, I think, had testified in one

6  of your grievances; is that correct?

7      A.   I said that he had acted as a witness for

8  one of my grievances.

9      Q.   Okay.  Were there other individuals on

10  this list of 21 people who acted as witness at any

11  of your grievances?

12      A.   Let me see.  Reggie Lackey, Randy Hisles,

13  Steve Knighten, Joe Starks, Mike Dieckmann.  That's

14  it.  I'm sorry, Dudley Quales.

15      Q.   I'm going to suggest this to both of you

16  since I've relied on this material so much during

17  the course of the deposition, I want to make sure

18  it's okay with you, but what I'd like to do is mark

19  all the materials that you provided to me today as

20  Exhibit A to this deposition.  We'll give the

21  original documents to the court reporter, she'll

22  copy everything, attach it as a permanent part of

23  the deposition, and then return the originals to

24  your attorney.  Are you okay with that?

25      A.   Yes, ma'am.

119

1          (Defendant's Exhibit A was marked for

2    identification.)

3    BY MS. FLEMING:

4        Q.    That way I'm not touching them, so we'll

5    entrust Jana with those documents.

6        A.    Okay.

7            MS. EZELL:  Okay.  And we'd also like

8        signature on the deposition.

9            MS. FLEMING:  Okay.

10                (Witness excused.)

11          (Deposition concluded at 3:32 p.m.)

12

13

14    _____        _____

15    OLLEN G. COLBERT                              DATE

16

17

18

19

20

21

22

23

24

25

120

```
1                              )

2    STATE OF OHIO             )

3                              )

4        I, Jana B. Colter, Notary Public for the State

5    of Ohio, do hereby certify:

6        That the witness named in the deposition,

7    prior to being examined, was by me duly sworn;

8        That said deposition was taken before me at

9    the time and place therein set forth and was taken

10   down by me in shorthand and thereafter transcribed

11   into typewriting under my direction and supervision;

12       That said deposition is a true record of the

13   testimony given by the witness and of all objections

14   made at the time of the examination.

15       I further certify that I am neither counsel

16   for nor related to any party to said action, nor in

17   any way interested in the outcome thereof.

18       IN WITNESS WHEREOF I have subscribed my name

19   and affixed my seal this 14th day of March, 2003.

20                    Jana B. Colter, RMR

21                    JANA B. COLTER, RMR

22                    Notary Public

23                    My Commission expires: 3/27/07

24

25
```

Barlow Reporting Services

# Invoice

333 Madison Avenue
Covington, KY  41011
(859) 261-8440

TAX ID NO.: 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

| DATE | INVOICE # |
|------|-----------|
| 3/14/03 | 6406 |

**BILL TO**

Rose Ann Fleming, Esq.
Professional Legal Corporation
3855 Ledgewood Drive, Suite 13
Cincinnati, Ohio  45207

| TERMS |
|-------|
| Net 15 |

| DESCRIPTION | AMOUNT |
|-------------|--------|
| Ollen G. Colbert, Jr.<br>vs<br>Cincinnati Gas & Electric<br>Deponent:<br>Ollen G. Colbert, Jr.<br>Date:<br>March 10, 2003<br><br>Copy of Transcript<br>Copy of Exhibits<br>Delivery Charge | <br><br><br><br><br><br><br><br>138.45<br>100.00<br>5.00 |

Thank you, Jana

| **Total** | $243.45 |