Service: Get by LEXSEE®
Citation: 2004 U.S. App. Lexis 10663

*100 Fed. Appx. 387, \*; 2004 U.S. App. LEXIS 10663, \*\**

HARRAH'S ENTERTAINMENT, INC., d/b/a RIO SUITE HOTEL & CASINO, Plaintiff-Appellant, v. ACE AMERICAN INSURANCE CO., Defendant-Appellee.

No. 02-6519

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

100 Fed. Appx. 387; 2004 U.S. App. LEXIS 10663

May 27, 2004, Filed

**NOTICE:** [\*\*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE. 01-02995. Mays Jr. 11-18-02.

**DISPOSITION:** Affirmed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff insured sued defendant insurer, asserting a breach of contract claim seeking coverage for forged cashier's checks under an insurance policy. The United States District Court for the Western District of Tennessee granted summary judgment to the insurer. The insured appealed.

**OVERVIEW:** The insured, a casino operator, extended gambling credit to a patron for two forged cashier's checks. The insured sought coverage for the loss under a blanket crime policy with the insurer, which the insured drafted. The appellate court determined that the insurer was entitled to summary judgment. Under an exclusion in the insuring agreement involving loss of money and securities, coverage did not extend to the giving or surrendering of money or securities in any exchange or purchase; the insured gave or surrendered gambling credit, which constituted "money or securities" under the policy, in exchange for the forged checks. The insuring agreement involving money orders and counterfeit paper currency did not provide coverage, because this insuring agreement provided coverage for post office or express money orders, and the cashier's checks were not postal money orders or express money orders. Even if the cashier's checks could be treated as money orders, it did not follow that these cashier's checks amounted to express money orders under the insurance policy. In addition, the district court did not abuse its discretion in striking two affidavits of the insured's experts.

**OUTCOME:** The appellate court affirmed the district court's judgment.

**CORE TERMS:** cashier's, money order, postal, transporting, insurance policy, gambling, ambiguity, summary judgment, post office, surrendering, abstraction, coverage, casino, credit cards, physically, delivery, drafter, provides coverage, provide coverage, negotiable, travelers, currency, insured, negotiable instrument, bank money order, common carrier,

orders issued, debit, card, headquartered

## LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Summary Judgment > Standards of Review
Insurance Law > Claims & Contracts > Policy Interpretation > Contract Interpretation Rules
Civil Procedure > Appeals > Standards of Review > De Novo Review
**HN1** The appellate court gives de novo review to the district court's summary judgment decision and its interpretation of the insurance policy. More Like This Headnote

Civil Procedure > Appeals > Reviewability
**HN2** The appellee may without taking a cross-appeal, urge in support of a decree any matter appearing in the record. More Like This Headnote

Governments > Federal Government > U.S. Postal Service
**HN3** Aside from being issued by a post office rather than by a bank, postal money orders differ from cashier's checks in that a postal money order with more than one endorsement is invalid. Domestic Mail Manual S020 § 2.7 (Jan. 2004). More Like This Headnote

Commercial Law (UCC) > Negotiable Instruments (Article 3) > Miscellaneous Provisions
**HN4** Cashier's checks are freely negotiable and maintain the essential characteristics of a check. Tenn. Code Ann. § 47-3-104(g) (U.C.C. § 3-104(g)). More Like This Headnote

Commercial Law (UCC) > Negotiable Instruments (Article 3) > Miscellaneous Provisions
**HN5** See Tenn. Code Ann. § 47-3-104(g) (U.C.C. § 3-104(g)).

Governments > Federal Government > U.S. Postal Service
Commercial Law (UCC) > Negotiable Instruments (Article 3) > Liability of Parties
**HN6** The Postmaster General retains the right to refuse payment of postal money orders. Domestic Mail Manual S020 § 3.2 (Jan. 2004). A bank, by contrast, may not refuse payment of its own cashier's checks; in signing the check as a drawer, the bank becomes liable to the holder for payment. Tenn. Code Ann. § 47-3-412 (U.C.C. § 3-412); Tenn. Code Ann. § 47-3-411(b) (U.C.C. § 3-411(b)). More Like This Headnote

