**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **OLLEN G. COLBERT** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | CASE NO. 1:00-CV-00909-SJD-TSH |
| | ) | |
| **CINCINNATI GAS & ELECTRIC and** | ) | JUDGE: J. Dlott |
| **INTERNATIONAL BROTHERHOOD** | ) | Magistrate Judge Hogan |
| **OF ELECTRICAL WORKERS,** | ) | |
| **LOCAL 1347** | ) | **BRIEF IN SUPPORT OF DEFENDANT** |
| | ) | **CINCINNATI GAS &** |
| | ) | **ELECTRIC COMPANY'S MOTION TO** |
| | ) | **STRIKE THE AFFIDAVITS OF** |
| | ) | **PLAINTIFF, DUDLEY QUARLES** |
| | ) | **AND LEON WATERS** |
| | ) | |
| **Defendants.** | ) | |

Plaintiff filed several copies of the Affidavit of Ollen Colbert along with the affidavits of Leon Waters and Dudley Quarles in connection with his responses to the defendants' respective Motions for Summary Judgment.[1] In his affidavits, Ollen Colbert makes legal arguments and expresses beliefs, neither of which are factual and therefore admissible. He also purports to testify to matters about which he already gave deposition testimony and/or which now contradict that testimony. As a result and under applicable law, the affidavits must be stricken.

"[I]t is well-established that '[a] party may not create a factual issue by filing an affidavit after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony.'" *Transou v. Electronic Data Systems Corp., 1993 U.S. App. LEXIS 4666 * 14,*

---

[1] This brief speaks to the affidavit filed by Colbert in response to CG&E's motion for summary judgment but is applicable to the affidavit he filed in response to the union's motion for summary judgment as well. To the extent the union files a separate motion to strike the affidavits, CG&E incorporates those arguments by reference.

quoting *Reid v. Sears Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986); accord, *Biechele v. Cedar Point Inc.* 747 F.2d 209, 215 (6th Cir. 1994). "The rationale for this rule is that ' if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Steier v. Michael M. Best*, 2004 U.S. App. LEXIS 13773 (6th Cir. 2004) quoting, *Biechele*, 747 F.2d at 215.

Furthermore, a plaintiff's attempt to explain away by affidavit, previous testimony or admissions, requires specificity under Fed. R. Civ. P. 56(e) (adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.) Plaintiff's mere assertions that something is unfair or discriminatory is not specific and therefore, not admissible. Under Rule 56, "[t]he non-moving party is not entitled to a trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986).

Under Fed. R. Civ. P. 56(e), "affidavits shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence." It is well-settled that "courts should disregard conclusions of law (or 'ultimate fact') found in "affidavits" submitted for summary judgment." *Harrah's Entertainment Inc. v. Ace American Insurance Co.*, 2004 U.S. App.LEXIS 10663 (6th Cir. 2004), quoting *F.R.C. Int'l, Inc. v. United States*, 278 F.3d 641, 643 (6th Cir. 2002). In *Harrah's* the court struck affidavits in which the parties "opined" on the ultimate question having to do with insurance coverage, finding that paragraphs in the affidavits that "in my opinion there is coverage" amounted to nothing more than legal argument on the very conclusion the parties wanted the court to reach.

Finally, where, as here, a case has been pending long enough for the parties to obtain discovery and where, as here, Colbert was examined at length, the court has good reason to "prevent that party from introducing new evidence in an affidavit opposing summary judgment." *Lockard v. General Motors Corp. 2002 U.S. App. LEXIS 25787 (6th Cir. 2002)*

