UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **OLLEN G. COLBERT** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | CASE NO. 1:00-CV-00909-SJD-TSH |
| | ) | |
| **CINCINNATI GAS & ELECTRIC** and | ) | JUDGE: J. Dlott |
| **INTERNATIONAL BROTHERHOOD** | ) | Magistrate Judge Hogan |
| **OF ELECTRICAL WORKERS,** | ) | |
| **LOCAL 1347**) | ) | **DEFENDANT CINCINNATI GAS &** |
| | ) | **ELECTRIC'S REPLY BRIEF IN** |
| | ) | **SUPPORT OF ITS MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| | ) | |
| **Defendants.** | ) | |

## I. INTRODUCTION

Colbert's reply to CG&E's and the union's motions for summary judgment miss the mark. Colbert misapprehends the nature of CG&E's collateral estoppel argument which simply is that Colbert cannot re-litigate the legitimacy of prior disciplinary action taken up through 1997, that prior disciplinary actions may be considered by CG&E in any decision to terminate Colbert, and that CG&E retains management authority over hiring, firing, promotion and termination decisions. Moreover, Colbert may not litigate claims based on four prior EEO charges for which he received Right to Sue Notices but did not timely file a complaint, and neither a "continuing violation" nor pattern and practice argument saves him. As to his panoply

of race claims (disparate treatment, hostile environment, and retaliation), Colbert is long on allegations and short on any substantiated facts and summary judgment is appropriate.[1]

In his response to the union's motion for summary judgment (and the argument CG&E raised in its motion) on his hybrid §301 claim, Colbert makes two arguments. First, he argues that CG&E was obligated to promote him if, in his view, he had a year of no disciplinary actions and second he argues that his termination in 2000 violated the CBA. Colbert's first claim is barred by the statute of limitations and in any event is without merit as there was no obligation under the CBA to promote him within a certain time frame, particularly where his subsequent performance was extremely poor. As to the second claim, Colbert cannot show that CG&E violated the CBA by considering his performance history in terminating him. In fact, the CBA gives CG&E the unfettered right to do so and Colbert is precluded from arguing otherwise. With respect to the union's representation of him, CG&E incorporates by reference the arguments advanced by the union in its reply, noting only that Colbert must prove both that CG&E violated the CBA and that the union acted arbitrarily and capriciously. If he fails on either element, both the union and CG&E are entitled to summary judgment on this claim.

---

[1] Plaintiff filed his own affidavit and the unsigned Quarles and signed Waters affidavits in support of his allegations. CG&E has moved to strike these in a separate filing. If those affidavits are considered and are intended to create an issue of fact on the discrimination claims, they fail to do so. First, the affidavits lack specificity, failing to provide any information about the identity of similarly situated individuals and the circumstances in which they were treated differently. Second, the affidavits contain general opinions and statements such as Colbert was "supervised by management much more than any other employee." Not only do these statements provide no evidence of disparate treatment but must mean that all other employees, both white and black, were subject to less scrutiny. It follows that any additional scrutiny to which Colbert was subject was not tied to his race. Similarly, allegations in the Waters and Quarles affidavits that white supervisors asked about Colbert's behavior is not racist, just logical, given Colbert's poor performance and continuous problems, particularly with black co-workers. Water's allegation that "if you reported Colbert was not industrious, Colbert was disciplined" suggests that Colbert was disciplined for his failure to work not his race. Finally, Water's allegations that Colbert received an outside work assignment on the day he had a grievance hearing but that "for anyone else, the Company would simply provide a room to sit down and so some paper work" not only lacks specificity but means that all other employees, both white and black, were treated similarly.

