UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| OLLEN G. COLBERT | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CASE NO. 1:00-CV-00909-SJD-TSH |
| | ) | |
| CINCINNATI GAS & ELECTRIC and | ) | JUDGE: J. Dlott |
| INTERNATIONAL BROTHERHOOD | ) | Magistrate Judge Hogan |
| OF ELECTRICAL WORKERS, | ) | |
| LOCAL 1347 | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CG&E'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO
MAGISTRATE'S REPORT AND RECOMMENDATION**

Defendant, Cincinnati Gas & Electric Company ("CG&E"), by its counsel and in response to the Objections filed by Plaintiff to the Magistrate's Findings, Recommendations and Report Granting Summary Judgment to Cinergy/The Cincinnati Gas & Electric Company, requests that the objections be denied in their entirety and that this Court enter an order adopting the Magistrate's report and recommendation granting CG&E its motion for summary judgment.

First, plaintiff has failed to timely file objections and therefore, has waived the right to object. The Magistrate Judge's Report and Recommendation in this matter was filed on May 20, 2005 and served electronically on the parties. Pursuant to a notice attached to the Magistrate Judge's Report and Recommendation, plaintiff was informed that he had ten (10) days after being served a copy of the Report to file any objections, referring specifically to Fed. R. Civ. P. 72(b) which contains the 10-day time limitation. The Advisory Committee Notes to Rule 72(b) indicate that "the 10-day period, as specified in the statute, is subject to Rule 6(e) which provides for an additional 3-day period when service is made by mail." Under Rule 6(e), if service is

made as prescribed under Rule 5(b)(2)(D) -- namely, by electronic means to which the party has consented (as is the case here), three days are added to the prescribed period. Thus, plaintiff had a total of 13 days to file his objection. The Magistrate Judge's notice also informed plaintiff that a failure to timely file the notice would result in the waiver of any further appeal.

Thirteen days after service would have made plaintiff's objections due on June 2, 2005. Plaintiff did not file his objections until June 6, 2005. Accordingly, his objections are waived and this Court may enter an order adopting the Magistrate Judge's Report and Recommendation.

Second, if not waived, the objections are not valid. Initially, Colbert complains that the Magistrate failed to hold CG&E to the Collective Bargaining Agreement because it imposed progressive discipline and then terminated plaintiff while he was grieving some of the disciplinary steps. The Magistrate Judge correctly noted that if Colbert's §301 claim fails either as against the union or CG&E, it fails as a matter of law. Not only must Colbert show that CG&E breached the collective bargaining agreement, but he must also show that the union acted arbitrarily and capriciously. He cannot do either, both because CG&E was not obligated to disregard discipline on which grievances were pending and had a sufficient basis to fire him anyway and because the union's decision not to take certain discipline to arbitration is not a basis for a §301 claim.

Colbert points to no applicable and valid case law or any portion of the collective bargaining agreement that prohibits the employer from imposing successive disciplinary steps merely because the employee has grieved some other step. In an earlier brief, Colbert cited *United States Postal Service v. Gregory,* for the proposition that an employer cannot fire an employee while grievances are pending. In citing *Gregory*, plaintiff conflated a citation to an earlier but overruled and vacated appellate opinion (212 F.2d 1296) with the subsequent

Supreme Court opinion (Sup. Ct. 00-758, 2001). In point of fact, the *Gregory* case stands for exactly the opposite and relates to proceedings before the Merit Systems Protection Board, which by law, is required to analyze prior disciplinary actions under a standard applicable only to that Board. In making this analysis, the Supreme Court held the Board may validly and appropriately consider disciplinary actions that are currently being grieved. *534 U.S. 1, 122 S.Ct. 431*.

In looking at the collective bargaining agreement, the Magistrate Judge correctly held that certain facts have been established and that Colbert is collaterally estopped from arguing them again. In a lawsuit filed in 1995, Colbert made arguments that certain discipline he received violated the collective bargaining agreement because CG&E took his history of even earlier disciplinary actions into consideration. After full opportunity to conduct discovery and be heard in that suit, this Court made the following findings: (1) the CBA's management rights clause in Art. 1, Section 9(a), gives CG&E the right to discipline Colbert on the basis of his performance; (2) Art. 1, Section 9(a) permits discipline, suspension and termination; (3) up through 1995, Colbert had thirteen incidents of discipline and received a demotion because of his overall work performance; (4) nothing in the CBA prevents CG&E from considering Colbert's collective work history in meting out subsequent discipline including the demotion; and (5) CG&E is not required to remove any prior disciplinary records from Colbert's employment file. Those principles, having been established in earlier litigation, were correctly part of the basis for the analysis in this litigation.