Insurance Law > Claims & Contracts > Policy Interpretation > Ambiguous Terms
Commercial Law (UCC) > Negotiable Instruments (Article 3) > Miscellaneous Provisions
**HN7** The phrase "postal or express money order" does not naturally encompass a cashier's check issued by a bank. More Like This Headnote

Insurance Law > Claims & Contracts > Policy Interpretation > Ambiguous Terms
**HN8** "Express company" is defined as a firm or corporation engaged in the business of transporting parcels or other moveable property, in the capacity of common carriers, and especially undertaking the safe carriage and speedy delivery of small but valuable packages of goods and money. More Like This Headnote

Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule
Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders
**HN9** The appeal of a district court's final judgment draws into question all prior non-final rulings and orders. More Like This Headnote

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion 

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Strike
HN10± The appellate court reviews a district court's ruling on a motion to strike for an abuse of discretion. More Like This Headnote

Civil Procedure > Summary Judgment > Supporting Papers & Affidavits
HN11± Under Fed. R. Civ. P. 56(e), affidavits shall be made on personal knowledge and shall set forth such facts as would be admissible in evidence. Fed. R. Civ. P. 56(e). It is well settled that courts should disregard conclusions of law (or "ultimate fact") found in affidavits submitted for summary judgment. More Like This Headnote

**COUNSEL:** For HARRAH'S ENTERTAINMENT, INC. dba Rio Suite Hotel & Casino, Plaintiff - Appellant: Nicholas E. Bragorgos, McNabb, Bragorgos, & Burgess, Memphis, TN.

For HARRAH'S ENTERTAINMENT, INC. dba Rio Suite Hotel & Casino, Plaintiff - Appellant: Jeffrey D. Leathers, Greer, Pipkin, & Russell, Tupelo, MS.

For ACE AMERICAN INSURANCE CO., Defendant - Appellee: John M. Gillum, Jeffrey S. Price, Manier & Herod, Nashville, TN.

**JUDGES:** Before: SILER, MOORE and SUTTON, Circuit Judges.

**OPINIONBY:** SUTTON

**OPINION:** [*388] SUTTON, Circuit Judge. After accepting $ 1.5 million in forged cashier's checks for gambling credit at one of its casinos, Harrah's Entertainment, Inc. sought coverage under an insurance policy issued by ACE American Insurance Company. The [**2] district court granted summary judgment to ACE, concluding that the policy did not cover the losses. We affirm.

[*389] I.

On January 3, 2001, Jing Li went to Harrah's Rio Suite Hotel & Casino in Las Vegas, Nevada for what would have been a night of high-stakes gambling had Li been using his own money. Li presented the casino with an instrument purporting to be a cashier's check for $ 500,000 from Bank of America, naming Li as the payee. Li endorsed the check, and Harrah's extended $ 500,000 in gambling credit, which Li lost in a matter of hours. Soon thereafter, Li gave the casino another cashier's check from Bank of America that also identified him as the payee, this time in the amount of $ 1 million. Harrah's again accepted the check for gambling credit, and the predictable occurred. Before Harrah's could discover the fraud, Li had lost $ 1,461,800 and the casino had paid him the $ 38,200 balance in cash, bringing Harrah's total loss to $ 1.5 million.

At the time of this incident, Harrah's maintained a "Blanket Crime Policy" with ACE. Harrah's filed a claim with ACE under the policy but the insurance company denied it, explaining that the policy did not cover this type of loss.

In response, [**3] Harrah's filed a state-law, breach-of-contract claim against ACE in federal district court, seeking to recover its $ 1.5 million loss. Because Harrah's is a Delaware corporation headquartered in Tennessee and ACE is a Pennsylvania corporation headquartered in Philadelphia, the district court had subject-matter jurisdiction over the action. See 28 U.S.C. § 1332(a).

No factual disputes arose, and the parties moved for summary judgment, each focusing on whether Insuring Agreements II and IV of the policy provided coverage. Described as "Loss

Inside the Premises Coverage," Insuring Agreement II (as amended by Addendum 14) covers the following:

> Loss of Money and Securities by the actual destruction, disappearance, wrongful abstraction [or] Funds Transfer Fraud thereof within or from the Premises, Banking Premises or similar recognized places of safe deposit.