Colbert was deposed three times and had every opportunity to give full answers, often indicating that he had no information, evidence or testimony in support of his claims, particularly the race discrimination claims. For example, in early 1999, Bricking counseled Colbert for blowing stickers off his truck with a power washer. (Colbert 11-11-04, p. 73). Colbert has no information that this counseling was based on race (Colbert 11-11-04, p. 74) or that if Bricking saw anyone else do the same thing, he failed to counsel them. (Colbert 11-11-04, p.73, Dep. Ex. 19). Colbert was counseled for taking company property off-premises without permission, an offense that Colbert concedes can lead to discipline (Colbert 11-11-04, p. 76). Colbert knows of no one who took company property off premises and was not counseled. (Colbert 11-11-04, p. 78). Colbert also testified that he knows of no white employees who left their key in the truck who did not receive counseling, a fact confirmed by Bricking. (Colbert 11-11-04, p. 92; Bricking p. 151) Nor could Colbert point to any employee who sat in their truck and waited for someone to bring them the key. (Colbert 11-11-04, p. 95). In July 1999, Bricking looked for Colbert in the yard to find out what he was doing and found him in a storeroom, ostensibly "cooling off". Colbert was not on break, had just come back from lunch, and had not finished his task. (Bricking pp. 152-153). Colbert testified that the storeroom did not have air conditioning although his assigned truck did (Colbert 11-11-04, p. 99, Dep. Ex. 24; Bricking p. 69, 76) and he knows of no white employee, caught in similar circumstances, who was not disciplined. (Colbert 11-11-04, p. 100). On August 24, 1999, Colbert and three other African-Americans were

permitted to go to the United Way tour. (Bricking pp. 87-88). The tour ended early, at approximately 10:30 in the morning and the others returned to work, something they simply knew to do since they were being paid. (Bricking pp. 90, 155-56). Colbert did not return to work. (Colbert 11-11-04, pp. 107-108, 111). He received a one-day suspension which he concedes cannot possibly be based on race given that the others returned to work, knew to do so, and were African-American. (Colbert 11-11-04, p.108, Dep. Ex. 26).

Colbert's subsequent affidavits are nothing more than "opinions" on ultimate conclusions and/or enhancements or contradictions of this testimony. Paragraphs 1 through 37 largely present information in the record in one form or another. To the extent Colbert is simply repeating information (in fact, citing to the deposition in some paragraphs), these paragraphs should be stricken. In Paragraphs 38 through and including 41, Colbert makes arguments such as CG&E "became more arrogant" or that CG&E breached the CBA without supplying any facts. As such the allegations lack specificity and should be stricken. In Paragraphs 42 through and including Paragraphs 66, Colbert makes assertions about grievances he allegedly instituted with respect to each disciplinary action he received from 1999 to the present. Here, although he was deposed at length about the disciplines, Colbert purports to add factual assertions that he did not make at the time of his deposition when he was asked about each disciplinary action and/or attempts to exonerate himself with self-serving statements. For example, in Paragraph 47, Colbert states other employees, who went to the United Way tour did not work the remainder of the day. In deposition, Colbert said that he did not know whether others returned to work. In Paragraph 48, Colbert states that his "tardies" were based on Bricking's attitude and claims that Bricking wrote him up without proof, not something he either testified to at deposition or can

*142911*                                                         4

substantiate with any facts (for example, a specific instance when he was not late but was written up anyway).

In connection with the event that led to his termination, the testimony was that on March 2, 2000, Colbert was scheduled to be at a grievance hearing at about 1:00 p.m. Because he was required to attend the meeting and would be paid for attending, he was also required to work the 1st half of that day (under the collective bargaining agreement, Colbert could not take a ½ day vacation). (Bricking p.146). Colbert testified that he understood this and that is why he reported to work. When he arrived, Wilson, the lead person, gave him two choices, paint or cut poles. (Bricking pp. 126-127) Colbert refused, claiming he did not want to get dirty. He was told that he would be let go early so that he could clean up. He still refused, and in front of his union representative, stated "suspend me." (Bricking pp. 128-131, 134) He was subsequently suspended and fired. (Colbert 11-11-04, pp. 121-124).