## II.    SUMMARY JUDGMENT IS APPROPRIATE
## ON PLAINTIFF'S TITLE VII CLAIMS

A.    <u>Issue Preclusion</u>

CG&E does not contend that all claims raised here were litigated in the lawsuit Colbert instituted in 1995. However, certain issues were litigated in that case and the rulings on those issues can be given preclusive effect in this suit. In Colbert's prior suit, the issue was whether CG&E violated a CBA with a management rights clause identical to the one here, when it disciplined Colbert and took into consideration his prior work history in doing so. In connection with those issues, the Court considered whether (1) Colbert had an adequate work performance, (2) that performance warranted discipline, and (3) that discipline violated the CBA. To the extent Colbert seeks to raise similar issues against CG&E in this lawsuit, his claims are estopped. Not only are those issues identical here, but the other elements of collateral estoppel are also present: the prior case was fully litigated, Colbert was given the opportunity to present evidence in response to CG&E's motion for summary judgment, the prior case was brought to final judgment, and, of course, the parties are identical.

This Court's findings in the prior case on the following points may be given preclusive effect in this case (1) the CBA's management rights clause in Art. 1, Section 9(a) gives CG&E the right to discipline Colbert on the basis of his performance; (2) Art. 1, Section 9(a) permits discipline, suspension and termination; (3) up through 1995, Colbert had thirteen incidents of discipline and received a demotion because of his work performance; (4) CG&E's disciplinary actions and demotion in 1995 did not violate any provision of the CBA and CG&E may consider Colbert's collective work history in meting out discipline;(5) CG&E was not required to remove any prior disciplinary records from Colbert's employment file under the CBA; and (6) it is not unreasonable for CG&E to be concerned with safety of its employees and the public in evaluating performance and giving discipline.

*142810*                                    3

Colbert cannot argue that CG&E unfairly considered his entire record each time it took the next step in the disciplinary process or for purposes of promotions or termination.

**B.       Certain of Colbert's Claims are Untimely**

Colbert failed to file suit within 90 days of receipt of four separate Right to Sue Notices having to do with events that unfolded before 1999, including the alleged decision not to consider him for promotion to Groundsperson Driver "A." Plaintiff argues that he can revisit all these claims either under a "pattern or practice" theory or a continuing violation theory. First, plaintiff has never made a pattern or practice claim in any filing at the EEOC. Thus, he is precluded from doing so here. His only viable claims arise from the last EEO filing in 2000 which is based on his termination in 2000. That charge contains no allegations of pattern or practice. Second, the continuing violation theory has nothing to do with a disparate treatment claim or for that matter, with a hostile environment claim if the events complained about are discrete acts that occur on single discrete days. *Tackett v. Marion County Fair Board, 272 F. Supp. 2d 686 (N.D. Ohio 2003).* In his prior EEO charges, Colbert complained about discrete events; instances of discipline or a failure to promote. In fact, because Colbert filed a separate charge on each of these events, he took the position that they were discrete discriminatory events. He cannot now argue that they created a hostile environment of which he was unaware until a sufficient number of events had occurred. "The statute of limitations accrues in response to a discriminatory act, not in response to the effects of past acts." *Trzebuckowski v. City of Cleveland, 319 F.3d 853,858 (6th Cir. 2003).*

**C.      Colbert Offers No Evidence of Race Discrimination, Harassment or Retaliation.**

     **1.      Colbert has no direct evidence of race discrimination.**

Direct evidence is that which "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor." *Bartlik v. United States Dep't of Labor*, 73 F.3d 100, 103, n.5 (6th Cir. 1996). In other words, direct evidence is of a nature that does not require inference. The arguments Colbert makes in this portion of his response essentially are arguments that others, similarly-situated, were treated differently. Colbert claims that he was disciplined for denting a company vehicle (an event he does not deny) and that this is direct evidence that he was discriminated against because Bricking chose to believe facts as reported by the African-American lead person (who said that the dent was not there when Colbert took the vehicle) rather than Colbert (who initially denied denting the vehicle but then snuck the vehicle to the garage to have it repaired). How this proves that CG&E was motivated by race is inexplicable. Colbert also argue that he can prove discrimination because *he alleges* that Ralph Kroger was treated differently, offering no proof whatsoever that Ralph Kroger was involved in a similar event, had the same supervisor,[2] or that Kroger was treated differently. His mere assertions that this is the case are not enough to defeat summary judgment.