Taking these established facts and adding to them the fact that (1) the management rights clause does not require that any of the steps be taken in any order (2) that the progressive discipline policy says "Typically, employee self-discipline and mutual cooperation are relied upon to maintain efficiency and harmony in our working relationships. For those occasional

instances, however, when an employee is unable or unwilling to do his or her part, supervisors are authorized to take prompt corrective action. Such corrective action may vary from a warning to an immediate discharge. The seriousness and/or frequency of violations are the primary factors considered by management when determining the disciplinary measures to be applied." (Bricking Dep. Ex. 3) (that is to say, steps can be skipped), (3) prior disciplinary history always can play a part in subsequent decisions, and (4) the sheer volume of poor performance (39 incidents over 10 years) Colbert amassed, there was an adequate basis to terminate Colbert even if certain grievances were pending. Colbert conveniently segments his employment history for purposes of this argument, ignoring the fact that he had more discipline than anyone else, that he had an ongoing history of disciplinary and performance problems, and that he was not showing improvement.

Nothing in the collective bargaining agreement contain a requirement that pending grievances be disregarded. The fact that an employee has the right to grieve under Section 9(d) does not "expressly abridge" the employer's right, under Section 9(a), to terminate for further violations.

Colbert's next argument is almost incomprehensible. It appears that he is objecting to the Magistrate Judge's conclusion that a claim based on a "failure to promote" in 1999 under §301 is time-barred under the six-month statute of limitation. That limitations period was announced in *Del Costello v. Int'l Brotherhood of Teamsters, 462 U.S. 151, 165 (1983)* and is strictly enforced. Colbert testified that he was aware on May 17, 1999, that the union would not file a grievance on this claim (See Colbert's Affidavit ¶ 34). Since a §301 action accrues when a plaintiff knows or should know that a grievance will not be filed, Colbert had to file a §301 action on his failure to promote claim within 6 months of May 17, 1999. His October 2000 lawsuit was untimely.

Colbert refers to EEO charges and a theory based on continuing violations neither of which have anything to do with a §301 claim.

Colbert's fourth objection is not to finding that the Magistrate Judge made in his Report and Recommendation concerning a lack of evidence that someone similarly situated was treated differently. Rather, it is a collateral attack on an earlier discovery ruling by the Magistrate Judge denying Colbert's last minute attempt to engage in what should have been initial discovery in the preceding four years. This objection is inappropriate under Fed. R. Civ. P. 72(b). It is also unfair. Colbert had over 4 years to conduct discovery and seek documents pertaining to other employees. He chose not to do this discovery and instead, waited until the discovery cut-off lapsed to request documents. When CG&E objected, plaintiff filed a motion to extend discovery not only to take one deposition but to seek documents pertaining to a host of other employees.[1] After full briefing, the Magistrate Judge ruled that Colbert could take the one requested deposition but could not engage in additional paper discovery noting that Colbert had previously made a total of ten requests for extension during the past two years. Colbert has no one but himself to blame for his lack of evidence. Notwithstanding, at deposition, when given a chance to testify about other similarly-situated individuals, Colbert categorically testified that he was unaware of such individuals.

Next, Colbert contends that the Magistrate Judge erred in ruling on his retaliation claim. The Magistrate Judge ruled that plaintiff engaged in protected activity when he filed successive EEO charges up through July 1999. But as the Magistrate Judge also noted, Colbert must link the filing of those charges to the disciplinary actions that occurred subsequently and to do that,

---

[1] Colbert alleges that he was deprived of the opportunity to depose co-employee Kroger and Kroger's supervisor and therefore, could not show that Kroger was similarly situated but treated differently with respect to an incident involving damage to a company truck. Colbert never sought either deposition and never requested an extension of the discovery deadline for that purpose. To now claim the Magistrate Judge denied him that opportunity is plainly wrong and unfair.

*150340*            5

Colbert relied solely on temporal proximity. The Magistrate Judge then correctly concluded that where an employee steps up insubordinate and inadequate performance, he can not gain mileage from that behavior by arguing a subsequent termination is temporally related to prior EEO filings. "[E]vidence that harassment occurred soon after a plaintiff engaged in protected activity is not sufficient to establish a causal link, absent other evidence of a retaliatory motive." *Schramm v. Slater, 2004 U.S. APP. LEXIS 14889 (6th Cir. 2004); citing Nguyen v. City of Cleveland, 229 F.3d 559,566 (6th Cir. 2000).*

Here, Colbert was terminated for his entire work history, not just the events that post-dated the last EEO filing. In his objections, Colbert argues the Magistrate did not consider his assertions that he was not late (presumably meaning that one of his suspensions was at least partially baseless). Plaintiff's assertions are not sufficient to create a genuine issue of material fact, particularly in light of Bricking's uncontested testimony that he personally observed Colbert's late arrival on several occasions. (Bricking p. 103.) Moreover, tardiness was just one aspect of Colbert's on-going disciplinary issues, all of which were outlined in CG&E's motion for summary and some of which preceded the July 1999 EEO charge.