JA 210. The policy defines "Money" as "currency, coins, bank notes and bullion; and travelers checks, register checks and money orders held for sale to the public." JA 197. "Securities" are "all negotiable and non-negotiable instruments or contracts representing either Money or other property [**4] and include[] revenue and other stamps in current use, tokens and tickets, but do[] not include Money." Id.

Section 2(e) of the Exclusions portion of the policy applies to Insuring Agreement II and precludes coverage for any:

> loss (1) due to the giving or surrendering of Money or Securities in any exchange or purchase; (2) due to accounting or arithmetical errors or omissions; or (3) of manuscripts, books of account or records.

JA 196.

Insuring Agreement IV (as amended by Addendum 6) is entitled "Money Orders and Counterfeit Paper Currency Coverage" and provides coverage for:

> Loss due to the acceptance in good faith, in exchange for merchandise, Money, House Chips and Tokens or Services, of any post office or express money order, issued or purporting to have been issued by any post office or express company, if such money order is not paid upon presentation, or due to the acceptance in good faith in the regular course of business of counterfeit United States or Canadian paper currency.

JA 205. Harrah's drafted the insurance policy.

[*390] In support of its summary-judgment motion. Harrah's filed virtually-identical affidavits from two insurance experts. [**5] The affidavits relied on legal dictionaries and a publication from the International Risk Management Institute that purported to analyze this type of insurance policy. After defining several contractual terms and analyzing the policy provisions, the experts opined that the parties intended to cover Harrah's loss. The court refused to consider either affidavit because both of them offered legal conclusions, and nothing more. Order Granting Mot. to Strike at 4: see Fed. R. Evid. 702.

In ruling on the summary judgment motions, the district court concluded that the term "wrongful abstraction" covered Li's fraud under Insuring Agreement II but that Section 2(e) excluded coverage. Because Li's act involved "the giving or surrendering of Money or Securities in any exchange or purchase." the court determined that Section 2(e) applied. Turning to Insuring Agreement IV, the court described the instruments as "teller's checks" and concluded that they fairly could be characterized as "money orders" under the policy. D.Ct.Op. at 8. Still, because the money orders had not been issued by an "express

company," it concluded that Insuring Agreement IV did not [**6] provide coverage. *Id.* at 12.

II.

A.

The parties agree that Tennessee law governs this dispute. *See* Hayes v. Equitable Energy Res. Co., 266 F.3d 560, 566 (6th Cir. 2001). **HN1** We give de novo review to the district court's summary judgment decision and its interpretation of the insurance policy. Duane Mgmt. Co. v. Prudential Ins. Co., 29 F.3d 245, 248 (6th Cir. 1994).

B.

We agree with the district court that Insuring Agreement II does not cover this loss. Regardless of whether Li committed a "wrongful abstraction" under Insuring Agreement II, Section 2(e) of the policy excludes coverage. Under Section 2(e), coverage does not extend to the "giving or surrendering of Money or Securities in any exchange or purchase." JA 196. In this instance. Harrah's gave or surrendered gambling credit--which constitutes "Money or Securities" under the policy, JA 197--in exchange for Li's forged checks.

Harrah's, notably, does not challenge the premise of this conclusion--that Li's transaction was a "giving or surrendering ... in exchange" and that the gambling credit amounted to "Money or Securities." Instead, the company points to an outside source--the International [**7] Risk Management Institute--to try to show that the parties meant something else when they signed the policy. According to a publication issued by the International Risk Management Institute, Section 2(e) is a "rather loosely worded exclusion" that generally applies to "loss of money caused by a salesperson's undercharging on a purchase, an error in making change, or the giving of an unwarranted refund." Int'l Risk Mgmt Inst., Inc., *Commercial Property Crime* XII.D.27 (1998). In choosing an exclusion that the industry considers applicable to salesperson error, Harrah's argues, the parties could not have intended the exclusion to eliminate coverage for check fraud. If the parties intended to exclude check fraud, Harrah's adds, they would have selected the alternative "voluntary parting of title to or possession of property" exclusion that the International Risk Management Institute found to exclude losses "when the insured has willingly entered into a business transaction that [*391] turns out to be fraudulent." *Id.* at XII.D.28.