In his affidavit, Paragraph 53, Colbert now asserts that Bricking did not tell Miller that Colbert had to meet with his union representative before the grievance hearing on March 8, 2000. As a result, Colbert alleges that Bricking falsified the situation so that Colbert would be unfairly disciplined. There is not one shred of evidence that Bricking knew that Colbert had to meet with his representative as Colbert now claims and in fact, Bricking testified that he did not. Moreover, to bolster his argument that Bricking treated him unfairly, Colbert asks this court to take judicial notice of his drive time in Paragraph 54, suggesting that he was justified in refusing to do any work – which is not something this Court should or could do.

Colbert's assertions in Paragraphs 58 and 60, about what Bricking "was interested in" are not admissible since they relate to Bricking's state of mind and again, are unsupported by any facts. The assertion in Paragraph 63 regarding Bricking's alleged refusal to grant a full day

vacation is new testimony and not given in deposition despite that Colbert had full opportunity to tell his tale and failed to do so.  It also contradicts the fact that Colbert said at deposition, that he knew he had to work.

Paragraphs 69 through and including 76 also contain allegations that Colbert could have but did not make in deposition.  For example, in Paragraph 69, Colbert alleges that "I am the only black man to have been terminated by Bricking [which impliedly means a white man was terminated as well] when all of the actions for which I was disciplined were also performed from time to time by white employees . . ."  At deposition, as each instance of discipline was discussed, Colbert was given the opportunity to describe a similar situation and/or identify someone who had been treated differently and could not do it.  This, of course, is the heart of his race case and his inability to supply specifics, either then or now in this self-serving, contradictory affidavit, is the reasons why summary judgment should be granted and the affidavit stricken.

Although, at deposition, Colbert mentioned Ralph Kroger as someone who was treated differently, he could not then and still cannot now identify any situation involving Kroger that parallels plaintiff's situations.  Mere assertions that Kroger once was treated differently, without specific facts, do not meet the admissibility standards for affidavit testimony and should be stricken.

Paragraphs 72 through and including 75 are nothing more than iterations of plaintiff's beliefs, unsubstantiated in any way. Whether or not, for example, Colbert believes that Bricking was interviewed by the EEOC is neither factual nor material to the Court's resolution of the issues. Bricking testified he was not interviewed and that he was unaware of prior EEO charge. That is the evidence in this case and Colbert's beliefs to the contrary do not change those facts.

Again, contrary to his assertions in his affidavit, Colbert testified in deposition that Bricking was not his supervisor when the first four EEO charges were filed and that he, Colbert, never discussed them with Bricking. Any attempt to contradict that testimony through this affidavit in these paragraphs is inappropriate.

From Paragraphs 76 to 99, Colbert simply engages in argument, which has no place in an affidavit. Colbert lists the reasons he "feels" or believes that he was discriminated against, suggesting for example, in Paragraph 80 that the "history of unswerving [sic] application of the progressive and construction [sic] discipline policy . . . indicates an intent by the Company to discharge me." Colbert certainly is entitled to feel any way he wants, however; he must show that each of the events that led to his discharge, were either 1) untrue, 2) if not untrue, not a legitimate reason for discipline, or 3) if a legitimate reason, not normally a reason for discipline. In each instance of discipline, as enumerated in CG&E's opening brief in support of summary judgment, Colbert testified that he had no evidence of discriminatory treatment. While Colbert can assert that others were treated differently, as he has in certain paragraphs of this affidavit, his assertions are not enough; he must provide evidence as to who those people were, what situation they were in and how they were treated differently.

Likewise, assertions that Bricking must have been motivated by prior EEO filings, not only are contradictory to testimony that Bricking was unaware of them, but are based on nothing more than plaintiff's speculation. Colbert offers not the first bit of evidence that anyone at CG&E acted for any reason other than his extremely poor performance.

The evidence developed in the record, is that Colbert's African-American co-workers, had many complaints about his work performance – he now claims that they are lies (see Paragraph 86), but offers not information that would show that this is the case. In Paragraphs 86

*142911*  7

through 89, Colbert seeks to re-argue events that he testified about in his first case and which this Court ruled could be considered by CG&E in meting out subsequent discipline.