Colbert's other argument is he was not promoted after a brief period without discipline. He claims Kroger was promoted. However, Colbert testified both in the prior case and in this case, that he knows of no one who had the same performance record or as many disciplines as did he. Thus, even if Kroger was promoted (and assuming all other facts surrounding Kroger and Colbert are the same), Colbert cannot show that Kroger was similarly situated. The fact that

---

[2]   Based on the unsigned affidavit of Dudley Quarles, submitted by Colbert, it appears that Ralph Kroger and Colbert were not similarly situated. Quarles' affidavit indicates that he did not work with Colbert after 1999, when the various disciplines leading to discharge took place. (Quarles ¶4). Quarles was at Brecon between 1994 and 1999, and assuming (because the affidavit does not state) that the incidents about which he purports to testify occurred at Brecon, his testimony concerning Ralph Kroger can create no comparables because Kroger would have reported to someone else. Bricking testified that that he became the supervisor at the Brecon Heavy Equipment yard, where Colbert worked, in January 1999. (Deposition of Donald Bricking, 12-10-04, p. 9, 10-11).
.

*142810*                                                      5

Colbert's work history was so poor is a proper basis for distinguishing his treatment from that of others. *Transou v. Electronic Data Systems Corp.,* 1993 U.S. App. LEXIS 4666 (6th Cir. 1993).

In *Transou,* plaintiff, like Colbert in this case, admitted to making errors but argued that others did as well, without offering proof that this was the case. The employer, on the other hand, offered affidavits from supervisors that plaintiff made errors far more frequently and was not similarly-situated to other employees. On appeal, the court upheld summary judgment for the employer on this basis finding that the other employees were not similarly-situated.

    **2.**    **Colbert's attempt to make a prima facie case of race discrimination fails.**

Colbert argues that he is able to make a prima facie showing of discrimination by proving he is a minority, was qualified for his position, suffered an adverse employment action and was treated differently than other similarly-situated employees. To show that he suffered an adverse employment action, Colbert relies on the time-barred claim that he did not receive a promotion in 1999. It is undisputed that Colbert filed an EEO charge on this claim, received a Right to Sue Notice and did not file a complaint. He cannot now claim that this alleged "failure to promote" is the adverse employment action for which he can seek redress.[3]

Colbert then returns to the same argument he made in the "direct evidence" portion of his brief, claiming that he was disciplined more harshly than other similarly-situated white employees, relying on a pre-1999 event involving Ralph Kroger. The record is simply silent on what Ralph Kroger allegedly did, when he did it, where he did it, what was proven, who his supervisor was at the time, what discipline was meted out, and Kroger's overall performance history. As discussed above, the record is silent on whether Bricking was even the supervisor when Kroger was involved in the alleged event. "[T]o be deemed 'similarly situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the

---

[3] Colbert is not seeking to use the time-barred 1999 event as evidence of a "pattern" of discrimination or in connection with his hostile environment claim. He relies on this event as the basis of his race discrimination complaint on page 7 of his brief.

*142810*

same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *Warfield v. Lebanon Correctional Inst.*, 181 F. 3d 723 (6th Cir. 1999) (concluding a discrimination plaintiff has the burden to establish that the other employee's acts are comparably serious to his or her own infraction); *Williams v. Cargill, Inc.,* 159 F. Supp. 2d 984 (S.D. Ohio 2001) (comparing oneself to others who have not committed similar acts of comparable seriousness fails to demonstrate disparate treatment).

Colbert also makes assertions concerning unspecified events in or around 1995 allegedly involving Mr. Hatfield, which are equally unhelpful to his case. Although Colbert seems to want to re-visit the discipline he received for an accident he was involved in 1995 and compare himself to Mr. Hatfield, he does not show what Mr. Hatfield did, where and when he did it, what his performance record was prior to the accident, who his supervisor was at the time, and what discipline he received. Most importantly, it is clear that Bricking was not the supervisor involved in any events at that time, meaning the situations cannot be comparable.

Colbert also points to an event involving Mike Ryan about whom Colbert complained. He does not, however, claim that Ryan was not disciplined, testifying instead that he does not know whether Ryan was disciplined. Hence, Colbert has no evidence that Ryan was treated more favorably.