The only other "evidence" is Colbert's opinion that the subsequent discipline was unfair. Whether or not Colbert agrees with discipline he received is not the issue; the issue is whether the events for which he was disciplined occurred (and Colbert fails to show that they did not). Colbert may disagree about whether he should receive discipline, but it is uncontested that the following occurred and that Colbert could not link any of them either to his EEO filing or his race.

- In early 1999, Bricking counseled Colbert for blowing stickers off his truck with a power washer. (Colbert 11-11-04, p. 73). Colbert has no information that this counseling was based on race (Colbert 11-11-04, p.

150340                                                    6

    74) or that if Bricking saw anyone else do the same thing, he failed to counsel them. (Colbert 11-11-04, p.73, Dep. Ex. 19). Colbert was next counseled for taking company property off-premises without permission, an offense that Colbert concedes not only can lead to discipline (Colbert 11-11-04, p. 76) but, was not be based on race. (*Id.*) Colbert knew of no one who took company property off premises and was not counseled. (Colbert 11-11-04, p. 78). Moreover, Colbert conceded that the incident was reported by Willie Wilson, an African-American and that if Bricking relied on Wilson's report, Bricking would not be basing his reliance on race. (Colbert 11-11-04, p. 83).

- Likewise, when Colbert was formally disciplined for failing to stay with a pole truck in June 1999, the discipline was based on a report from the pole truck drive, Vince Rutledge, also African-American. Rutledge reported that Colbert failed to stay with him, one of *several* complaints Bricking received about Colbert, all from African-American drivers. (Bricking pp. 58-59, 83, 86, 149-150; Colbert 11-11-04, Dep. Ex. 21). Colbert claimed that the pole truck driver ran a red light and he was justified in leaving the truck (Colbert 11-11-04, p. 86-87) but concedes that Bricking's decision to rely on Rutledge's version of events rather than Colbert's denial, would not have been based on race. (Colbert 11-11-04, pp. 85, 87). Moreover, he does not contest Bricking's testimony that the warning was based on more than one complaint from several drivers.

- On June 28, 1999, Colbert was warned when he not only failed to put his truck keys away and left them in his truck, but then came in the next day, sat in his truck, and refused to go in to get his keys to begin his work assignment. (Colbert 11-11-04, Dep. Ex. 28, p. 93,[2] Bricking pp. 64-65, 150-151). Again, the key was collected and reported as having been left in the truck by Willie Wilson, an African-American. (Colbert 11-11-04, p.

---

[2] Colbert's testimony on this incident is a classic example of his dissembling. Initially, Colbert denied that he sat in his truck waiting for someone to bring him the key until he was handed a document that he wrote in which he stated that he had done just that. (Colbert 11-11-04, p. 93-94, Dep. Ex. 23).

89) Colbert testified that he knew of no white employees who left their key in the truck who did not receive counseling, a fact confirmed by Bricking. (Colbert 11-11-04, p. 92; Bricking p. 151) Nor could Colbert point to any employee who sat in their truck and waited for someone to bring them the key. (Colbert 11-11-04, p. 95).

- Next, Colbert and another African-American co-worker, Jeff Gregg, got into a tussle when Colbert refused to do his assignment. (Colbert 11-11-04, p. 97). Colbert claimed that Gregg threatened him with a metal bar but concedes that if Bricking took Gregg's word over his, that decision would not be based on race. (*Id.*; Bricking p. 81) Likewise, Leon Waters, another African-American, complained that Colbert literally laid down in the yard and refused to work. (Bricking p.160) which Colbert concedes would not be a complaint based on race. (Colbert 11-11-04, p. 98).

- In July 1999, Bricking looked for Colbert in the yard to see what he was doing and found him in a storeroom, ostensibly "cooling off". Colbert was not on break, had just come back from lunch, and had not finished his task. (Bricking pp. 152-153). Colbert testified that the storeroom did not have air conditioning although his assigned truck did (Colbert 11-11-04, p. 99, Dep. Ex. 24; Bricking p. 69, 76) and he knows of no white employee, caught in similar circumstances, who was not disciplined. (Colbert 11-11-04, p. 100). For this incident, Colbert received another warning. (Colbert 11-11-04, Dep. Ex. 24).