This argument, however, fails to come to grips with two points. It does not account for the "natural[] and ordinary meaning" of Section 2(e), Drexel Chem. Co. v. Bituminous Ins. Co., 933 S.W.2d 471, 477 (Tenn. Ct. App. 1996). [**8] which excludes coverage for any "giving or surrendering of Money or Securities in any exchange or purchase" and which is what occurred here. And the argument at best suggests an ambiguity in this admittedly "loosely worded exclusion," Int'l Risk Mgmt Inst., Inc., *Commercial Property Crime* XII.D.27. an ambiguity that we must construe against the drafter of the policy. Harrah's, under Tennessee law, *see* Realty Shop v. RR Westminster Holding, 7 S.W.3d 581, 598 (Tenn. Ct. App. 1999).

C.

We also agree with the district court that Insuring Agreement IV does not provide coverage, though we take a slightly different path in reaching that conclusion. In our view, the instruments at issue were not "express money orders" issued by an "express company."

As a preliminary matter, Harrah's argues that we may not consider this argument because ACE did not file a separate notice of appeal challenging the district court's contrary conclusion on this point. Because ACE's legal argument presents an alternative ground for affirmance, however, the company was free to raise this argument on appeal without filing a cross-

appeal. See Moore v. Freeman, 355 F.3d 558, 565 (6th Cir. 2004) [**9] HN2("The appellee may. without taking a cross-appeal, urge in support of a decree any matter appearing in the record.").

Insuring Agreement IV provides coverage for "[1] post office or [2] express money orders." not money orders in general. The cashier's checks at issue in this case assuredly are not postal money orders. HN3 Aside from being issued by a post office rather than by a bank, postal money orders differ from cashier's checks in that a "[postal] money order with more than one endorsement is invalid." Domestic Mail Manual S020 § 2.7 (Jan. 2004); see also 39 C.F.R. § 111.1 (incorporating the Domestic Mail Manual into the Code of Federal Regulations by reference); 5A Lary Lawrence, *Anderson on the Uniform Commercial Code* § 3-104:61 (2003) (a postal money order "is not a negotiable instrument transferable to a bona fide holder for value free of defenses." and "it lacks the essential characteristics of a negotiable instrument and there are numerous restrictions and limitations in the postal laws and regulations which are inconsistent with a concept of negotiability"). HN4 Cashier's checks on the other hand are freely negotiable and maintain the essential [**10] characteristics of a check. See Tenn. Code Ann. § 47-3-104(g) (U.C.C. § 3-104(g)) HN5("'Cashier's check' means a draft with respect to which the drawer and drawee are the same bank or branches of the same bank."); see also Spencer v. Sterling Bank, 63 Cal. App. 4th 1055, 74 Cal. Rptr. 2d 576, 578 (Ct. App. 1998) ("Checks, including cashiers' checks, are 'negotiable instruments' covered by" Article 3 of the Uniform Commercial Code.). HN6 The Postmaster General also retains the right to refuse payment of postal money orders. Domestic Mail Manual S020 § 3.2. A bank, by contrast, may not refuse payment of its own cashier's checks; in signing the check as a drawer, the bank becomes liable to the holder for payment. See Tenn. Code Ann. § 47-3-412 (U.C.C. § 3-412); id. § 47-3-411(b) (U.C.C. § 3-411(b)); Glenn G. Munn et al., *Encyclopedia of Banking and Finance* 168 (9th ed. 1991).

[*392] The more taxing question is whether these instruments constitute "express money orders." The phrase "express money orders" is not a term of art that lends itself to [**11] a readily-agreed-upon definition. The Uniform Commercial Code, for example, does not define the phrase. And Munn's *Encyclopedia of Banking and Finance* does not independently define an "express company money order," Munn et al., *supra,* at 315, but merely refers the reader to the general definition of "money order," *id.* at 673, and at other times contrasts the phrase with other instruments, *id.* at 96, see infra.