Paragraph 91 is a further example of the inappropriate nature of Colbert's affidavit. Colbert argues that he was not promoted (a claim precluded by Colbert's failure to timely file a complaint) and states "I also believe I had seniority for that appointment. Instead, I believe that Bricking filled the open position with a Caucasian when I was qualified." Again, there is no evidence that Colbert had seniority or that a Caucasian was chosen. Absent evidence, Colbert's beliefs have no bearing on the merits of this case.

Finally, Paragraph 94 through the remaining paragraphs of the Affidavit are nothing more than arguments formulated in terms of Colbert's beliefs, none of which are substantiated by any evidence that things are the way Colbert imagines them to be. The purpose of an affidavit is not to make arguments but to set forth evidence of the nature that would be admissible in evidence. For that reason those paragraphs should be stricken as well.

The affidavit of Dudley Quarles is unsigned and therefore, is not evidence in this case and should be stricken for that reason. Even had that affidavit been signed, it does not appear to be based on personal knowledge or on information of the type that is admissible. First, Quarles did not work with Colbert after 1999, when the various disciplines leading to discharge took place. (Quarles ¶4). Thus, he has no first hand knowledge of the events that led to the termination, who made them, or on what basis. Second, because Quarles was at Brecon between 1994 and 1999, and assuming (because the affidavit does not state) that the incidents he purports to testify about occurred at Brecon, his testimony concerning Ralph Kroger and Don Bricking create no comparables. It is undisputed that Bricking did not become supervisor at Brecon Yard until 1999. Therefore, Bricking was not in the same relationship to Kroger as he was to Colbert

(notwithstanding that there is nothing in the affidavit about the Kroger incident that would create a parallel between Kroger and Colbert). Moreover, statements that white supervisors supervised Colbert "more" or asked more questions about his performance than about others' fail for lack of specificity. In any event, such statements must mean that both black and white employees were treated differently, suggesting that performance, not race, was at work.

Likewise, Leon Waters, cannot give affidavit testimony that things would have turned out differently had Bricking given Colbert an inside job on the day that led to Colbert's termination (¶ 19) because this is nothing more than rank speculation. Nor, in reference to the need to go to a grievance hearing, can Waters testify that "this type of employee needs [sic] generally was handled without incident, based on the past pattern and practice of the Company." Waters is not a supervisor, offers no specifics on past events, was not a union steward at the time, and offers no basis for his statement. Likewise, there is no evidence to support the statement "For anyone else, the Company would simply provide a room to sit down and do some paper work until it was time to go." (¶ 15) Indeed, taking Waters' statement to its logical conclusion, what occurred simply cannot be based on race, since everyone else, both black and white, were accorded rooms and paperwork.

Because plaintiff's affidavits are rife with argument, unsubstantiated with any specific facts, individuals, times and dates, and/or contradict either testimony that was given or could have been given, they should all be stricken.

       Respectfully submitted,

       CINCINNATI GAS & ELECTRIC


       By: s/Ariane Schallwig Johnson
          Ariane Schallwig Johnson, #2104-45
          One of the Attorneys for Cincinnati Gas & Electric

**CERTIFICATE OF SERVICE**

  I hereby certify that on **April 7, 2005**, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Rose Ann Fleming
Rose Ann Fleming Professional Legal Corp.
3855 Ledgewood Drive, Suite 13
Cincinnati, OH 45207
fleming@xavier.edu

Jerry A. Spicer
Snyder, Rakay & Spicer
11 West Monument Building, Suite 307
Dayton, OH 45402
snyrakspi@aol.com

                   s/Ariane Schallwig Johnson
                   Ariane Johnson

Ariane Schallwig Johnson
LEGAL DEPARTMENT
CINERGY SERVICES, INC.
1000 E. Main Street
Plainfield, IN 46168
Telephone: 317/838-1285
Facsimile: 317/838-1842
ariane.johnson@cinergy.com