Simply asserting that certain events are discriminatory is not enough. *Vaughn v. Watkins Motor Lines, Inc.,* 291 F.3d 900 (6th Cir 2002). Subjective beliefs and feelings are insufficient to prove discrimination based on race. *Ngeunjuntr v. Metropolitan Life Insurance Co.*, 146 F.3d 464 (7th Cir 1998); *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of age

discrimination"); *Rin Das v. The Ohio State University,* 2003 U.S. App. LEXIS 2236 (6th Cir. 2003) (employee failed to produce competent objective materials evidence to prove discriminatory animus and disprove defendant's articulated legitimate business reason for her discharge).

### 3. Colbert cannot show that CG&E's stated reasons for his termination are a pretext.

To makes a showing of pretext, Colbert must offer evidence that (1) the reason proffered by employer has no basis in fact; (2) the reason did not actually motivate the adverse action; or (3) the reason is insufficient to motivate adverse action. *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).* In other words, Colbert must produce sufficient evidence from which the jury could reasonably reject CG&E's explanation and infer intentional discrimination. *Braithwaite v. Timken, Co., 258 F.3d 488 (6th Cir 2001).*

At deposition, as outlined in CG&E's initial brief, each event for which Colbert was disciplined was discussed with him. In many instances, Colbert does not deny that the events occurred or that they were a legitimate basis for discipline. For example, Colbert did not deny that blowing stickers off his car, taking company property off premises, tardies, absences, cussing at a supervisor, refusing to work, all occurred and/or are basis for discipline nor did he deny co-workers made complaints. His mantra at deposition was simply that others did not face similar discipline, never offering any specifics, either because no other similar circumstances occurred or because he was aware of none.[4]

---

[4] For example, in early 1999, Bricking counseled Colbert for blowing stickers off his truck with a power washer. (Colbert 11-11-04, p. 73). Colbert has no information that this counseling was based on race (Colbert 11-11-04, p. 74) or that if Bricking saw anyone else do the same thing, he failed to counsel them. (Colbert 11-11-04, p.73, Dep. Ex. 19). Colbert was next counseled for taking company property off-premises without permission, an offense that Colbert concedes can lead to discipline (Colbert 11-11-04, p. 76). Colbert knows of no one who took company property off premises and was not counseled. (Colbert 11-11-04, p. 78). Colbert also testified that he knows of no white employees who left their key in the truck who did not receive counseling, a fact confirmed by Bricking. (Colbert 11-11-04, p. 92; Bricking p. 151) Nor could Colbert point to any employee who sat in their truck and waited for someone to bring them the key. (Colbert 11-11-04, p. 95). In July 1999, Bricking looked for Colbert in the yard to find out what he was doing and found him in a storeroom, ostensibly "cooling off". Colbert was not on

To the extent Colbert seeks to contradict his deposition testimony with affidavit testimony in which he alleges that he was treated differently, the affidavit is inappropriate and should be stricken.

In any event, Colbert's reliance on events long ago misses the big picture. Colbert's termination was the result of his cumulative poor performance from the outset of employment through 2000. And in that regard, Colbert has no comparables; no one, black or white, had the same poor performance record, with 22 instances of documented disciplines and countless counseling. Moreover, there is a complete absence of any evidence that this type of record would not, ordinarily, lead to termination.

**4.     There is no evidence that Colbert was terminated based on his EEO charges.**

Colbert argues that because he filed five EEO charges, Bricking did not like him and therefore, sought to terminate him. To make a prima facie case of retaliation, a plaintiff must prove that he engaged in protected activity; the defendant knew it; the defendant thereafter, took adverse employment action or subjected the plaintiff to harassment and that there is a causal connection between the protected activity and the adverse employment action or harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784 (6th Cir. 2000).