- In August 1999, Willie Wilson took Colbert to his assigned location and parked his truck for him because Colbert was having trouble parking in close quarters. Wilson told Colbert to call him if he needed help pulling the truck out. Wilson subsequently found Colbert in the yard garage, asking to have a dent repaired that had not been there that morning. Colbert denies the event, but concedes that if Bricking took Wilson's story into account along with the matching dent on the door in the area in which Colbert was working, his decision to discipline Colbert for failing to report the accident would not be based on race. (Colbert 11-11-04, p. 105)

150340                                  8

- On August 24, 1999, Colbert and three other African-Americans were permitted to go to the United Way tour. (Bricking pp. 87-88). The tour ended early, at approximately 10:30 in the morning and the others returned to work, something they simply knew to do since they were being paid. (Bricking pp. 90, 155-56). Colbert did not return to work. (Colbert 11-11-04, pp. 107-108, 111). He received a one-day suspension which he concedes cannot possibly be based on race given that the others returned to work, knew to do so, and were African-American. (Colbert 11-11-04, p.108, Dep. Ex. 26).

- On or about October 15, 1999, Colbert got into a verbal altercation with Tom Sams, another African-American, in which he cussed at Sams in a loud and hostile manner in front of a witness. (Colbert 11-11-04, pp. 112-113; Bricking pp. 96, 100). If, based on the report of Sams and another witness, Bricking decided to impose discipline as a result of this incident, Colbert concedes that this is not racial. (Colbert 11-11-04, p.113). This event, coupled with on-going problems with tardiness as documented by Bricking, resulted in a three-day suspension meted out on October 25, 1999. (Colbert 11-11-04, p.115, Dep. Ex. 27; Bricking pp. 96, 103). Colbert understood his attendance was critical; as he put it, "All job's attendance is critical." (Colbert 11-11-04, p.119).

- Colbert therefore, should not have been surprised when, in December 1999, he received a 5-day suspension for continued attendance problems, the first absence coming just 4 days after his October 25, 1999 suspension. (Colbert 11-11-04, p.119; Bricking p. 109). Colbert testified that nothing in that suspension is based on race (Colbert 11-11-04, p.120) **and conceded that he was absent on the days in question**. (Colbert 11-11-04 p.119).

- On March 2, 2000, Colbert was scheduled to be at a grievance hearing at about 1:00 p.m. Because he was required to attend the meeting and would be paid for attending, he was also required to work the 1st half of that day (under the collective bargaining agreement, Colbert could not take a ½ day

vacation). (Bricking p.146). Wilson, the lead person, gave him two choices, paint or cut poles. (Bricking pp. 126-127) Colbert refused, claiming he did not want to get dirty. He was told that he would be let go early so that he could clean up. He still refused, and in front of his union representative, stated "suspend me." (Bricking pp. 128-131, 134) He was subsequently suspended and fired. (Colbert 11-11-04, pp. 121-124).

Bricking testified he was unaware of EEO filings and was giving Colbert a clean slate effective 1999 when he took over. (Bricking p. 53). And even if Bricking was aware of a filing in July 1999, Colbert testified that his only support for his retaliation claim was his view that management is "tight-niched" and could seal his fate with one telephone call, which he concedes is also true for white employees. (Colbert 11-11-04, p.128). Colbert also failed to overcome the fact that Bricking did not make discipline and termination decisions. Bricking testified and it is undisputed that if discipline involved any more than documented counseling, Bricking sought input and guidance from his superior and human resources. There is no evidence and not even conjecture by Colbert that these decision makers were motivated by EEO filings.

Finally, Colbert attacks the Magistrate Judge's findings on the hostile environment claim arguing that the "long history and frequency of discriminatory conduct" is sufficient to show a hostile environment claim. Merely because Colbert claims discipline was unfair or discriminatory does not make it so. As outlined above and more extensively in the briefs in support of its Motion for Summary Judgment, Colbert had a long history of poor performance – there is no evidence that he received discipline for that poor performance based on race – not the first comment, document, or even complaint against him, particularly as most of those were made by African American co-employees. Colbert may believe that he is always in the right, but that does not mean that if others choose to believe his African American co-workers who tell a

different story, that any resulting discipline is harassment; particularly when there is not a single similarly-situated person. Colbert simply misuses the word.

>Respectfully submitted,
>
>CINERGY CORP.
>
>
>By:  s/Ariane Schallwig Johnson
>Ariane Schallwig Johnson, #2104-45
>One of the Attorneys for Cincinnati Gas &
>Electric

## CERTIFICATE OF SERVICE

I hereby certify that on **June 14, 2005**, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Rose Ann Fleming
Rose Ann Fleming Professional Legal Corp.
3855 Ledgewood Drive, Suite 13
Cincinnati, OH 45207
fleming@xavier.edu

Jerry A. Spicer
Snyder, Rakay & Spicer
11 West Monument Building, Suite 307
Dayton, OH 45402
snyrakspi@aol.com

>s/Ariane Schallwig Johnson
>Ariane Johnson

Ariane Schallwig Johnson
LEGAL DEPARTMENT
CINERGY SERVICES, INC.
1000 E. Main Street
Plainfield, IN 46168
Telephone: 317/838-1285
Facsimile: 317/838-1842
ariane.johnson@cinergy.com

150340                                11