Although some definitions of "money order" encompass cashier's checks, see *Black's Law Dictionary* 1022 (7th ed. 1999), any attempt to classify these cashier's checks in this way at best leads one to the conclusion that this is a "bank money order," not an "express money order." Indeed, while Munn's Encyclopedia of Banking and Finance does not separately define "express money order," it does define "bank money order" as "practically a modified form of a cashier's check" that is "issued and sold by banks, *as distinguished from postal and express money orders,*" and "*unlike* [a] postal money order[] may be endorsed any number of times." Munn et al., *supra,* at 96 (emphasis added); see also Henry J. Bailey & Richard B. Hagedorn, *Brady on* [**12] *Bank Checks* P 1.20 (2003) (same); Barkley Clark & Barbara Clark, *The Law of Bank Deposits, Collections and Credit Cards* P 3.06[3][D] (2003) ("Bank money orders are obligations executed by the bank itself ... They should be treated like cashier's checks."). Thus, even if a cashier's check may be treated as a "money order," it does not follow that these cashier's checks amount to express money orders under the insurance policy. See Computer Works, Inc. v. CNA Ins. Cos., 757 P.2d 167, 169 (Colo. Ct. App. 1988) (finding "no ambiguity in the term 'post office or express money order'" used in an insurance policy and holding that "a cashier's check issued by a private banking institution does not fall into either classification").

Aside from its belief that we do not have jurisdiction to consider the issue, Harrah's offers no argument to counter this interpretation. Because HN7 the phrase "postal or express money

order" does not naturally encompass a cashier's check issued by a bank and because at a minimum ambiguity clouds the meaning of the phrase, see Realty Shop. Inc., 7 S.W.3d at 598, Insuring Agreement IV fails to cover Harrah's loss.

A related [**13] limitation in Insuring Agreement IV prompts a similar conclusion. Not only did Harrah's have to show that these cashier's checks were "express money orders" in order to obtain coverage, but it also had to show that they were issued by an "express company." That phrase is at best inscrutable and at worst undermines Harrah's position. While the most recent Black's Law Dictionary does not define the phrase, earlier editions HN8↑define "express company" as "a firm or corporation engaged in the business of *transporting parcels or other moveable property,* in the capacity of *common carriers,* and especially undertaking the safe carriage and speedy delivery of small but valuable *packages* of goods and money." Black's Law Dictionary 691 (4th ed. 1968) (emphasis added); see also Crane v. Ry. Express Agency, Inc., 369 Ill. 110, 15 N.E.2d 866, 871 (Ill. 1938) ("The business of an express company, as usually conducted, involves continuous custody of goods received as a bailee from the time of their receipt until their final delivery.").

As a national banking institution, Bank of America does not naturally fit within these definitions. Although Bank of America offers [**14] its customers a variety of [*393] mechanisms for making payments, obtaining cash or obtaining credit, it does not *physically* transport goods or money. Debit and credit cards, electronic funds transfers, travelers' checks and other negotiable instruments all contemplate methods of payment, not methods of physically transporting money. See, e.g., Black's Law Dictionary 409 (7th ed. 1999) ("A [debit] card [is] used to pay for purchases by electronic transfer from the purchaser's bank account."); *id.* at 375 ("A [credit] card [is] used to obtain items on credit."); Tenn. Code Ann. § 47-4A-101 cmt. (U.C.C. § 4A-101) ("In [drafting Article 4A on Funds Transfers] a deliberate decision was made ... to treat funds transfer as a unique method of payment."). Indeed, the whole point of these services, it would seem, is to make "express companies" irrelevant--or at least irrelevant when it comes to transporting money.

In arguing to the contrary, Harrah's relies on *Harrah's Entm't, Inc. v. ACE Am. Ins. Co.,* No. 01-2032 M1/ADA (W.D. Tenn. Oct. 30, 2001) (*Harrah's I*), which determined that when a company issues money orders, [**15] travelers' checks and credit cards, it offers customers a means of transporting money in a convenient form. *id.* at 8-9. *Harrah's I,* however, offered no support for this conclusion and failed to explain how banks and express companies in fact provide the same service. While express companies provide "safe carriage and speedy delivery of ... money," banks supplant this physical-delivery service by providing modern methods of payment and credit. Other authorities, it bears adding, use the phrase "express company" in the limited sense of those organizations engaged in the physical transportation of property and money. See White v. United Parcel Svc., Inc., 495 So. 2d 675, 676 (Ala. Civ. App. 1986) (defining an express company as "'a common carrier that carries at regular and stated times, over fixed and regular routes, money and other valuable packages, which cannot be conveniently or safely carried as common freight'") (quoting Pac. Express Co. v. Seibert, 44 F. 310, 318 (C.C.W.D. Mo. 1890)); Ind. Code § 8-2.1-21-1 (enacted in 1989) (defining an "express company," for purposes of regulating motor carriers, as a company [**16] "in the business of carrying or transporting gold or silver coin or paper currency, over or upon any of the railroads, rivers, canals or other thoroughfares in Indiana"); Cal. Pub. Util. Code § 219 ("'Express corporation' includes every corporation or person engaged in or transacting the business of transporting any freight, merchandise, or other property for compensation on the line of any common carrier or stage or auto stage line within this State.").