First, at deposition, Colbert testified that Bricking was not his supervisor at the time he filed his first four EEO complaints (Colbert 11-11-04, p. 64) and that he did not discuss them with Bricking. (Colbert 11-11-04 pp. 126-127). Thus, Colbert's characterization of those charges

---

break, had just come back from lunch, and had not finished his task. (Bricking pp. 152-153). Colbert testified that the storeroom did not have air conditioning although his assigned truck did (Colbert 11-11-04, p. 99, Dep. Ex. 24; Bricking p. 69, 76) and he knows of no white employee, caught in similar circumstances, who was not disciplined. (Colbert 11-11-04, p. 100). On August 24, 1999, Colbert and three other African-Americans were permitted to go to the United Way tour. (Bricking pp. 87-88). The tour ended early, at approximately 10:30 in the morning and the others returned to work, something they simply knew to do since they were being paid. (Bricking pp. 90, 155-56). Colbert did not return to work. (Colbert 11-11-04, pp. 107-108, 111). He received a one-day suspension which he concedes cannot possibly be based on race given that the others returned to work, knew to do so, and were African-American. (Colbert 11-11-04, p.108, Dep. Ex. 26).

142810                                                                 9

at pages 13 and 14 of his brief as unfair do nothing to tie those charges to Bricking or retaliation. The fifth charge was filed after Colbert was terminated and cannot be a basis for a retaliation claim.

 Second, Colbert gets no mileage from timing. The first four EEO charges were filed well before Colbert was terminated – Colbert's fourth charge, filed on July 23, 1999, was filed almost a year before Colbert was terminated.

 Third, even were the timing closer, this record is void of any evidence that the EEO charges were causally connected to any subsequent discipline. "[E]vidence that harassment occurred soon after a plaintiff engaged in protected activity is not sufficient to establish a causal link, absent other evidence of a retaliatory motive." *Schramm v. Slater, 2004 U.S. APP. LEXIS 14889 (6th Cir. 2004); citing Nguyen v. City of Cleveland, 229 F.3d 559,566 (6th Cir. 2000).* The only other "evidence" Colbert offers is his opinion that the subsequent discipline was unfair. Whether or not Colbert agrees with discipline he received is not the issue; the issue is whether the events for which he was disciplined occurred (and Colbert does not claim they did not) and whether, but for the filing of an EEO charge, he would have been disciplined. Colbert seeks to create an inference that he would not have been disciplined because other similarly-situated individuals were treated differently, but offer no specifics. The fact that Colbert's version of events involving Tom Sams and his final day at work do not match with what others, principally African-Americans, told Bricking and that Bricking found others to be more credible, does not prove, even inferentially, that Bricking was motivated by retaliation in meting out discipline.

 Fourth, Colbert's poor disciplinary track record was established long before Bricking became Colbert's supervisor. Bricking testified that he was unaware of Colbert's prior work history other than in the general sense and actually told Colbert that as far as he was concerned, Colbert had the chance to wipe the slate clean. (Bricking p. 53). Colbert testified that he had no

*142810*             10

information that Bricking was out to "get him" because of prior complaints. His only support for his retaliation claim is his view that management is "tight-niched" and could seal his fate with one telephone call, which he concedes is also true for white employees. (Colbert 11-11-04, p.128).

Fifth and finally, Colbert cannot overcome the fact that Bricking did not make discipline and termination decisions. Bricking testified and it is undisputed that if the discipline involved any more than documented counseling, Bricking sought input and guidance from his superior and human resources. There is no evidence and not even conjecture by Colbert that these decision makers were motivated by EEO filings.

### 5.   The fact that Colbert was disciplined for poor performance does not create a hostile environment.

To establish a prima facie case of hostile work environment based on race, Colbert must show that he (1) is in a protected class, (2) was subjected to unwelcome racial harassment, (3) the harassment was based on race, (4) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile or offensive work environment, and (5) the employer is liable. *Hafford v. Seidner*, 183 F.3d 506,512 (6th Cir. 1999).