While the weight of authority in our view suggests that express companies physically transport money and other valuable property, it is at least a matter of some ambiguity to say that they perform the same services as banks. As the drafter of the policy, Harrah's bears responsibility for that confusion, a responsibility that has particular significance here. There is

a material difference between the risk of insuring money orders issued by the United States Postal Service and traditional express companies on the one hand and the risk of insuring money orders issued by all banks on the other. As one court concluded in interpreting a similar policy, "the difference in the number of institutions whose instruments [**17] would be implicated, as well as the differing internal business practices of each, might well influence the degree of risk that an insurer would be assuming." *Computer Works, Inc.,* 757 P.2d at 168-69. Before expecting an insurance company to take on that additional risk, the insured ought to take care that the policy by its terms covers such instruments, and that is particularly true [*394] when the insured (Harrah's) is the drafter of the policy.

III.

We need not take long in addressing Harrah's final argument--that the district court committed reversible error in striking the two affidavits of its insurance experts. First, contrary to ACE's contention, we have jurisdiction to review this ruling, as HN9⚓the appeal of a district court's final judgment "draws into question all prior non-final rulings and orders," *McLaurin v. Fischer,* 768 F.2d 98, 101 (6th Cir. 1985), including this interlocutory ruling.

Second, HN10⚓we review a district court's ruling on a motion to strike for an abuse of discretion. See *Adusumilli v. City of Chicago,* 164 F.3d 353, 359 (7th Cir. 1998); see also *Mohney v. USA Hockey, Inc.,* 5 Fed. Appx. 450, 2001 WL 223852, at *2 (6th Cir. 2001) [**18] . HN11⚓Under Rule 56(e) of the Federal Rules of Civil Procedure, "affidavits shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence." Fed. R. Civ. P. 56(e). "It is well settled that courts should disregard conclusions of law (or 'ultimate fact') found in affidavits" submitted for summary judgment. *F.R.C. Int'l. Inc. v. United States,* 278 F.3d 641, 643 (6th Cir. 2002). In this instance, there were no disputed questions of fact, and the "ultimate issue" before the court (in Harrah's words) was "whether or not the parties intended to insure the Loss caused by Mr. Li." Appellant Br. at 27. The affidavits offered in support of Harrah's interpretation did nothing more than reach a series of legal conclusions about this one issue. For example, both experts stated: "In my opinion, the [policy] was intended to provide coverage in the present situation. "JA 51. 64: "Insuring Agreement II provides coverage for the loss sustained by Harrah's," JA 52, 65; "it is also my opinion that Harrah's loss is covered under ... Insuring [**19] Agreement IV," JA 53. 66; they defined the terms "wrongful abstraction," "money order," and "express company," JA 52-53, 65-66; they opined that Li's actions were a "wrongful abstraction" under Insuring Agreement II, that the cashier's checks were "money orders" and that Bank of America was an "express company" under Insuring Agreement IV, JA 53-54, 65-67. As the two affidavits amounted to nothing more than legal conclusions, the district court did not abuse its discretion in striking them.

IV.

For the foregoing reasons. we affirm the district court's judgment.

Service: **Get by LEXSEE®**
Citation: **2004 U.S. App. Lexis 10663**
View: Full
Date/Time: Thursday, April 7, 2005 - 10:55 AM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
▧ - Questioned: Validity questioned by citing refs
▲ - Caution: Possible negative treatment
◆ - Positive treatment is indicated

- Ⓐ - Citing Refs. With Analysis Available
- Ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.