Colbert does not claim that anyone engaged in racially hostile behavior, made racial slurs or used epithets or that he was ridiculed because of race. He simply re-alleges that he should not have been disciplined for the events that were discussed with him in deposition at great length and which he now seeks to re-cast in his affidavit. Non-racial conduct, including discipline, cannot form the basis of a hostile environment claim unless Colbert can show that but for his race, he would not have been subjected to that discipline. *See, Bowman v. Shawnee State University*, 220 F.3d 456,463 (6th Cir. 2000). As discussed above and in CG&E's opening brief, Colbert cannot show that but for his race, he would not have been disciplined for his various workplace infractions.

### III. COLBERT'S § 301 CLAIM AGAINST CG&E CONCERNING A FAILURE TO PROMOTE IS LATE AND WITHOUT MERIT.

In a § 301 action, a plaintiff must prove two interrelated things: first, plaintiff must show that the employer breached a collective bargaining agreement and second, that the union, which represents him, breached its duty of fair representation. *Del Costello v. Int'l Brotherhood of Teamsters, 462 U.S. 151,165 (1983)*. Unless plaintiff can show both parts of the claim, he cannot recover against either the union or the employer. *White v. Anchor Motor Freight, Inc., 899 F.2d 555,561 (6th Cir. 1990).*

Despite the need to prove two things, plaintiff never alleged that CG&E violated the CBA until CG&E filed a motion for summary judgment. On that ground alone, summary judgment is appropriate for CG&E on all §301 claims. *See Simoneau v. General Motors Corporation, 2003 U.S. App. LEXIS 26607 (6th Cir. 2003)* (where plaintiff's complaint failed to allege union breached its duty of fair representation – one of the two elements necessary for a hybrid § 301 claim – summary judgment was appropriate).

Even if Colbert's bare recitation of § 301 is enough to create a viable cause of action against CG&E, Colbert's claim now based on an alleged breach of a settlement agreement reached in 1995 and finalized in 1997, is barred by the six-month statute of limitations.

Colbert contends that CG&E breached the settlement agreement arising from his demotion in 1995 when it failed to reinstate him to position of Groundperson Driver "A" following a brief period when he did not receive discipline. A hybrid § 301 claim is subject to the six month statute of limitations contained in 29 U.S.C. § 160(b); *DelCostello, 462 U.S. at 164-65*. "A hybrid cause of action accrues and the six-month limitations period begins to run when the plaintiff 'knew or should have known'" of CG&E's breach of the collective bargaining agreement and the union's attendant breach of fair representation. *Hanley v. Intern'l Brhd of*

*Locomotive Engineers,* 2003 U.S. App. LEXIS 13626 (6th Cir. 2003). Typically, the claim against the union accrues when the period to file a grievance expires or, if the grievance is filed, when the plaintiff knows the grievance will not be pursued. This determination is objective "the asserted actual knowledge of the plaintiff is not determinative if [he] did not act as reasonable persons and, in effect, closed [his] eyes to evident and objective facts concerning the accrual of [his] right to sue." *Id.* at **17, quoting *Chrysler Workers Ass'n v. Chrysler Corp.* 834 F.2d 573, 579 (6th Cir. 1987)

Colbert signaled that he was aware of his claim based on an alleged breach of the settlement letter when he filed an EEO charge against CG&E in July 1999. Moreover, in his affidavit, filed in support of his response to summary judgment, Colbert asserts that he was aware that the union would not pursue a grievance on this issue on May 17, 1999. (Colbert ¶ 34). This lawsuit was not filed until October 2000, more than six months after Colbert knew or should have known both of any alleged breach by CG&E and the union's decision not to grieve the alleged breach. His claim is barred and subject to summary judgment.

In any event, Colbert cannot show how, if at all, CG&E violated the CBA and any settlement agreement, because the CBA, under which that settlement was reached is no longer in effect, meaning that there is no contract from which that claim arises over which this Court has jurisdiction, *see Bauer v. RBX Industries, Inc.* 368 F.3d 569 (6th Cir. 2004) and nothing in that settlement abrogated CG&E's right to make promotion decisions or to consider prior disciplinary action in making that decision or obligated CG&E to give Colbert a promotion or even consider him for one after about a year without discipline. As Colbert aptly notes, the letter agreement ultimately reached states: ". . .[W]e have decided to withdraw this grievance . . . 'if and when Mr. Colbert maintains a satisfactory work record for a *significant period of time*, the Company will *consider* him for future job openings in the Groundperson Driver "A" job classification.'"

Nothing in that agreement required CG&E to promote Colbert much less after a certain amount of time.

As to the claim that his termination is unfair and violates the CBA, Colbert is collaterally estopped from arguing that CG&E violated the CBA by disciplining him for his work performance. In Colbert's prior suit, the issue was whether CG&E violated the CBA, containing a management rights clause identical to the one here when it disciplined Colbert and took into consideration his prior work history in doing so. To the extent Colbert seeks to raise similar issues against CG&E in this lawsuit, his claims are barred.

The effect of the prior disciplines was that Colbert could ill-afford insubordination on March 2, 2000, his final day of work. It is undisputed on that day that 1) Colbert was scheduled to work his normal job for at least ½ of the day; 2) coveralls were available; 3) and Colbert was given the opportunity to change or clean up. Colbert's decision to refuse his assignment, in the face of his prior disciplinary record, was at his own risk. He testified that he knew that further discipline could lead to discharge and that this remained true through the time of his discharge. (Colbert 11-11-04, pp. 46 and 47)

Nothing in the CBA obligated CG&E to assign paperwork when an employee is scheduled for a grievance hearing. Colbert is entitled to pay on days when he spends time on grievance-related activities. But, because his grievance was in the afternoon and he was not taking a vacation day, he was obligated to work the first half of the day, and indeed he wore work clothes and was prepared to work, as both he and Leon Waters testified. The company retains the contractual right to make work assignments and Colbert's refusal, no matter whether he believed it was warranted, were adequate grounds for discipline. Given his prior discipline history, there is no question that CG&E was within its rights in terminating him and Colbert has not shown otherwise.

Without offering specifics, Colbert seems to be suggesting that CG&E did not follow the progressive disciplinary steps in terminating him. Bricking testified that he followed CG&E practice and moved from oral to written warnings, and then to one-, three- and five-day suspensions to termination. (Bricking p. 30). Bricking also testified that beyond the oral warning stage, he sought input from higher management and human resources and in doing so, provided them with documentation that he made at or near the time of the events concerning Colbert. (Bricking pp. 30, 34, 163, Dep. Ex. 41-51). Bricking explained that oral warnings are for inappropriate behavior, followed by written warnings for more severe infractions or the same behavior again. (Bricking pp. 32-33). Suspensions could be for more serious infractions or the same infractions that led to prior oral and written warnings. (Bricking p. 33). Although one could receive several oral warnings, for example, before receiving a written warning, the number of prior disciplines could affect what would happen next. In short, there is no evidence that the decision to terminate Colbert, given his prior work history violated the CBA. Accordingly, CG&E is entitled to summary judgment.

## IV.  **CONCLUSION**

Based on the undisputed evidence, defendant CG&E respectfully requests that summary judgment be entered in its favor and against Colbert on all claims in Colbert's complaint against it, including the Title VII and § 301 claims.

        Respectfully submitted,

        CINCINNATI GAS & ELECTRIC COMPANY,

        By: s/Ariane Schallwig Johnson
           Ariane Schallwig Johnson, #0077236
           One of the Attorneys for Cincinnati Gas &
           Electric

## CERTIFICATE OF SERVICE

       I hereby certify that on **April 7, 2005**, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Rose Ann Fleming
Rose Ann Fleming Professional Legal Corp.
3855 Ledgewood Drive, Suite 13
Cincinnati, OH 45207
fleming@xavier.edu

Jerry A. Spicer
Snyder, Rakay & Spicer
11 West Monument Building, Suite 307
Dayton, OH 45402
snyrakspi@aol.com

                                                     s/Ariane Schallwig Johnson
                                                     Ariane Johnson

Ariane Schallwig Johnson
LEGAL DEPARTMENT
CINERGY SERVICES, INC.
1000 E. Main Street
Plainfield, IN 46168
Telephone: 317/838-1285
Facsimile: 317/838-1842
ariane.johnson@cinergy.com